UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Larry Randall Powell, Lawrence | § | |
| William DeOre, Paula F. Watson, | § | |
| Gary Van West, Raul Prezas Reyes, | § | |
| Timothy Arthur O'Leary, Jan Michael | § | |
| Hubbard, Michael S. Coons, John Paul | § | |
| Chamless, Ira Hadnot Alexander, Deborah | § | |
| Sue Voorhees, Linston Robert Lofley, | § | |
| Karen Patterson, Linda Jones, Gary Stratton, | § | |
| Ewina H. Schumacher, Paulette | § | |
| Ladach, and Stephen Wayne Yount, | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. 3-06CV1960-B |
| | § | |
| vs. | § | |
| | § | |
| The Dallas Morning News L.P.; | § | |
| Belo Corp.; G. B. Dealey Retirement | § | |
| Pension Plan; Belo Savings Plan; Belo | § | |
| Benefits Administrative Committee, as | § | |
| plan administrator for the G.B. Dealey | § | |
| Retirement Pension Plan and the Belo | § | |
| Savings Plan, Robert W. Decherd and | § | |
| James M. Moroney III, | § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## AMENDED COMPLAINT AND JURY DEMAND

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs Larry Randall Powell, Lawrence William DeOre, Paula F. Watson, Gary Van West, Raul Prezas Reyes, Timothy Arthur O'Leary, Jan Michael Hubbard, Michael S. Coons, John Paul Chamless, Ira Hadnot Alexander, Deborah Sue Voorhees, Linston Robert Lofley, Karen Patterson, Linda Jones, Gary Stratton, Ewina H. Schumacher, Paulette Ladach, and Stephen Wayne Yount file their Amended Complaint and Jury Demand[1] and complain of

---

[1] Plaintiffs amend their Complaint pursuant to the Court's June 28, 2007 Memorandum Order. Although the Court

Defendants The Dallas Morning News L.P., Belo Corp., G. B. Dealey Retirement Pension Plan, Belo Savings Plan; Belo Benefits Administrative Committee, as plan administrator for the G.B. Dealey Retirement Pension Plan and Belo Savings Plan; Robert W. Decherd and James M. Moroney III and respectfully show the Court as follows:

## I.  The Parties

1.      Plaintiffs are individuals who are current or former citizens of the State of Texas and at all relevant times were employed by Defendants The Dallas Morning News L.P. ("Morning News L.P.") or Belo Corp. in Dallas County, Texas.  Plaintiffs timely filed charges of discrimination with the Equal Employment Opportunity Commission and they file this complaint within ninety (90) days of receiving a notice of the right to sue from the EEOC.

2.      To the extent applicable, Plaintiffs bring this lawsuit as a collective action pursuant to section 216(b) of the Fair Labor Standards Act, and would request permission to allow parties to opt in as necessary.

3.      Defendant Morning News L.P. is a limited partnership organized under the laws of the State of Delaware, and has entered an appearance.

4.      Defendant Belo Corp. ("Belo") is a corporation organized under the laws of the State of Delaware, and has entered an appearance.

5.      Defendant G. B. Dealey Retirement Pension Plan ("Belo Pension Plan" or the "Pension Plan") and the Belo Savings Plan are employee benefit plans sponsored by Defendant Belo.  Each has entered an appearance.

6.      Defendant Belo Benefits Administrative Committee (the "Committee") is the administrator of the above-referenced plans, and has entered an appearance.

---

granted in part Defendants' Motion to Dismiss certain of Plaintiffs' claims, Plaintiffs have reasserted certain of those claims to preserve them for appeal or reconsideration by this Court.

---

**AMENDED COMPLAINT AND JURY DEMAND – Page 2**

7.      Defendant Decherd is President and CEO of Belo Corp.  Moroney is publisher and CEO of The Dallas Morning News.  Each has entered an appearance.

8.      A copy of this complaint also is being served upon the Secretaries of the U.S. Department of Labor and the Department of the Treasury by certified mail, return receipt requested, pursuant to 29 U.S.C. section 1132(h) of ERISA.

## II.  Federal Jurisdiction

9.      This Court has jurisdiction over this lawsuit under Title 28, sections 1331 and 1343 of the United States Code because certain of the causes of action arise under the Employee Retirement Income Security Act ("ERISA") (29 U.S.C. §1001 et seq.) and the Age Discrimination in Employment Act ("ADEA") (29 U.S.C. § 623, et seq.)

10.      The Court has supplemental jurisdiction over the non-federal claims under section 1367 of Title 28 of the United States Code.  The jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights guaranteed by federal law, which rights provide for injunctive and other relief for illegal discrimination in employment and deprivation of civil rights, and to obtain fair compensation for employment.

11.      Defendants Morning News and Belo, acting singly or in concert, are and were at all relevant times employers in Dallas County, Texas and employed more than 500 regular employees.

12.      Defendants Morning News L.P. and Belo also, at all times relevant to the causes of action asserted, engaged in an industry or enterprise affecting commerce.

## III.  Facts

**A.     Plaintiffs Are Former Belo Employees**

13.     Defendants Morning News L.P. and Belo own and publish a newspaper, The Dallas Morning News ("DMN").  Belo is a media company that owns television, newspaper, cable and interactive media assets.

14.     Plaintiffs Powell, DeOre, Watson, West, Reyes, O'Leary, Hubbard, Coons, Chamless, Alexander, Voorhees, Lofley, Patterson, Jones, Stratton and Yount worked in the DMN newsroom department as writers, editors or artists.

15.     Plaintiffs Schumacher and Ladach worked in the information technology ("IT") and circulation departments, respectively, at Defendant Morning News L.P. or Belo.

16.     On October 27, 2004, Defendants terminated Plaintiffs' employment in a reduction in force ("RIF").  Most of the Plaintiffs, like many of the other terminated employees, were over age 40–and most were over 50–and nearing retirement; Plaintiffs collectively had provided hundreds of years of service to Defendants Belo and the Morning News L.P.

**B.     The Circulation Fraud Announced by Belo in 2004**

17.     On August 5, 2004, less than three months before the RIF, Defendant Belo through its chief executive officer Defendant Decherd announced that:

> (a)     Belo had misrepresented the DMN's circulation numbers to employees, investors, advertisers, readers and the public; and
>
> (b)     Belo would refund over $23 million to advertisers as a result of the false circulation numbers.  (Belo bases newspaper advertising rates on the number of readers of a particular media product.)

18.     Belo's August 5, 2004 announcement had an immediate adverse impact on the company's stock values.

C.    **Belo's 2004 Reduction in Force**

19.    On September 29, 2004, Defendant Belo announced that:

(a)    Belo would reduce its overall workforce by approximately 250 positions, the majority of which would be at DMN; and

(b)    the selection of individuals for termination in the RIF would be based on the elimination of positions and would not be based on merit.

D.    **The Targeting of Active Participants in the Belo Pension Plan**

20.    On information and belief, Plaintiffs Powell, DeOre, Watson, Reyes, O'Leary, Coons, Chamless, Alexander, Voorhees, Lofley, Jones, Stratton, Yount and Schumacher ("Plaintiff Pension Plan Participants") were among a decreasing number of Belo employees who remained eligible to accrue benefits ("Active Participants") under the Belo Pension Plan.

21.    In 2000, Defendant Belo announced it would limit the number of Active Participants in the Belo Pension Plan, and on March 16, 2000, Belo began to notify employees that:

(a)    the Pension Plan had been amended and employees hired after June 30, 2000 (except certain union employees of The Providence Journal, one of the media products owned by Belo) would not be eligible to participate in the Pension Plan;

(b)    employees would be required to elect in writing either to continue as an Active Participant or to opt out of the Belo Pension Plan;

(c)    employees who opted out of the Belo Pension Plan would become eligible to receive  benefits, in the form of Belo contributions, under an enhanced 401(k) plan under the Belo Savings Plan ("Enhanced 401(k)");

(d) employees who did not opt out of the Belo Pension Plan would remain eligible to participate in the classic 401(k) plan under the Belo Savings Plan, and Belo would continue to provide matching benefits but in a lesser amount; and

(e) employees who elected to remain as Active Participants in the Belo Pension Plan after June 30, 2000 would continue to accrue benefits under that Plan until the employee terminated employment with all Belo companies.

22. The Belo Pension Plan provides that:

(a) monthly pension benefits are calculated under the Plan's formula;

(b) generally, employees who retire at the "normal" retirement age under the Plan (65) would have their monthly basic pension benefits calculated based on the employees' years of credited service and Final Monthly Compensation, as defined in the Plan;

(c) qualifying employees between ages 55 and 64 could receive early retirement benefits, with the monthly pension benefits determined as of the date the employee retired ("Early Retirement Date");

(d) in the event of early retirement, the pension benefits would be reduced by a stated percentage for each month that the employee retired before age 65; and

(e) benefit values accelerated between ages 55 and 65.

23. Beginning in March 2000, Defendant Belo informed its employees that:

---

(a)    younger employees would enjoy certain advantages by electing to opt out of the Belo Pension Plan, as the Enhanced 401(k) would provide them with greater control over their retirement accounts; more flexibility if they did not wish to retire with Belo; access to their accounts before retirement; portability and a potentially greater return on their investments; and benefits that would accrue more rapidly in the early years of their careers than under the Pension Plan;

(b)    the Belo Pension Plan would be a better plan for participants with a greater number of years of service as its main focus was to reward long-term service and provide an incentive for long-term employees to stay with Belo; thus the Plan had been drafted to provide for faster acceleration of benefit values in the later years of the employees' careers, as they approached retirement;

(c)    Belo would become "more competitive" by providing more "contemporary" employee benefits such as the Enhanced 401(k), which would assist the company in attracting and retaining "new" employees in today's "increasingly mobile" and "technology-based" market;

(d)    the company would achieve "significant" savings over the next few decades by reducing pension costs, including "burdensome pension administrative expenses";

(e)    employees were required to contribute under the classic 401(k) plan in the Belo Savings Plan; under the Enhanced 401(k), no employee contribution would be required and Belo would make automatic contributions;

**AMENDED COMPLAINT AND JURY DEMAND – Page 7**

(f)    most of Belo's matching contributions to the classic 401(k) plan and all to the Enhanced 401(k) were invested automatically in Belo series B common stock; employees age 55 and over could transfer the value; and

(g)    the value of the Belo stock in the employees' accounts would be affected by the company's performance.

**E.    Information Withheld by Belo Beginning in January 2003**

24.    On August 9, 2004, four days after Belo's CEO Robert Decherd publicly disclosed the circulation fraud, he wrote a memo to "Belo colleagues," in which he stated that:

(a)    in June 2004 he had instructed Belo's senior management to review circulation practices at all of Belo's newspapers;

(b)    certain questionable circulation practices were reported to him "the week before last" and that he had "immediately" ordered a "stepped-up investigation" to uncover "all of the pertinent facts";

(c)    an investigation was being conducted and a report would be delivered to the Audit Committee of the Belo Board of Directors within six to eight weeks;

(d)    Belo had made public its findings, was moving to change its circulation procedures and was developing a plan to compensate advertisers "in a fair and expeditious manner";

(e)    Belo had communicated "forthrightly and speedily" about the "overstatement and about our response," beginning with Morning News L.P. employees;

(f)    Decherd knew that a personal concern to many was the impact that such news would have on Belo's stock price; and

(g)    the circulation situation was "serious."

25.    Defendants Belo and Decherd, in making their many public disclosures through August 5, 2004, failed to state that:

(a)    in January 2003, Decherd had received a letter from a circulation contractor stating that DMN circulation numbers were being significantly overstated, and that Belo's general counsel, David Starr, had attempted to convince the contractor to turn over to Belo copies of the letter and related documents;

(b)    Belo in 2003 had conducted an investigation of the contractor's allegations and had cleared itself but had not publicly announced the findings or the reports of circulation fraud or informed employees, investors, advertisers, readers or the public;

(c)    Belo after January 2003 continued to contribute Belo stock to employees' accounts in the Belo Savings Plan, as part of its employer contributions;

(d)    Belo on August 1, 2004 had amended the Pension Plan and Savings Plan to exclude from eligibility as Active Participants in the Pension Plan all new employees of The Providence Journal, but had failed to inform DMN and most Belo employees and Plan participants of the major amendments to the Plans; and

(e)    the U.S. Department of Labor in 2004 had issued an "early warning" notation indicating that Belo's contributions to at least one of its employee benefit plans were delinquent for plan year 2003.

26.    On September 29, 2004, Belo issued a press release, in addition to the release announcing the RIF, in which it stated that:

(a)    it had concluded its investigation of the "circulation overstatement" announced on August 5, 2004, and had determined that the fraud had resulted from an aggressive pursuit of circulation goals by former senior circulation managers;

(b)    Belo did not have adequate procedures in place, but there was no evidence of improper activity by current senior executives, including Defendant Decherd, who on information and belief had authorized or participated in the investigation; and

(c)    Belo had a "strategy for the future" to address Wall Street concerns about its stock values, which would include the workforce reduction announced that day.

**F.    Belo's Severance Plan**

27.    During the weeks leading up to the RIF, Defendants Morning News L.P. and Belo announced that employees whose positions were eliminated in the RIF would be paid a severance amount of one week's salary for each "year of service" to Belo.

28.    The term "year of service" is defined in the Belo Pension Plan and the Belo Savings Plan to include a total of the years each employee was employed by Belo or one of its subsidiaries, even if the service years had not been continuous.

29.    Belo failed to pay Plaintiff Hubbard severance based on his total years of service, which were not continuous.

30.     Belo also failed to provide several of the Plaintiffs with copies of a written severance plan or any written information regarding the severance plan, although requested by Plaintiffs.

**G.     The Targeting of Older Employees**

31.     Beginning in 1998, a representative of Defendants Morning News L.P. and Belo publicly announced that Defendants had concerns about the "graying of the newsroom" at DMN.

32.     In 2002, a DMN manager publicly announced that the newspaper was hiring a new Editorial Department manager, Keven Willey, to help "rejuvenate" that Department.  Ms. Willey replaced Rena Pederson, who was over age 50 and more than ten years older than Ms. Willey.

33.     In the two years preceding the RIF, DMN's publisher, Defendant Moroney, and DMN 's managing editor, Robert Mong, made speeches to employees announcing the "Newspaper of the Future,"a restructuring of DMN which would include a focus on regional rather than national news and the publication of new media products in an attempt to reach certain audiences.

34.     Specifically, Defendant Moroney announced that DMN would target wealthy Collin County readers; younger readers through Dallasnews.com and Quick, a free publication designed to appeal to readers under age 40; and the rapidly expanding Hispanic market in North Texas through Al Dia, a Spanish-language publication.

35.     During the same two-year period, DMN replaced additional older department heads in the newsroom with younger managers.

36.     Defendant Moroney and Mong made speeches informing employees that they wanted them to be more flexible and willing to assume multiple roles, and required them to

exhibit "passionate virtuosity," which Mong said was lost over time in the daily grind of the newspaper industry.

37.    Many employees under age 40 were assigned to work for Dallasnews.com and Quick; many Hispanic employees were assigned to Al Dia.

38.    The environment at DMN became hostile for many employees over age 40, some of whom became the subject of derogatory comments based on their ages, made by younger managers; some were targeted in reviews by the younger managers, including older employees with medical problems, as DMN began to focus on hiring younger writers, editors and artists.

39.    Many DMN employees over age 40 were stereotyped as:

(a)    inflexible and unable to adapt to new technology or to assume multiple job responsibilities, although the older employees had filled many positions throughout their careers;

(b)    difficult to work with; and

(c)    unlikely to accept the changes Defendant Moroney and Mong associated with the "Newspaper of the Future," which by Moroney's accounts would be tied more to marketing based on reactions of "focus groups" for target audiences rather than on excellent, ethical journalism.

40.    On information and belief, Defendants Morning News L.P. and Belo did not have in place, or did not enforce or properly oversee, objective criteria to guide managers in selecting employees who would be terminated in the RIF, and in the weeks leading up to the announcement of the RIF, Defendants transferred certain employees to new positions or assigned new job duties to ensure "safe" or "unsafe" positions.

41.    Defendants Morning News L.P. and Belo then hired employees under age 45 to fill many of the positions and assume the job duties of Plaintiffs and other employees over age 45 whose jobs purportedly had been eliminated in the RIF.

42.    Four long-term employees in the Editorial Department, all age 47 or older, purportedly had their positions terminated in the RIF, although DMN immediately reassigned all or most of their job duties or replaced them, then recruited applicants for one such "eliminated" position, and filled it with an employee in her early 30s.

43.    Defendants Morning News L.P. and Belo also gave inconsistent reasons for the selection of the Plaintiffs for termination in the RIF, first asserting that the terminations were based solely on the elimination of job positions.  When Defendants' assertions were rebutted, Defendants next stated that some of the terminations were based on merit, although at the time of the RIF they repeatedly stated that the terminations were not merit-based.

44.    Defendants Morning News L.P. and Belo also gave inconsistent statements on the reasons for the RIF itself, as they reported to employees that growth for Belo was not good in 2004, and the outlook for growth in the future looked bleak, while reporting otherwise to stockholders.

## IV.  Claims

### Count One:  ERISA Violations: Interference With Pension Plan Benefits
### (Against Defendants Morning News L.P., Belo, Decherd, Moroney, and the Committee; Relief Sought Against Belo Pension Plan)

45.    Plaintiff Pension Plan Participants throughout their employment remained Active Participants in and beneficiaries of the Belo Pension Plan, an employee benefit plan subject to ERISA.

46.     On information and belief, many of the other employees terminated in the 2004 RIF were Active Participants in the Belo Pension Plan at the time of their termination.

47.     Belo knowingly terminated those Plaintiffs and additional employees because of their continued participation in the Belo Pension Plan, for the purpose of interfering with their rights under that Plan.

48.     On information and belief, at all relevant times Defendants Morning News L.P. and Belo acted as sponsors or administrators of the Belo Pension Plan, through Defendants Decherd or Moroney or the Committee.  Defendant Decherd served as chairman of the Belo Board of Directors, which was required under the Pension Plan to select a Committee chairman and which retained the authority to amend the Pension and Savings Plans.  Defendant Moroney, on behalf of Defendant Morning News, L.P., had the authority to petition the Board to allow Defendant Mornings News, L.P. to opt out of participating in the Plans, and to contribute cash rather than Belo stock to Plaintiffs' Savings Plan accounts as their employer's matching contributions.

49.     The Committee administered certain aspects of the Belo Pension Plan and the Belo Savings Plan.  The Committee consisted of certain members who acted as principals of or on behalf of Defendant Belo or entities in which Defendant Belo owned an interest.

50.     Defendants Morning News L.P., Belo, Decherd, Moroney and the Committee, acting singly and in concert, violated the provisions of ERISA by terminating or causing to be terminated Plaintiffs' employment because they continued as Active Participants under the Pension Plan and for the purpose of interfering with the attainment of their rights under that Plan.

51.     Plaintiff Pension Plan Participants seek to recover all benefits due or to become due to them under the terms of the Belo Pension Plan, had their employment not been wrongfully

terminated, and also seek judgment awarding them all additional damages and equitable relief to which they are or may be entitled as a result of Defendants' ERISA violations.

52.     Plaintiff Pension Plan Participants have engaged the undersigned attorneys to bring this lawsuit and have agreed to pay those attorneys a reasonable fee for their services, which Plaintiffs seek to recover as allowed under ERISA, together with costs and interest as allowed by law.  Plaintiffs also seek to recover additional attorneys' fees in the event this case is appealed to the court of appeals or the United States Supreme Court, and Plaintiffs prevail in such an appeal.

**Count Two:  Additional ERISA Violations**
**(Against Defendants Morning News L.P., Belo, Decherd, Moroney and the Committee;**
**Relief Sought Against Belo Savings Plan,)**

53.     Defendants Belo and Morning News L.P., acting singly and in concert with Defendants Decherd, Moroney and the Committee, continued to contribute Belo stock, or to cause it to be contributed, to fund a portion of the company's obligations to the Belo Savings Plan, an employee benefit plan subject to ERISA, in which Plaintiffs were participants and beneficiaries, but failed to contribute cash in lieu of Belo stock, to amend the Plan or to request its amendment, although authorized to do so, to require contributions other than Belo stock while withholding information known by Defendants in 2003 that:

(a)     on information and belief, Belo's contributions to at least one Belo employee benefit plan were delinquent for plan year 2003;

(b)     in January 2003 significant circulation "overstatements" had been reported to one or more of the Defendants by knowledgeable employees in the DMN Circulation Department;

(c)     Belo would have potential liability to employees, advertisers, investors, lenders and Belo shareholders if its circulation numbers had been overstated, regardless of the cause of the misstatement;

(d)     the overstatements directly and significantly affected Belo's revenue and would impact revenue in 2003, 2004 and beyond;

(e)     Belo's stock value would be adversely affected due to announcements of significant revenue overstatements and significant refunds to advertisers and shareholders and liability incurred due to the overstatements;

(f)     the overstatements were significant as to DMN's circulation; in 2003, the group of newspapers owned by Belo generated approximately 52 percent of Belo's revenues; within that group, DMN generated approximately 60 percent of revenues;

(g)     any decline in Belo's stock value due to Belo's conduct would decrease the value of the employees' benefits under the Belo Savings Plan.

54.     Despite Decherd's and Moroney's knowledge of the circulation overstatement in January 2003, they waited until August 5, 2004 to reveal the overstatement.

55.     On August 1, 2004, Belo made major amendments to the Belo Pension and Savings Plans, as described in the "Facts" section above, but failed to notify Plan participants of the amendments, in violation of ERISA disclosure requirements.

56.     Decherd, acting in concert with Moroney, signed SEC filings and press releases, and participated in conferences with investors and analysts in 2003 and 2004, in which he withheld material information and provided false or misleading information about Belo's

revenue, which directly impacted Belo stock value. Decherd and Moroney engaged in the following conduct in Dallas, Texas:

    (a)    Defendant Decherd certified a May 12, 2003 form 10-Q filed with the Securities and Exchange Commission ("SEC"), stating that *DMN* circulation for the six-month period ended on March 31, 2003 was 533,567 for daily papers and 786,594 for Sunday papers, when the true circulation numbers were 11.4 percent and 16.6 percent lower for daily and Sunday papers, respectively; *DMN* suffered 15 and 20 percent declines, respectively, from 2003 through 2005 in its daily and Sunday circulations for in-home delivery; Defendant Decherd also falsely certified that he had no knowledge of any information that would affect the information reported for Belo; that the company's financial statements were accurate; and that the company's internal controls were adequate.

    (b)    Defendant Decherd certified the SEC filing although he had been informed in January 2003 of fraudulent circulation practices and pressure on circulation managers to manipulate the circulation numbers, and DMN had terminated the employment of several circulation managers, indicating that the manipulation was not isolated.

    (c)    The practice of providing bonuses and incentives to circulation managers, and lack of oversight and sufficient controls, found by Belo to be major causes of the circulation manipulation, remained in place into 2004.

    (d)    Decherd failed to disclose in any press releases, employee meetings held in Dallas, Texas, employee memos or SEC filings in which he participated

that circulation overstatements at DMN had been revealed in Belo's investigation into a January 2003 report of circulation fraud at DMN; that advertisers had been overcharged as a result, going back to at least 2000; and that Belo had failed to adjust its reported revenue to provide for reimbursement to defrauded advertisers; and failed to disclose potential liabilities resulting from the circulation fraud.

(e)     On information and belief, on May 3, 2004, before Decherd announced the circulation fraud, he sold 40,000 shares of Belo stock, for over $1.1 million.    Decherd sold an additional 80,000 shares of Belo stock November 3, 2003 and March 1, 2004.    Defendants Decherd and Moroney, however, failed to disclose information, and provided false information, in numerous other press releases and SEC filings listed below.

(f)     On May 20, 2003, June 19, 2003 and July 25, 2003, Defendant Decherd issued or caused to be issued press releases on behalf of Defendants Belo and Morning News, L.P., falsely stating that DMN's circulation had increased over the prior year, when Defendants knew that the circulation had decreased.

(g)     On August 11, 2003, Defendant Decherd certified and caused to be filed with the SEC on behalf of Defendant Belo a form 10-Q, in which Defendants again falsely stated the circulation numbers for daily and Sunday papers and falsely stated that Belo had in place sufficient internal controls to support the statements made about the company's financial

information.  Defendant Decherd again failed to disclose the circulation overstatements, the company's findings with regard to the investigation, including the finding that circulation numbers had been overstated and that the company had failed to adjust revenues to reflect reimbursements to defrauded advertisers.

(h)    On August 20, 2003 and September 15, 2003, Defendant Decherd issued or caused to be issued press releases on behalf of Defendants Belo and Morning News, L.P., falsely stating that DMN's circulation had increased .7 percent for daily and 1.3 percent for Sunday papers over the previous year.

(i)    On February 6, 2004, Defendant Decherd issued a press release regarding Defendant Belo's performance for 2003.  Decherd falsely stated that circulation increased at DMN in 2003, when Decherd knew the circulation numbers were being significantly overstated.  Decherd failed to disclose that circulation at DMN was significantly less than the stated numbers.

(j)    On March 4, 2004, Defendant Decherd certified a form 10-K filed with the SEC on behalf of Belo, in which he again falsely reported Belo's revenues, as he knew the stated income was based on fraudulent circulation numbers at DMN; Decherd failed to report that the revenue was based on false numbers or that Belo would incur liability to advertisers due to the overstatements; he also failed to disclose that Belo did not base the reported financial information on accepted accounting methods or that Belo lacked adequate internal controls.

(k)    On May 19, 2004, Defendant Decherd issued or caused to be issued a press release stating Belo's financial performance for April 2004. The circulation numbers were overstated by 5.1 and 11.9 percent for daily and Sunday papers, respectively.

(l)    On information and belief, Moroney in 2003 and 2004 met with circulation managers and participated in the investigation into circulation fraud, yet in 2003 certified false circulation numbers to the Audit Bureau of Circulation ("ABC,"), which oversees circulation reporting within the newspaper industry.

(m)    On information and belief, Moroney also assisted Decherd with preparing and announcing the statements in the 2003 and 2004 press releases and SEC filings as listed in this paragraph.

57.    Decherd as chairman of the Belo Board of Directors appointed key members of the Committee, who in turn appointed the remaining members of the Committee; many were Belo principals and officers who reported to Decherd; the Committee members failed to conduct an independent investigation or analysis of Belo's, Decherd's or Moroney's conduct in significantly overstating Belo revenue in 2003 and 2004; and failed to take action against Belo to recover losses to the value of the Plan benefits due to Belo's conduct.

58.    Defendants Decherd, Moroney and members of the Committee, who also acted as principals of Belo, knew or should have known that the artificially inflated circulation numbers would cause artificial inflation of Belo's financial results, because those results were derived, in large part, from the circulation results of DMN; regardless of this knowledge, Decherd, acting with Moroney, issued public statements listing DMN's circulation and public financial

statements containing artificially inflated financial results; he thus was severely reckless in disregarding that DMN, and therefore Belo, was recognizing revenue it had not earned.

59.     To the extent Defendants Morning News L.P., Belo, Decherd, Moroney and the Committee acted as ERISA benefit plan sponsors, administrators or fiduciaries, they breached their fiduciary duties or otherwise violated ERISA as follows:

(a)     by wrongfully denying Plaintiffs and other Belo Pension Plan and Savings Plan participants the benefits and information to which they are entitled under ERISA during and following their employment with Defendants Morning News L.P. and Belo;

(b)     by failing to disclose that any Belo contributions to ERISA plans were delinquent for plan year 2003, to the extent required by ERISA;

(c)     by failing to disclose to Pension and Savings Plan participants the August 1, 2004 amendment to the Plans;

(d)     by knowingly making false or misleading statements about Belo revenue, while withholding damaging information about circulation fraud for over one and one-half years, with knowledge that the circulation fraud and its announcement would negatively impact Belo stock values while continuing to fund participants' employee-benefit accounts with Belo stock and while allowing the circulation fraud to continue;

(e)     by failing to provide Plaintiffs with adequate information to determine or protect their rights to benefits;

(f)     by causing Plaintiffs to lose benefits and rights, or suffer delay of rights, as a result of the false or misleading statements and denial or omission of information required under ERISA;

(g)     by making false or misleading statements to Plaintiffs and the public, including in SEC filings, investor conferences and reports, about circulation information for DMN, which directly affected Belo revenues and the value of Belo stock, thus the value of the benefits to which Plaintiffs would be or were entitled, and the security of those benefits; and

(h)     by inducing Plaintiffs and other Belo employees to elect to participate in the Belo Savings Plan, to retain Belo stock in their Savings Plan accounts and to otherwise purchase Belo stock, although Defendants had superior knowledge of the manipulation of revenue and thus the manipulation of stock values, which they failed to disclose while making false and misleading statements about Belo circulation numbers and revenue.

60.     Plaintiffs, acting individually and as representatives of the Belo Savings Plan, seek the following remedies against Defendants Morning News L.P., Belo, Decherd, Moroney the Committee and the Belo Savings Plan, jointly and severally, to the extent permitted under ERISA:

(a)     recovery of all benefits due or to become due them under the terms of the Belo Savings Plan or any other ERISA plan to which Plaintiffs are entitled which they were wrongly denied, or in which they lost rights or suffered delayed rights due to Defendants' wrongful conduct;

(b)     recovery of all benefits or damages due or to become due to the Savings Plan as a result of Defendants' wrongful conduct;

(c)     enforcement of Plaintiffs' rights under ERISA plans, and clarification of their rights to future benefits under the terms of any ERISA plan;

(d)     civil penalties and additional damages as allowed under ERISA based on Defendants' willful conduct in withholding plan documents or information about ERISA plans and benefits and amendments to plans and misleading Plaintiffs; and

(e)     attorney's fees, costs of court and interest to the extent allowed by law.

**Count Three: ERISA Violations:  Failure to Provide Severance Plan Information**
**(Against Defendants Morning News L.P. and Belo)**

61.     Plaintiffs during their employment by Defendants Morning News L.P. and Belo did not receive a summary plan description for the Belo severance plan, which is subject to the terms of ERISA.

62.     Defendants Morning News L.P. and Belo, in response to Plaintiffs' requests for copies of the severance plan and information required under ERISA, denied that the severance plan is subject to ERISA and did not provide copies of the plan, any plan summaries or other written information about benefits provided to Plaintiffs under the severance plan.

63.     Defendants Morning News L.P. and Belo on information and belief acted as the plan administrator(s) for the Belo severance plan.

64.     Defendants Morning News L.P. and Belo violated ERISA as follows:

(a)     by failing to provide Plaintiffs with adequate summary plan descriptions or copies of any severance plan under whose terms Plaintiffs were participants and/or beneficiaries;

      (b)    by failing to supply requested information within thirty days of the request;

      (c)    by failing to provide Plaintiffs with adequate information to determine or protect their rights to benefits or the value of their benefits;

      (d)    by causing Plaintiffs to lose benefits and rights, or suffer delay of rights, as a result of the denial or omission of information required under ERISA or an ERISA plan; and

      (e)    by making false representations to Plaintiffs about the severance benefits to which they would be entitled, and the security of the benefits.

65.    Plaintiffs seek recovery for damages caused by Defendants Belo's and Morning News L.P.'s wrongful conduct, including loss of benefit or benefit values and civil penalties as allowed under ERISA; and also seek recovery for additional damages, attorney's fees, costs of court and interest to the extent allowed by law.

### Count Four: Violations of the Age Discrimination in Employment Act ("ADEA") (Against Defendants Morning News L.P. and Belo)

66.    Defendants Morning News L.P. and Belo terminated Plaintiffs' employment at a time when all but one were age 47 or older. Defendants replaced many of the Plaintiffs with, or assigned their job duties to, employees at least ten years younger than Plaintiffs.

67.    Plaintiffs' ages were motivating factors in their terminations of employment, in violation of the ADEA.

68.    Defendants engaged in disparate treatment of Plaintiffs based on their ages. Defendants also implemented policies that had a disparate impact on employees over age 40, resulting in Plaintiffs' terminations. Specifically, Defendants focused on hiring younger writers and editors to "rejuvenate" the "Newspaper of the Future" and to create specific media products,

including Quick, to appeal to readers under age 40, and assigned younger writers and editors to work for that publication.

69.     Defendants also had a policy of allowing mid-level managers to select employees for termination without adequate, objective criteria, or without adequate oversight or evaluation of the policy and its implementation.

70.     Defendants also had a policy of replacing managers over age 50 with managers at least ten years younger, and created an environment in which managers made clear that they considered older employees to be lacking in passion, flexibility and technical savvy, as well as lacking appeal to the "Newspaper of the Future's" target readers under age 40.

71.     Plaintiffs have suffered damages in the form of lost wages and benefits, which they will continue to suffer in the future; consequential damages resulting from their termination of employment, including medical expenses due to lost benefits, for which they seek compensation to the extent allowed under the ADEA.

72.     Plaintiffs also seek liquidated and additional damages as allowed under the ADEA, together with attorney's fees, costs of court and interest as allowed by law.

### Count Five:  Fraud
#### (Against Defendants Morning News L.P., Belo, Dechert and Moroney)

73.     Defendants Morning News L.P., Belo, Dechert and Moroney, acting singly and in concert as Plaintiffs' employers and managers failed to accurately provide material facts to Plaintiffs about Belo revenue and stock values although withholding such information  adversely affected Plaintiffs' employee benefits and induced them to purchase or retain Belo stock.

74.     Defendants first learned of the circulation overstatements in January 2003 but failed to disclose that material information to Plaintiffs until August 5, 2004, while continuing to

fund Plaintiffs' Savings Plan accounts with Belo stock as more specifically described in the Facts section, above.

75.    Defendant Decherd, acting in concert with Defendant Moroney, made false and misleading statements to Plaintiffs, Belo employees, the public and investors in Belo as more specifically described in paragraph 56, above, which Plaintiffs fully incorporate by reference. When making the statements described in paragraph 56, those Defendants failed to disclose to Belo employees, Belo Plan participants, investors, the SEC, advertisers or Plaintiffs the circulation overstatements, and the resulting significant impact on Belo revenue.

76.    Decherd and Moroney learned of the circulation manipulation in January 2003; by February 2003, they knew the fraud was not an isolated event and that Belo lacked sufficient internal controls in overseeing and reporting DMN circulation numbers and thus in reporting revenue.  Defendants Decherd and Moroney failed to disclose those material facts to Plaintiffs in Dallas, Texas, or to other Belo employees or Savings Plan participants, in January 2003 or on the dates of the statements described in paragraph 56.

77.    Defendants Decherd and Moroney knew that Plaintiffs were ignorant of, and did not have an equal opportunity to discover, those facts, and Defendants were deliberately silent when they had a duty to speak, as they knew Plaintiffs relied on information provided by Defendants as to Belo's revenue in making decisions as to whether to participate in the Belo Savings Plan and whether to purchase or retain Belo stock based on Defendants' statements regarding Belo revenue.  Plaintiffs would not have retained Belo stock had they known of the false circulation numbers and the resulting impact on Belo revenue.

78.    The misstatements of facts were material, as the circulation overstatement was significant.  For example, the true circulation numbers certified by Decherd on May 12, 2003

were 11.4 percent and 16.6 percent lower for daily and Sunday papers, respectively.  Other statements regarding Belo and its revenues were similarly overstated, as discussed in paragraph 56 above, which Plaintiffs fully incorporate by reference.  DMN suffered 15 and 20 percent declines, respectively, from 2003 through 2005 in its daily and Sunday circulations for in-home delivery.  In 2003, the group of newspapers owned by Belo generated approximately 52 percent of Belo's revenues; within that group, DMN generated approximately 60 percent of revenues.

79.    By making false and misleading statements of material facts, and by failing to disclose those material facts, Defendants intended to induce Plaintiffs and other Belo employees to continue to invest in or retain Belo stock, which Plaintiffs did in reliance on Defendants' conduct.  Defendants also acted with reckless disregard as to the truth of the statements they made in the press releases and SEC filings listed in paragraph 56.

80.    Plaintiffs and other Belo employees were injured as a result of Defendants' conduct, as they continued to purchase or retain Belo stock, which significantly declined in value as a result of Defendants Morning News L.P.'s and Belo's circulation fraud.

81.    To the extent Defendants Morning News L.P., Belo, Decherd or Moroney were not acting as ERISA plan sponsors or fiduciaries in making false and misleading statements of material fact, and in withholding material facts, those Defendants are liable for damages incurred by Plaintiffs due to Defendants' wrongful conduct, including loss of stock value and additional damages resulting from Defendants' fraud, for which Plaintiffs seek recovery.

82.    Plaintiffs also seek recovery against those Defendants for punitive damages based on Defendants' knowing and intentional conduct and their reckless disregard for the truth.

**Count Six: ERISA Violations:  Wrongful Denial of Severance Benefits to Plaintiff Hubbard**
**(Against Defendants Morning News L.P. and Belo)**

83.    Defendants Morning News L.P. and Belo wrongfully withheld from Plaintiff Hubbard amounts to which he is entitled under the Belo severance plan in effect in 2004.

84.    Specifically, Defendants violated the terms of the severance plan and breached their fiduciary duty(ies) as plan administrator(s) for the severance plan, to the extent the Court finds that plan subject to ERISA, by arbitrarily, capriciously and intentionally denying Plaintiff Hubbard benefits and information to which he is entitled under the severance plan and under ERISA, during and following his employment by Defendants.

85.    Plaintiff Hubbard seeks recovery for severance amounts owed him in the approximate amount of $9,200, together with recovery for all civil penalties, additional damages, attorney's fees, costs of court and interest to the extent allowed by law.

**Count Seven: Plaintiff Hubbard's Alternative Claim for Breach of Contract**
**(Against Defendants Morning News L.P. and Belo)**

86.    Plaintiff Hubbard in the alternative brings suit for breach of contract.

87.    Plaintiff Hubbard entered into an oral employment agreement with Defendant Morning News L.P. or Belo, under the terms of which those Defendants agreed to pay Plaintiff an annual salary and to provide him with employee benefits.  Plaintiff performed the work in accordance with the terms of his contract and worked for Defendants until his termination in the RIF.

88.    At all relevant times, Plaintiff Hubbard was willing and able to perform the terms of his employment contract until his abrupt termination by Defendants.

89.    Plaintiff seeks recovery in the approximate amount of $9,200, the amount of the balance of the severance benefits owed to him, based on one week's pay for each year of service.

90.     Plaintiff also seeks compensation for attorney's fees, costs of court, pre- and post-judgment interest, and consequential damages, and any additional damages to which he is entitled as a result of Defendants' breach of the severance agreement.

## V.  Request for Relief

91.     Plaintiffs pray that Defendants be summoned to appear and answer this Complaint as required by law, and that upon final hearing, the Court enter judgment against Defendants The Dallas Morning News, L.P., Belo Corp., G. B. Dealey Retirement Pension Plan, Belo Savings Plan, Belo Benefits Administrative Committee, Robert W. Decherd; and James M. Moroney III, as follows:

    (a)     against Defendants Morning News L.P. and Belo, jointly and severally, as follows:

        i.     enter judgment in favor of Plaintiff Hubbard in the approximate amount of $9,200, due to Defendants' failure to pay Plaintiff Hubbard the full amount of the severance benefits to which he is entitled, together with attorney's fees, costs of court, interest as allowed by law, and all consequential and additional damages and civil penalties to which Plaintiff Hubbard is entitled due to Defendants' wrongful conduct;

        ii.     award civil penalties to each Plaintiff at the highest per diem rate as allowed under ERISA due to Defendants' failure to provide severance plan information or documents within thirty days of Plaintiffs' request for that information;

(b)  against Defendants Morning News L.P., Belo, Belo Pension Plan, Belo Savings Plan, Decherd, Moroney, and the Committee, jointly and severally, under ERISA as follows:

i.  for all income and benefits due or that would have become due to Plaintiffs under the terms of the Belo Pension Plan or the Belo Savings Plan, absent Defendants' wrongful conduct;

ii.  for all additional damages, civil penalties and equitable relief to which this Court finds Plaintiffs entitled under ERISA, including without limitation declaratory relief regarding Plaintiffs' rights under ERISA;

iii.  for all loss of benefits or value of benefits incurred by Plaintiffs, the Belo Savings Plan beneficiaries and the Belo Savings Plan as a result of Defendants' wrongful conduct;

iv.  for attorney's fees, costs of court, pre- and post-judgment interest, and all additional damages and equitable relief as allowed under ERISA.

(c)  against Defendants Morning News L.P. and Belo, jointly and severally, for lost wages, past and future;  together with attorney's fees, costs of court and pre- and post-judgment interest and all liquidated and additional damages as allowed under the ADEA;

(d)  against Defendants Morning News L.P., Belo, Decherd and Moroney, jointly and severally, for all damages resulting from their fraud as described in Count Five of this Complaint, together with punitive damages

due to their knowing and intentional conduct and reckless disregard for the

truth;

(e)    against all Defendants, jointly and severally, for all such other and further

relief, both general and special, at law or in  equity, to which the Court

may find Plaintiffs justly entitled.


KESSLER & COLLINS,
A PROFESSIONAL CORPORATION


By:    /s/ Howard C. Rubin
HOWARD C. RUBIN
TEXAS BAR NO. 17361400
LISA C. TULK
TEXAS BAR NO. 24047004

2100 Ross Avenue, Suite 750
Dallas, Texas 75201
214.379.0722 [Telephone]
214.373.4714 [Facsimile]
hrubin@kesslercollins.com


LAW OFFICE OF KAREN G. SHROPSHIRE


/s/ Karen G. Shropshire
KAREN G. SHROPSHIRE
TEXAS BAR NO. 08417150

300 Preston Commons West
8117 Preston Road
Dallas, Texas   75225
214.706.9250
214.706.9251 (fax)
kshropshire@abttx.com

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2007 I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system will send a notice of electronic filing to the attorneys of record in the case, all of whom I believe have consented in writing to accept the notice of service of this document by electronic means.

<u>      /s/ Howard C. Rubin      </u>
HOWARD C. RUBIN