**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **LARRY RANDALL POWELL, et al.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | Civil Action No. 3:06-CV-1960-BF |
| | § | |
| **THE DALLAS MORNING NEWS L.P., et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before the United States Magistrate Judge. The Motion for Summary Judgment of Defendants, The Dallas Morning News, Inc.[1] ("TDMN"); Belo Corp. ("Belo"); Belo Benefits Administrative Committee (the "Committee"), as plan administrator for the G.B. Dealey Retirement Pension Plan (the "Pension Plan"); and Belo Savings Plan (the "Savings Plan") (collectively, "Defendants") (doc. 241) is under consideration. Plaintiffs are Larry Randall Powell, Lawrence William DeOre, Paula F. Watson, Gary Van West, Raul Prezas Reyes, Timothy Arthur O'Leary, Jan Michael Hubbard, Michael S. Coons, John Paul Chamless, Ira Hadnot Alexander, Deborah Sue Voorhees, Linston Robert Lofley, Karen Patterson, Linda Jones, Gary Stratton, Ewina H. Schumacher, Paulette Ladach, and Stephen Wayne Yount.

In their Third Amended Complaint (doc. 176), Plaintiffs' allege that TDMN terminated their employment during a 2004 reduction in force ("RIF"). Seventeen of the Plaintiffs (all but Karen Patterson) ("ADEA Plaintiffs") bring claims under the Age Discrimination in Employment Act ("ADEA") based on theories of disparate impact and disparate treatment. Although TDMN was

---

[1] The Dallas Morning News, Inc. was formerly known as The Dallas Morning News, L.P.

1

their former employer, the ADEA Plaintiffs bring the same ADEA claims against Belo, contending Belo was a "joint employer" with TDMN. All Plaintiffs ("Plaintiffs") bring claims under § 502 of the Employee Retirement Income Security Act (ERISA) against Belo and the Committee, as administrators for the Pension Plan and the Savings Plan, for failure to timely provide them with copies of summary plan descriptions related to 2004 amendments to the Pension Plan and the Savings Plan.[2]

### Pending Motions and Objections to Summary Judgment Evidence

In addition to Defendants' Motion for Summary Judgment, the following motions are before the Court for consideration: Plaintiffs' Motion for Leave to File Consolidated Supplemental Appendix in Support of Plaintiffs' Response to Defendants' Objections to Plaintiffs' Declarations, filed December 10, 2010 (doc. 287); Plaintiffs' Motion for Leave to File Consolidated Supplemental Appendix in Support of Plaintiffs' Response to Defendants' Objections to Mischaracterization of Summary Judgment Evidence, filed December 10, 2010 (doc. 285); and Defendants' Motion to Strike Appendix in Support of Declaration of Michael A. Campion [doc.280], filed December 1, 2010 (doc. 283). The Court has considered the motions. the responses, and a reply.

---

[2] Plaintiffs voluntarily dismissed former defendants Robert W. Decherd, and James M. Moroney III from the case. (Doc. 240.) Plaintiffs have elected not to pursue their claims under ERISA with the exception of those that arise under Section 502 (29 U.S.C. § 1132). (Pls.' Br. at 232.) Similarly, Plaintiffs have indicated that Jan Hubbard no longer pursues his breach of contract claim (Count Seven). Accordingly, Plaintiffs should have no objection to dismissal of Count One; Count Two, Paragraph 53; and Count Seven. The District Court previously dismissed claims of interference with Pension Plan benefits with respect to former Defendant the Pension Plan; breach of fiduciary duty to disclose circulation overstatements; breach of fiduciary duty for failure to disclose 2003 delinquent Savings Plan contributions; failure to provide severance plan information; wrongful denial of severance plan benefits to Plaintiff Hubbard; disparate impact based upon the policy of replacing managers over age 50 with younger employees and creating an environment in which managers conveyed negative, age-based sentiments to older employees; and Plaintiff Hubbard's quantum meruit claim. (Memorandum Order, doc. 30 at 28.)

This case was filed in 2006. Defendants' Motion for Summary Judgment was filed April 30, 2010. The Court granted the parties' multiple requests for extensions during the summary judgment briefing period. The Court granted exceptions to the local summary judgment rules by permitting the parties to greatly exceed page limitations.[3] The parties filed unlimited Appendices in support of the summary judgment, the response, and the reply. Defendants filed their reply in support of the summary judgment on October 14, 2010. However, the parties filed, and the Court granted, unopposed motions for extensions of time to file various responses and replies to objections. The filings continued until December 28, 2010.

Plaintiffs' motions (docs. 285 and 287), filed December 10, 2010, seek to change the summary judgment record because of mistakes and omissions in their responsive filings of August 29, 2010 (docs. 249, 250, & 252-61). The Court granted Plaintiffs two extensions of time to file their responsive pleadings. The Court finds that Plaintiffs' motions are untimely and seek to expand the record with materials that should have been included in Plaintiffs' August 29, 2010 responsive pleadings. Pursuant to the Court's inherent power to control its docket and prevent undue delay, Plaintiffs' motions (docs. 285 and 287) are **DENIED**.

On November 17, 2010, without seeking leave of Court, Plaintiffs filed a supplemental declaration by their expert witness, Michael Campion, including it in an "Appendix in Support of Plaintiffs' Response to Defendants' Objections to the Declaration of Michael A. Campion Filed in Support of Plaintiffs' Response to Defendants' Motion for Summary Judgment (doc. 280). Defendants filed a Motion to Strike the supplemental declaration of Plaintiffs' expert witness on December 1, 2010 (doc. 283). When Plaintiffs filed the supplemental declaration, Defendants had

---

[3] One appendix contained over 3,000 pages.

deposed Michael Campion and the discovery deadline had expired. The Supplemental Declaration attempts to bolster Campion's credentials and show that the "reasonable HR practices" he described were based upon an acceptable approach to scientific inquiry. The Supplemental Declaration is in violation of the Local Rules, is untimely, and has already generated a request to reopen discovery and to depose Campion again (doc. 294). Pursuant to the Court's inherent power to control its docket and prevent undue delay, Defendants Motion to Strike (doc. 283) is **GRANTED**. The Clerk is ordered to strike document 280, and the Court will not consider the supplemental appendix in reaching the decision on Defendants' Motion for Summary Judgment.

The parties filed objections to the summary judgment evidence, responses, and replies. Evidence on summary judgment may be considered to the extent that it is not based on hearsay or other information that is not admissible at trial. *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). Statements that are conclusory and based upon speculation will not be considered. *See Brown v. City of Houston*, *Tex.*, 337 F.3d 539, 541 (5th Cir. 2003) (holding that unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment). Plaintiffs and Defendants object to each others' evidence on the grounds that it is speculative or conclusory, both with respect to fact witnesses and expert witnesses. In evaluating all of the evidence, the Court has disregarded any speculative, conclusory, or hearsay evidence and has considered only competent summary judgment evidence in deciding Defendants' summary judgment motion. Accordingly, any objections not specifically addressed are overruled as moot.

Plaintiffs object to the declarations of the various decision-makers who recommended Plaintiffs for termination during the RIF, specifically to the decision-makers' averments that they

did not consider the employee's age in recommending the employee for termination in the RIF. Plaintiffs' object that the averments are vague, conclusory, lack a proper foundation, and fail to set forth how affiant has personal knowledge of the facts alleged. However, most of the evidence in question is not presented for the truth of the matter asserted; rather, it is submitted to show the decision-makers' states of mind when they recommended Plaintiffs for termination. The decision-makers who decided which employees to terminate clearly had personal knowledge of the factors they considered in arriving at their recommendations. Plaintiffs' objections to the decision-makers declarations are overruled.

A court cannot consider an affidavit or declaration that contradicts prior testimony or admissions for the purposes of creating a fact issue because it is not competent summary judgment evidence. *See e.g., Crowe v. Henry*, 115 F.3d 294, 298 n.4 (5th Cir. 1997); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *Shiernbeck v. Davis*, 143 F.3d 434, 438 (8th Cir. 1998). Under the "sham affidavit" doctrine, a "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony. *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir. 1984); *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894-95 (5th Cir. 1980); *In re CitX Corp.*, 448 F.3d 672, 679 (3d Cir. 2006). Courts have consistently disregarded such sham affidavits as nothing more than an attempt to "manufacture a disputed material fact where none exists." *Albertson*, 749 F.2d at 228. The rule applies to exclude affidavits which contradict prior deposition testimony of the affiant. *Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102, 1104 (7th Cir. 1965). The Court sustains Defendants' objections to any of Plaintiffs' declarations and to the declarations of their expert witness which directly contradict the declarants' previous testimony.

With respect to Defendants' Objections to the Declaration of Michael A. Campion, the Court sustains Defendants' general objections in part and denies them in part as moot. As the Court will explain in examining Defendants' Reasonable Factor Other than Age ("RFOA") defense, the expert witnesses' 20 Reasonable HR Practices that Defendants allegedly should have known about and used during the RIF are irrelevant. Plaintiffs can rebut Defendants' RFOA defense only by demonstrating that the factors offered by Defendants are unreasonable. *See, e.g., Smith*, 544 U.S. at 243 (noting RFOA does not permit rebuttal by showing that other reasonable methods not resulting in a disparate impact were available). There is no requirement under the RFOA prong of the ADEA that the least-discriminatory method be implemented. *Smith*, 544 U.S. at 243. The Court sustains Defendants' objection and excludes Campion's testimony about his 20 Reasonable HR Practices as irrelevant and hence, inadmissible.

Additionally, the Court sustains Defendants' objection that Campions' declaration testimony regarding "age stereotypes" exceeds the scope of his expert designation. When Defendants took Campion's deposition in April 2010, Plaintiffs' designations of subjects on which Campion would testify did not include using Campion as an expert on age stereotyping. Defendants had no notice and would be prejudiced if Plaintiffs were permitted to introduce this testimony by way of his declaration after the deposition had concluded.

Extremely able counsel on both sides have thoroughly briefed every conceivable issue. The Court has considered all of the issues, arguments, and objections raised and overrules as moot any arguments and objections that are not addressed in this opinion. The Court also clarifies that it has not applied any presumptions based upon the age of the decision-maker or the fact that the decision-maker both hired and terminated an employee.

## Plaintiffs' Claims Against Belo Under the ADEA

Under the ADEA, a parent corporation like Belo, cannot be held liable for discriminatory employment actions unless it qualifies as an "employer" under the statute.  *See* 29 U.S.C. § 623; *Chapman v. The Dallas Morning News, L.P.*, No. 3:06-CV-2211-B, 2008 WL 2185389 *6 (N.D. Tex. May 27, 2008) (unpublished).   The ADEA defines an employer only as "a person engaged in industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."[4] 29 U.S.C. § 630(b). In *Chapman*, an age discrimination case based upon the same 2004 RIF that is the subjection of this action, the Hon. Jane J. Boyle, District Judge, granted the defendants' summary judgment as to Belo because Belo did not meet the statutory definition of employer and thus was not an employer under the ADEA.  *Chapman*, 2008 WL 2185389 at *6.  The Court agrees that the statutory definition contains no basis for disregarding the venerable corporate law principle of limited liability or for otherwise extending liability to a parent corporation for the discriminatory acts of its subsidiary.

However, Plaintiffs in this case allege that they are former employees of TDMN or Belo and assert that a "fact issue exists as to Belo's status as a 'joint employer' under the ADEA." (Defs.' Br. at 225.)  In support of this assertion, Plaintiffs cite *Fields v. Hallsville  Indep. Sch. Dist.*, 906 F.2d 1017, 1019-20 (5th Cir. 1990) for the proposition that the Fifth Circuit uses the hybrid economic realities/common law control test for determining the existence of an employment relationship under both Title VII and the ADEA.  (Defs.' Br. at 226.)  Nevertheless, contrary to Plaintiffs' assertion, the plaintiffs in *Fields* did not argue that the two potential employers in that case should be

---

[4]  An employer must have at least twenty employees to be covered by the ADEA.  29 U.S.C. § 630(b).  Plaintiffs do not allege the number of Belo employees.  Rather, they allege that Belo and TDMN had at least 500 regular employees.  (Third. Am. Compl. at 3.)

considered a single employer under a "joint employer" theory, and the Fifth Circuit Court of Appeals did not address that issue. *Fields*, 906 F.2d at 1019 n.2. Other Fifth Circuit cases have used a "hybrid economic realities/common law control test" to resolve when companies will be considered single employers in ADEA suits. *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 296 (5th Cir. 1994); *Deal v. State Farm County Mut. Ins. Co. of Texas*, 5 F.3d 117, 118 (5th Cir. 1993). Under the economic realities/common law control test, the right to control an employee's conduct is the most important factor. *Broussard v. L.H. Bossier, Inc.*, 789 F.2d 1158, 1160 (5th Cir. 1986). "If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979). The Fifth Circuit explains in *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d at 761, 764 (5th Cir. 1997) that the "hybrid economic realities/common control test" was first used in the context of determining whether a worker employed as an independent contractor should be considered the employee of an entity for the purposes of Title VII and extended to ADEA cases in *Fields*. However, the Fifth Circuit later extended the original test to determine if separate, related business entities could together be considered the employer of a plaintiff in a civil rights case. *Id*. (citing *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 (5th Cir.1983). The hybrid test developed to help determine when plaintiffs could be considered employees of business entities, not to help decide if different entities were so integrated as to constitute a single employer of a plaintiff. *Schweitzer*, 104 F.3d at 764. According to the Fifth Circuit Court of Appeals, although *Trevino* and the hybrid test are similar, the tests are not interchangeable. *Id*. The hybrid test should be used to determine if a plaintiff is an employee of the defendant or of one of the defendants in a multi-defendant case. *Id*.

Then, if a question remains with respect to whether a second defendant is sufficiently connected to the employer-defendant to be deemed a single employer, the court should conduct a *Trevino* analysis. *Id.* The *Trevino* analysis will establish if the additional defendant is also an employer of the plaintiff. *Id.*

In this case, it is not necessary for the Court to apply the hybrid test to determine if TDMN is Plaintiffs' employer. Plaintiffs admit that they were employed by TDMN. (Defs.' App. 2304; 592:19-23; 1832:7-8; 227:22-24; 2136:15-16; 1589:12-20; 1416:14-1417:9; 825:14-16; 1280:9-22; 1683:8-15; 371:15-17; 1062:3-6; 122:1-15; 1781:16-23; 1200:15-25; 1162:21-23, 1163:21-22; 471:5-8; 490:13-15; 708:3-5; 912:20-22.) The only question that remains is whether, under the *Trevino* test, Belo is sufficiently connected to TDMN for TDMN and Belo to be considered a single employer or joint employer.

To determine whether a parent corporation and its subsidiary may be regarded as a "single employer" or "integrated enterprise" under the ADEA, the Fifth Circuit Court of Appeals applies the four-part analysis originally adopted by the United States Supreme Court in the context of labor disputes. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 777 -781 (5th Cir. 1997) (citing *Radio Union v. Broadcast Serv.*, 380 U.S. 255, 257 (1965), and extended to civil rights actions by the Fifth Circuit in *Trevino v. Celanese Corp.,* 701 F.2d 397 (5th Cir.1983)). The four factors to consider include: (1) interrelation of operations, (2) centralized control of labor or employment decisions, (3) common management, and (4) common ownership or financial control. *Id.* This analysis ultimately focuses on whether the parent corporation was a final decision-maker in connection with the employment matters underlying the litigation. *Id.*; *see Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir.1986). All four factors are examined only as they bear on this

precise issue. *Id.*; *see Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 765 (5th Cir. 1997). More specifically, the Court must determine which entity made the final decisions regarding employment matters relating to the individuals claiming discrimination.

The only factor upon which Plaintiff's submit any evidence is the second one, centralized labor or employment decisions. According to Plaintiffs, Belo played a considerable role in the RIF at TDMN, which was an operating subsidiary of Belo in 2004. (Spitzberg Dep., Pls.' App. 2102-2103.) The evidence shows that the economically driven RIF led to the termination of more than 125 jobs at TDMN and approximately 194 jobs across all of Belo's media companies. (Daume Aff. ¶ 3, Defs.' App. 2304.)

Belo made the decision that there would be a RIF at TDMN rather than options such as pay cuts or other alternatives to layoffs. (Willey Dep., Pls.' App. 2381, 2395.) The RIF Documents, which contained the instructions to rank the affected employees and the criteria by which to rank them, came from Marian Spitzberg at Belo. (Pls.' App. 1054-1079.) Belo handled HR matters for TDMN. (Miller Dep., Pls.' App. 1714-1715; *see also* Miller Dep., Pls.' App. 1725.)

Marian Spitzberg, Kim Cummings, and Sheila Hartley – all of whom held HR positions at Belo – provided input or review into the decision to terminate each Plaintiff. (*See, e.g.,* Defendant The Dallas Morning News, Inc.'s Objections and Responses to Plaintiff John Paul Chamless' First Interrogatories, Answer No. 2, Pls.' App. 2628-2637; Cummings Dep., Pls.' App. 1404-1405; Spitzberg Dep., Pls.' App. 2103, 2104; Miller Dep., Pls.' App. 1725.) When there was a position at TDMN that required a job description, the job description was created by Belo. (Miller Dep., Pls.' App. 1716.) The performance evaluations which were required for each Plaintiff in 2003 and 2004 – and variously used by managers and supervisors when ranking employees in the RIF – were

10

created by Belo. (Miller Dep., Pls.' App. 1716.) Performance improvement plans were developed and implemented by Belo. (Spitzberg Dep., Pls.' App. 2105-2106.) Plaintiffs do not claim that Belo made the final termination decision with respect to any of the plaintiffs.

Plaintiffs have not presented any evidence of the number of Belo employees or the number of Belo subsidiaries, the interrelation of operations among the parent and subsidiaries, or evidence with respect to common management, common ownership, or financial control.

A strong presumption that a parent corporation is not the employer of its subsidiary's employees arises from the doctrine of limited liability. *Lusk*, 129 F.3d at 778. This presumption can be rebutted only by evidence of control that significantly departs from the ordinary relationship between a parent and its subsidiary, similar to that which is sufficient to pierce the corporate veil. *Id*. Plaintiffs failed to present evidence sufficient to withstand summary judgment on Belo's liability. The summary judgment evidence upon which Plaintiffs rely does not show that Belo had control over TDMN's daily operations or that Belo made the decision to terminate any of the plaintiffs in this case. Plaintiffs' evidence is not sufficient for the Court to disregard the corporate structure. Accordingly, Defendants' motion for summary judgment on Plaintiffs' ADEA claims against Belo is **GRANTED**.

## Statement of Facts

Defendants set forth a statement of undisputed facts. In their response, Plaintiffs state generally that they "dispute the 'undisputed facts'" as set forth by Defendants. However, they do not identify which facts they dispute or provide the court with a citation to the evidence showing that the fact is disputed. Rather, they set forth their own version of the facts, many of which are included

in Defendants' fact statement.  Additionally, Plaintiffs refer the Court to: "specific examples of Defendants' mischaracterization of the facts [] set forth [] in Plaintiffs' 'pretext' argument."

Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n. 7 (5th Cir. 1992).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id.*  To the extent that Plaintiffs include additional facts which are relevant and material, the Court will consider these facts.  On summary judgment, the Court must consider the facts in the light most favorable to Plaintiffs.

## Background

Around 2004,  a dramatic decline was happening in the American newspaper industry; this was largely the result of a significant loss of advertising revenue – particularly classified ads – to the internet and other media sources and continued decreases in print circulation. (Brisbane Aff. ¶ 5 at Defs.' App. 2210-2211.)  This generated a serious and well-documented concern that the newspaper industry would not survive.  (*Id*.) Many major newspapers had filed for bankruptcy during this time.  (*Id*.)  Others experienced fluctuations in profits.  (*Id*.)  Stock prices of the major publicly-owned newspaper groups had dropped sharply. (*Id*.)  Between 1999 and 2008, the total number of jobs in the American newspaper industry experienced a twenty-five percent decrease. (Brisbane Aff. ¶ 6 at Defs.' App. 2211) (citing statistics from the U.S. Department of Labor). the

American Society of News Editors published an April 2009 study which found that the number of journalism jobs declined by seventeen percent over the past ten years. (*Id.*) During the same period, many major newspapers engaged in reductions in force.[5] (*Id.*) TDMN also experienced profound economic pressures, including significant revenue and circulation declines. (Brisbane Aff. ¶ 7 at Defs.' App. 2211.) In 2001, TDMN had instituted an involuntary RIF due to economic necessities.

On Monday, March 15, 2004, James M. Moroney III ("Moroney"), the publisher of TDMN, announced that beginning October 4, 2004, a team of fifteen employees of TDMN would begin designing the "Newspaper of the Future." (Pls.' App. 0338-0339; Grigsby Dep., Pls.' App. 1489.) The design process followed several months of research. (Pls.' App. 0338-0339.) The working sessions were described as "intense" and " continuous;" lasting until the week before Thanksgiving. (*Id.*) TDMN's goal was to create a future, "instead of reacting to it." (*Id.*)

### The 2004 Reduction In Force

To cut expenses, Belo undertook a strategic alignment affecting most of its operating companies in early 2004. (Spitzberg Dep. at Defs.' App. 1518:18-1519:13.) Due to continuing drops in advertising revenues and increases in operating costs, Belo decided that this overall alignment required another RIF. (*Id.*; Moroney Dep. at Defs.' App. 1036:23-1037:3, 1048:6-1049:7.) TDMN also had experienced a combination of declining revenues and a concurrent

---

[5]The *New York Times* laid off 100 employees in its Newsroom in 2009. (Carlos Sanchez, "Going Against the Grain," *Waco Tribune-Herald*, Nov. 1, 2009). *The Washington Post* conducted four rounds of employee buyouts between 2003 and 2009. ("In Brief," *The Commercial Appeal (Memphis)*, Mar. 27, 2009, at C3). The *Los Angeles Times*, which recently filed for bankruptcy, terminated 205 employees in 2008. (Kara Rowland, "Christian Science Monitor to stop printing daily," *Washington Times*, Oct. 29, 2008, at A12). And the nation's most widely-circulated daily newspaper, *USA Today*, reduced its workforce by ten percent in 2008. (Laura Stevens, "LR paper lays off 50 to 60 in state, Ad revenue keeps falling," *Arkansas Democrat-Gazette (Little Rock)*, Feb. 24, 2009).

increase in business costs, including escalating newsprint prices. (Moroney Dep. at Defs.' App. 1036:14-1037:3, 1054-1055; *Oct. 28, 2004 Moroney E-Mail to TDMN Employees* at Defs.' App. 1059, 1054; *see also* Hubbard Dep. at Defs.' App. 604:6-11.)

In 2003, Belo announced that allegations of circulation overstatements at TDMN were under investigation. (Defs.' Answer to 3d Am. Compl. ¶ 26.) Robert Decherd ("Decherd"), President of Belo Corp., Belo employees a letter concerning circulation overstatements and informed them of the investigation. (Defs.' Answer to 3d Am. Compl. ¶ 24.) Ultimately, the 2003 circulation overstatement resulted in the refund of $26 million to advertisers about the same time that Belo announced that it would conduct an RIF. (Pls.' App. 3042-3073.)

On September 29, 2004, Decherd announced that Belo's overall workforce would be reduced by approximately 250 positions. (Defs.' App. 1537-1538, 1511.) Belo announced that the RIF at TDMN was part of a company-wide downsizing that affected the Belo corporate organization and most Belo operating companies. (Spitzberg Dep., Pls.' App. 2110, Pls.' App. 2156 (Ex. 6).) However, the majority of the planned reductions were scheduled to take place at TDMN. (Defs.' App. 1537-1538, 1511.) Moroney made an additional announcement regarding the RIF to employees of TDMN at a September 29, 2004 meeting at the Dallas Convention Center. (Hubbard Dep. at Defs.' App. 601:4-602:10; Ladach Dep. at Defs.' App. 848:13-18; Patterson Dep. at Defs.' App. 1173:21, 1174:22.) At this meeting, he informed the audience that employees who were terminated as a result of the RIF would be given one week of severance pay for each year of service. (Hubbard Dep. at Defs.' App. 636:19-22.)

In 2004, TDMN was an operating subsidiary of Belo. (Spitzberg Dep. at Defs.' App. 1506:16-1507:3.) Plaintiffs were all employees of TDMN. (*See* Daume Aff. ¶ 4 at Defs.' App.

2304; Hubbard Dep. at Defs.' App. 592:19-23; West Dep. at Defs.' App. 1832:7-8; Coons Dep. at Defs.' App. 227:22-24; Yount Dep. at Defs.' App. 2136:15-16; Stratton Dep. at Defs.' App. 1589:12-20; Schumacher Dep. at Defs.' App. 1416:14-1417:9; Ladach Dep. at Defs.' App. 825:14-16; Reyes Dep. at Defs.' App. 1280:9-22; Voorhees Dep. at Defs.' App. 1683:8-15; DeOre Dep. at Defs.' App. 371:15-17; O'Leary Dep. at Defs.' App. 1062:3-6; Chamless Dep. at Defs.' App. 122:1-15; Watson Dep. at Defs.' App. 1781:16-23; Powell Dep. at Defs.' App. 1200:15-25; Patterson Dep. at Defs.' App. 1162:21-23, 1163:21-22; Hadnot Dep. at Defs.' App. 471:5-8, 490:13-15; Linda Jones Dep. at Defs.' App. 708:3-5; Lofley Dep. at Defs.' App. 912:20-22.)

**Defendants' Five-Stage Plan for the Reduction In Force**

On September 8, 2004, a confidential communication (the "Spitzberg Memo") was distributed to key individuals at Belo operating companies, including TDMN, notifying them about the upcoming RIF and providing directives and forms to be used for position eliminations, downsizings, and consolidations. (Spitzberg Dep. at Defs.' App. 1516:24-1517:4, 1539-1564, 1516-1517.) The RIF directives and forms contained in the Spitzberg Memo had originally been developed for the 2001 RIF based on documents supplied by outside legal counsel. (*Id.* at Defs.' App. 1519:14-23, 1521:7-10.) Belo's Senior Vice President of Human Resources, Marian Spitzberg ("Spitzberg"), revised the original 2001 forms for use in the 2004 RIF. (*Id.* at Defs.' App. 1518:10-16, 1520:12-14.) Specifically, Spitzberg revised the RIF documents and forms to clarify them for the managers who were required to fill them out. (*Id.* at Defs.' App. 1521:1-8.) In both the 2001 RIF and 2004 RIF, Belo Human Resources concluded that in each operating company, managers and supervisors with direct knowledge of specific job positions could best determine where salary cuts

could be made while retaining essential skill sets and manpower needs for the future. (Spitzberg Aff. ¶ 12 at Defs.' App. 3268.)

The only written communication from Belo management regarding the various methods for reducing the workforce was the Spitzberg Memo. (Spitzberg Dep. at Defs.' App. 1524:6-19.) As stated, the memo was highly confidential and not to be released to, or shared with, anyone other than the managers and supervisors directly involved in the RIF. (Pls.' App. 1054-1079.) Managers were instructed: "[D]o not write any notes, memos or e-mails about this process except on the attached forms. *Do not retain any copies or give copies to anyone else* because these documents contain highly confidential information." (Pls.' App. 1055 (emphasis in original).)

According to the Spitzberg Memo, the goal of the 2004 RIF was to achieve adequate salary cost reductions while retaining requisite job skills and personnel levels to keep each operating unit viable in the future. (Spitzberg Aff. ¶ 12 at Defs.' App. 3268; Spitzberg Dep. at Defs.' App. 1539; 1516-1517.) The Spitzberg Memo stated in the "General Guidelines" that "we must retain those employees who have demonstrated the most productivity, the greatest adaptability and/or versatility, and who possess the skill sets best suited to our projected work." (Pls.' App. 1054-1055.)

In late August or early September 2004, Spitzberg held a meeting to notify Human Resources ("HR") representatives at TDMN, including David Skooglund ("Skooglund") and Sandi Scott ("Scott"), of the impending RIF. (*See* Cummings Dep. at Defs.' App. 325:16-25.) At that meeting, Spitzberg stressed that "uniform guidelines for employee selection" should be used during the RIF. (*Id.* at Defs.' App. 326:12-19.) Spitzberg specifically instructed the HR representatives that they should "look at anything that would pertain to discrimination … against race, color, creed, national origin, sex, sexual orientation, religious affiliation, [or] veteran status...[and] age," to ensure that

discrimination did not occur in the RIF. (Cummings Dep. at Defs.' App. 326:19-327:1.) The Spitzberg Memo also included this directive in the "General Guidelines" section.. (*See* Spitzberg Dep. at Defs.' App. 1539, 1516-1517.) The HR representatives were admonished specifically to pay particular attention to age, sex, and ethnicity, to look for patterns of discrimination, and to verify that all information provided as part of their RIF analyses was complete. (Cummings Dep. at Defs.' App. 326:24-327:3, 327:16-21.)

The RIF selection and review process involved five stages. Operational management performed the first stage, examining, among other things, prior performance ratings for each individual being reviewed as part of the RIF process.[6] (*Id.* at Defs.' App. 327:3-6.) After Bob Mong("Mong"), TDMN's Editor, and George Rodrigue ("Rodrigue"), TDMN's Managing Editor, discussed which areas of TDMN could be downsized, and by how much, they reached a salary reduction targets for each department or area. (Rodrigue Dep. at Defs.' App. 1359.1:20-1359.2:10.) They gave managers of each department or area salary reduction targets they had to meet. (Mong Dep. at Defs.' App. 1027:23-1028:20.) Managers not only looked at employees' overall performance ratings from the three years preceding the RIF, but also considered the ratings and

---

[6] Before 2003, although employees received annual performance evaluations, a consistent policy for how to perform the evaluations had not been formulated. (Skooglund Dep. at Defs.' App. 1490:12-41:4.) Belo instituted a standardized process and forms for performance reviews in 2003. (Skooglund Dep. at Defs.' App. 1489:14-20; Spitzberg Dep. at Defs.' App. 1527:13-23, 1564.1-1564.4.) A corporate-wide committee headed by the Belo Vice President of Talent Management, Bob Barner, developed the standardized performance reviews. (Spitzberg Dep. at Defs.' App. 1510:8-24.) When they were introduced, Belo Human Resources trained every manager and employee in all operating companies on the new annualized review process and forms. (*Id.* at Defs.' App. 1509.1:11-1509.2:1.) For a few years before the RIF, employees of TDMN evaluated their own performance annually in addition to the yearly performance evaluations by their supervisors. (*See, e.g.*, DeOre Dep. at Defs.' App. 378:4-379:10.) Self-evaluations helped the employees discuss their supervisors' evaluations at the annual performance evaluations. (Watson Dep. at Defs.' App. 1790:20-1791:9.)

written responses from sub-sections of the annual performance evaluations. (*See, e.g.*, Rush Dep. at Defs.' App. 1401:18-1402:18.) Specifically, if the overall performance ratings of comparable employees were equivalent, managers were instructed to look through the individual sections of the performance evaluations to see what ratings each employee received in each section. (Rush Dep. at Defs.' App. 1377:21-24, 1386:6-1387:7.)

Managers could conduct three different types of evaluations as part of the RIF – downsizings, eliminations, or consolidations – and the Spitzberg Memo described what each entailed. (Cummings Dep. at Defs.' App. 327:10-15.) The Spitzberg Memo directed reviewers to "carefully review those functions performed by your company, department or work group and determine how headcount may be reduced through job eliminations, downsizing, or through job restructurings and consolidations." (Spitzberg Dep. at Defs.' App. 1539, 1516-1517.) The Spitzberg Memo specifically directed reviewers to consider the future needs of their department over the next twelve months. (*Id*. at Defs.' App. 1547, 1516-1517.) When a position and all of its functions could be eliminated-- with no need to reassign job functions-- the Memo told managers to utilize the job eliminations form. (*Id*. at Defs.' App. 1540, 1516-1517.) When the duties performed by a certain position could be fulfilled by fewer employees in that position, the Memo told managers to complete the position downsizings form. (Spitzberg Dep. at Defs.' App. 1540-1541, 1516-1517.) Finally, the Memo directed that when managers decided to combine and restructure existing positions and reduce headcount, the Memo directed managers to use the form for consolidations. (Spitzberg Dep. at Defs.' App. 1541, 1516-1517.) For a position elimination, a manager identified the position to be eliminated and listed the number and names of employees in that position. (Spitzberg Dep. at Defs.' App. 1543, 1516-1517.) For a position downsizing, a manager had a manager or supervisor

with direct working knowledge of the employees in that position evaluate and stack rank the employees based upon the employees' skills, knowledge, past ability, and future needs of the position. (Spitzberg Dep. at Defs.' App. 1547, 1516-1517.) During the evaluation and ranking of employees for downsizings, managers also were directed to consider prior performance evaluations, recent salary increases, and whether the employee had any disciplinary issues in the three years preceding the RIF. (Spitzberg Dep. at Defs.' App. 1549, 1516-1517.) For positions consolidations, managers had to first describe the essential functions of each position, identify the job titles and number of employees in each position, and then describe the essential functions of the consolidated position. (Spitzberg Dep. at Defs.' App. 1553, 1516-1517.) Managers or supervisors with working knowledge of the employees then had to evaluate and rank the employees against the criteria applicable to their prior position and the newly-consolidated position. (Spitzberg Dep. at Defs.' App. 1554, 1516-1517.) Evaluations of employees in connection with a consolidation were otherwise the same as for a downsizing. (Spitzberg Dep. at Defs.' App. 1554, 1516-1517.) Seniority was viewed as a positive factor which benefitted the employee, when employees were evaluated for both downsizings and consolidations. (Spitzberg Dep. at Defs.' App. 1550, 1560, 1516-1517.) If no formal evaluation had been completed for an employee in the 2004 calendar year at the time of the RIF, managers were still required to provide an appraisal of the employee's performance for 2004. (Spitzberg Dep. at Defs.' App. 1547, 1516-1517.)

The 2004 RIF procedure prohibited bumping or transferring of employees. (Cummings Dep. at Defs.' App. 327:16-21.) The no bumping, no transfer practices are standard procedure in most of Belo's large-scale RIFs. (*Id*. at Defs.' App. 342:10-15.)

The Spitzberg Memo designated Kim Cummings ("Cummings") and Sheila Hartley ("Hartley"), Belo's two Regional Directors of Human Resources, as individuals to whom any questions could be directed. (Spitzberg Dep. at Defs.' App. 1541, 1516-1517, 1508:6-8.) In turn, the HR Directors were instructed to ensure that: (1) the uniform guidelines for employee selection set forth by the Society of Human Resource Management were followed; (2) all documentation was complete and sufficient information was provided to differentiate between comparators with respect to objective characteristics such as work performance and work product; (3) an employee's protected status was not taken into account during the selection process; (4) performance appraisals were considered in the review; and (5) performance documents provided by managers were reviewed and the managers contacted if questions arose regarding that documentation. (Cummings Dep. at Defs.' App. 328:20-330:6.) As a general practice, questions from managers at TDMN came through Skooglund or Scott. (*Id.* at Defs.' App. 331:5-332:13.)

On September 8, 2004, Skooglund met with the Assistant Managing Editors ("AME"s) at TDMN to distribute the Spitzberg Memo and explain its contents (the "Skooglund Training"). (Yates Dep. at Defs.' App. 2022:11-15, 2022:21-25; Spitzberg Dep. at Defs.' App. 1509:9-23 (discussing Skooglund's position)). TDMN concluded, based upon its experience with previous RIFs, that the most effective way to determine critical skills and future needs for a position was to have managers or supervisors with a working knowledge of each position, including AMEs, conduct the RIF evaluations. (Spitzberg Aff. ¶ 13 at Defs.' App. 3268.) Skooglund went through all of the RIF forms in the Spitzberg Memo, explaining their purpose and meaning, and answering questions from the department heads who were in attendance. (Skooglund Dep. at Defs.' App. 1492:18-1493:11; Yates Dep. at Defs.' App. 2023:25-2024:5.) Skooglund stressed the importance of using

objective criteria during the individual analyses, such as: (1) the existence of a performance improvement plan ("PIP") for the employee,[7] (2) the employee's productivity levels, and (3) the results and comments in performance appraisals. (Kresl Dep. at Defs.' App. 801:5-12.) That same day, Skooglund also met individually with the Newsroom AMEs to discuss the RIF process. (Skooglund Dep. at Defs.' App. 1493:19-1494:8.)

The second stage of the RIF process entailed managers, or department heads, forwarding their completed RIF reviews and evaluation paperwork to their HR manager who then answered any remaining questions raised by the managers and confirmed that the evaluation forms were complete and accurate. (Cummings Dep. at Defs.' App. 336:17-337:11; Skooglund Dep. at Defs.' App. 1497:12- 24.) When the HR manager, in this case Skooglund, finished his review, he forwarded the RIF evaluation forms to Spitzberg for the third stage of the RIF process.

At the third stage, Spitzberg divided up the forms and forwarded them for further impartial review to HR representatives who did not regularly work with TDMN. (Spitzberg Dep. at Defs.' App. 1531:11-16.) With respect to the Plaintiffs in this lawsuit, those impartial reviewers were Cummings and Hartley who, after evaluating the forms, raised follow-up questions, and asked for further clarification and revisions on some of the forms. (Cummings Dep. at Defs.' App. 333:19-334:7.) When Cummings and Hartley found that it was unclear why a manager ranked one employee higher than another, they followed up by asking the manager to explain what differentiated the employees, and, in some cases, also ask them to resubmit new evaluation forms. (*Id*. at Defs.' App. 341.1:24-341.3:23.) In certain instances during the third stage, RIF forms were returned to managers to be redone in whole or in part. (Spitzberg Dep. at Defs.' App. 1532.1:15-

---

[7] TDMN places an employee on a PIP when the employee has demonstrated performance deficiencies that have been addressed but not corrected.

1532.2:10.) Some proposed terminations were reversed. (*Id.*) Joe Daume, Belo's Human Resources Director provided demographic data which Cummings and Hartley also analyzed during their review. (*Id.* at Defs.' App. 339:10-340:13.)

The fourth stage of the RIF process required Cummings and Hartley to forward the RIF evaluations and rankings to outside legal counsel after they completed their review. (Cummings Dep. at Defs.' App. 337:15-17; Spitzberg Dep. at Defs.' App. 1528:20-24.) Outside legal counsel had additional discussion with internal reviewers at TDMN and analyzed age, sex, and ethnic classifications to look for and address any patterns of possible discrimination. (Cummings Dep. at Defs.' App. 337:20-338:5.)

The final and fifth stage of the RIF selection and review process, required an Executive Review Committee, consisting of senior operations executives from TDMN, to conduct a final review of all RIF forms. (Spitzberg Dep. at Defs.' App. 1528:20-1529:2, 1531:11-20.) The Executive Review Committee analyzed all eliminations across each Belo property to ensure that they were fair, supported by justifiable business reasons, and nondiscriminatory. (*Id.* at Defs.' App. 1531:21-1532:3.)

## Standard of Review

A court shall render summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986); *Ragas,* 136 F.3d at 458. A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson,* 477 U.S. at 248.

When a court rules on a motion for summary judgment, the court must view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Ragas,* 136 F.3d at 458. Further, a court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Anderson,* 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary-judgment evidence that shows the existence of a genuine issue of material fact. *Matsushita,* 475 U.S. at 586. Mere conclusory allegations are not sufficient to defeat a motion for summary judgment because they are not competent summary-judgment evidence. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir. 1996). Moreover, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary-judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994). The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports his claim. *Ragas,* 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.; see also Skotak,* 953 F.2d at 915-16 & n. 7. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on

which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322-23.

## Analysis

### Age Discrimination in Employment

The Age Discrimination in Employment Act authorizes two types of discrimination claims: disparate treatment and disparate impact. Age Discrimination in Employment Act of 1967, § 4(a)(1, 2), 29 U.S.C. § 623(a)(1, 2); *Munoz v. Orr,* 200 F.3d 291, 299 (5th Cir. 2000); *Smith v. City of Jackson, Miss.,* 544 U.S. 228, 240 (2005). Disparate treatment refers to deliberate discrimination in the terms or conditions of employment. *Id.* In this case Plaintiffs allege deliberate discrimination during their discharge in an RIF. Disparate impact claims do not require the intent to discriminate. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431 (1971).

### Plaintiffs' Disparate Impact Claims

Defendants move for summary judgment on Plaintiffs' disparate impact claims.[8] A plaintiff alleging a disparate impact claim under the ADEA cannot merely allege a disparate impact, or point to a generalized policy that leads to such an impact. *Meacham v. Knolls Atomic Power Lab.,* 554 U.S. 84, 100 (2008). Rather, the employee is "responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities." *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 656 (quoting *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994 (1988)) (emphasis added). The plaintiff's burden is heavy, not only to isolate and

---

[8] Plaintiffs assert that because their disparate impact claims survived a motion to dismiss, the policies have been sufficiently identified and isolated. However, in deciding a motion to dismiss, the Hon. Jane J. Boyle, United States District Judge, noted that, even though the claims survived early dismissal, resolution of this issue would be better addressed through summary judgment. (Mem. Ord., doc. 30 at 22.)

identify the specific employment practices, but to establish causation by introducing a "substantial statistical disparity between protected and non-protected workers" with respect to the employment practices in question, the functional equivalent of intentional discrimination. *Munoz*, 200 F.3d at 299-300 (citing *Griggs*, 401 U.S. at 431). To establish a prima facie case of age discrimination based upon disparate impact, a plaintiff must: (1) identify a specific facially neutral employment policy or practice; (2) establish causation by presenting "statistical evidence of a kind and degree sufficient" to show (3) that the practice caused an adverse employment action (4) that disparately affected workers forty years of age or older. *Collins-Pearcy v. Mediterranean Shipping Co. (USA), Inc.*, 698 F. Supp. 2d 730, 741-42 (S.D. Tex. 2010). To rebut a prima facie case of disparate impact, the employer has the burden of production and persuasion to prove that the adverse impact was attributable to a nonage factor that was reasonable.[9] *Meacham*, 554 U.S. at 93-94.

Plaintiffs allege that Defendants unintentionally discriminated against them based on their ages by: (1) allowing undue subjectivity in the RIF termination selection process, and (2) executing a policy of rejuvination by excluding two Belo subsidiaries, *Quick* and *Al Dia*,[10] from the RIF. Defendants respond that Plaintiffs' disparate impact claims fail because Plaintiffs: (a) have not adequately identified the specific policies or practices on which they base these claims; (b) failed to provide Defendants with fair notice of these claims; (c) cannot rely on excessive subjectivity in

[9] "Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement." *City of Jackson*, 544 U.S. at 243. "Certain employment criteria that are routinely used may be reasonable despite their adverse impact on older workers as a group." *Id*. at 241.

[10] *Quick*, a publication formatted for news at a glance, and *Al Dia*, a Spanish language publication, were launched approximately two years before the 2004 RIF.

a RIF as a basis for these claims; (d) have not proven the existence of a policy or practice allowing managers to consider too much subjectivity when deciding who to terminate; and (e) have not demonstrated a disparate impact on ADEA-protected employees. Defendants assert that even assuming, arguendo, that Plaintiffs have demonstrated a genuine issue of material fact with respect to their disparate impact claims, it has presented undisputed summary judgment evidence that its RIF was based on nonage related reasons.

### Identifying Within the Selection Process for the RIF a Specific Facially Neutral Policy or Practice Which Has a Measurable Impact

`

The Court will first consider Plaintiffs' allegation that the RIF selection procedure was unduly subjective. With regard to specificity, Defendants contend that Plaintiffs' disparate impact claim based on "the use of subjective criteria in the RIF" is equivalent to a claim that the selection process for the RIF created a disparate impact. The Court agrees. The United States District Court for the Northern District of Texas recently disapproved a disparate impact claim based upon the plaintiff's failure to identify, within the selection process for the layoff, a specific policy or practice responsible for purported statistical disparities. *Oinonen v. TRX, Inc.*, No. 3:09-CV-1450-M, 2010 WL396112, at *4-5 (N.D. Tex. Feb. 3, 2010). The Honorable Barbara M.G. Lynn, United States District Judge, pointed out that identifying a specific practice is not a trivial burden and is necessary to protect employers from potential liability when the statistical imbalances are the result of legitimate and non-discriminatory employment actions. *Id*. (citing *Meacham*, 554 U.S. at 101). *See also City of Jackson*, 544 U.S. at 242 (citing *Wards Cove*, 490 U.S. at 657). Other courts agree that an ADEA plaintiff cannot rely on a broad unmeasurable policy as a basis for a disparate impact claim. *See Mustelier v. Equifax, Inc*., No. 08-1008, 2009 WL 890468, at *6 (D.P.R. Mar. 25, 2009) (holding plaintiff failed to identify a facially neutral rule in the restructuring process that was

responsible for a disparity); *Kourofsky v. Genencor Int'l Inc.*, 459 F. Supp. 2d 206, 215 (W.D.N.Y. 2006) (plaintiffs failed to identify any facially neutral policy); *White v. Am. Axle & Mfg., Inc.*, No. 05-CV-72741-DT, 2006 WL 335710 *4 (E.D. Mich. Feb. 14, 2006) (holding plaintiff must identify the specific employment practice to give the defendant fair notice of what plaintiff's claim is and the grounds upon which it rests, not just termination selection procedures in a RIF).

Many courts have held that a plaintiff's reliance on the undue subjectivity of the RIF termination process is not a proper basis for a disparate impact claim. *See Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1270 n.5 (8th Cir. 1987) (noting that the RIF "was not implemented through some facially neutral procedure, such as a height and weight requirement or an aptitude test, but was conducted through a series of subjective decisions eliminating certain positions in order to cut costs;" therefore, a disparate impact claim was inappropriate given the lack of a "neutral policy, the impact of which could be measured"); *Combs v. Grand Victoria Casino & Resort*, No. 1:08-CV-00414-RLY-JMS, 2008 WL 4452460, at *3 (S.D. Ind. Sept. 30, 2008) (holding that a generalized policy such as subjective decision-making does not state a claim of disparate impact age discrimination or satisfy the requirement for a specific test, requirement, or practice) (citing *City of Jackson*, 544 U.S. at 241)(internal quotations omitted).

In *Watson v. Fort Worth Bank*, the United States Supreme Court recognized that the disparate impact theory may apply to claims alleging discrimination based on an employer's subjective decision making in a Title VII case. 487 U.S. at 989. Nevertheless, the Court made clear that "an employer's policy of leaving [termination] decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct." *Id.*; *see Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1292 (5th Cir.1994); *Page v. U.S. Indus., Inc.*, 726

F.2d 1038, 1046 (5th Cir. 1984).  As the United States Supreme Court held in *Wards Cove,* a plaintiff may not "simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is 'responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.'" 490 U.S. at 656 (quoting *Watson,* 487 U.S. at 994) (emphasis added).  A plaintiff's failure to identify the specific practice being challenged is the sort of omission that could "result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances . . . .'"  *Wards Cove*, 490 U.S. at 657.  *See City of Jackson*, 544 U.S. at 241. Additionally, policies can be facially neutral but applied in a discriminatory manner so that it impacts adversely on one group, and thus shows evidence of discrimination in disparate treatment cases.  *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 827 (5th Cir. 1982).

## Plaintiffs' Claims that Facially Neutral Policies Were
## Applied in a Discriminatory Manner

In an attempt to specify a policy or procedure, Plaintiffs allege that managers or supervisors failed to follow TDMN's policy, changed the policy, and applied TDMN's RIF policy in a discriminatory manner.  For example, Plaintiffs claim that the managers and supervisors (1) applied their own criteria to evaluate employees for the RIF; (2) violated Belo's "no bumping" policy and disregarded the guidelines for position consolidations; (3) were inconsistent in using an employee's proper performance evaluations; (4) added selective considerations to the selection process; (5) changed performance appraisal scores; (6) changed job titles so that some of the employees became a "class of one"; (7) used a "rubber stamp" approach to oversight of the RIF process; and (8) failed to conduct the required adverse impact analysis.  (Pls.' Resp. at 8-20.)  Plaintiffs contend that mangers or supervisors were implementing the Spitzberg instructions to "retain those employees

who have demonstrated the most productivity, the greatest adaptability and/or versatility, and who possess the skill sets best suited to our projected work environment." (Pls.' App. 1054-55.) Judge Boyle dismissed as "not facially neutral" Plaintiffs' disparate impact claim that was based upon defendants' policy of "replacing managers over age 50 with managers at least 10 years younger and [creating] an environment in which managers made clear that they considered older employees to be lacking in passion, flexibility, and technical savvy, as well as lacking appeal to the 'Newspaper of the Future's' target readers under age 40." (Mem. Ord., doc. 30 at 21). For the same reason, Defendants are entitled to summary judgment. Plaintiffs' purported discriminatory applications of the RIF policy are not facially neutral and are more properly considered as disparate treatment claims.

With respect to the rejuvenation claim, Plaintiffs allege that Defendants "focused on hiring younger writers and editors to 'rejuvenate' the 'Newspaper of the Future'; to create specific media products, including *Quick*, to appeal to readers under age 40; and hired and assigned younger writers and editors to work for that publication." (Third Am. Compl. ¶ 62.) Plaintiffs Lofley, Ladach, and O'Leary testified in their depositions that they believed this alleged policy was intentionally discriminatory. (Defs.' App. 966:17-967:4; 886:7-16; 1126:7-16.) An employer's focusing on hiring younger "predominantly non-ADEA-protected employees" could constitute intentional discrimination and cannot serve as the basis for a disparate impact claim. *Larkin v. State of Mich. Dep't of Social Servs.*, 89 F.3d 285, 289 (6th Cir. 1996) (recognizing that "facially discriminatory actions are just a type of intentional discrimination or disparate treatment and should be treated as such"). The Court does not find that Plaintiffs allegations regarding "rejuvenation" set forth a

facially neutral policy.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' disparate impact claim based upon a policy of rejuvenation.

A court will not consider on summary judgment claims that are raised for the first time in response to a motion for summary judgment.  *See Dickerson v. United Parcel Service, Inc*., 1999 WL 966430, *2 (N.D. Tex. 1999).  For this reason, the Court will not consider Plaintiffs' belated attempt to support a disparate impact claim by arguing in response to Defendants' Motion for Summary Judgment that Plaintiffs are not relying on the "RIF as a whole" for the first neutral policy or practice but "have only complained of the specific phase of the RIF in which the employees were evaluated under the Spitzberg Memorandum criteria."   (Resp. to Mot. for Summ. J. at 40.) Moreover, even if the Court were to consider it, Plaintiffs make no attempt to isolate this "phase," or the Spitzberg Memo's impact, from the RIF termination selection process as a whole.[11]

Plaintiffs did not timely identify within the selection process for the layoff  a specific measurable policy or practice responsible for purported statistical disparities.  The broad claim of undue subjectivity in the RIF termination process is not a proper basis for a disparate impact claim in an ADEA case.  Under Title VII, a plaintiff may challenge an overall decision-making process if it is not capable of separation for analysis; however, this exception is not permitted in ADEA cases. *See City of Jackson*, 544 U.S. at 241.

To the extent they are attempting to correct these deficiencies by claiming for the first time (in their response to summary judgment) that they are now relying on a certain "phase" or a certain "memo," Plaintiffs' disparate impact claims fail.  They have not given Defendants sufficient notice

---

[11]  The Spitzberg memo contained twenty-five pages of guidelines for managers to have used when they considered which employees to terminate (Spitzberg Dep. Ex. 5 at Defs.' App. 1539-64.) Plaintiffs never specify which of the guidelines and/or their implementation resulted in the disparate impact.

of their disparate impact claims.  The Court will now consider alternatively whether TDMN's RIF policy was exclusively subjective.

**Whether the Summary Judgment Record Shows
that TDMN's RIF Policy Was Exclusively Subjective**

Alternatively, assuming subjectivity in a RIF termination process as a whole can be the basis of a disparate impact claim, such a claim can proceed only if the entire RIF process is entirely subjective.  *Durante v. Qualcomm, Inc*., 144 F. App'x 603, 605-607 (9th Cir. 2005) (unpublished).  Evidence that a RIF excessively, but not exclusively, relied on subjective criteria cannot be the subject of a disparate impact claim.  *Id*.

In this case, Plaintiffs do not even contend that the RIF was completely subjective.  (Defs.' Resp. at 38.)  Plaintiffs set forth the following "evidence of the Policy, Process or Practice" to show that the RIF procedure was "overly subjective:" the RIF procedure required managers to rank employees without providing objective criteria or oversight because managers had the discretion to consider or ignore previous performance evaluations which themselves lacked adequate objective criteria.  (Campion Dec., § 180, Pls.' App. 0076-0078; Defs.' App. 3454.)

TDMN specifically instructed decision-makers to rely primarily on objective factors such as past performance, raises, and disciplinary issues when they decided which positions to eliminate and which individuals to lay off.  (Defs.' App. 801:5-12; 1539-1564, 1516.)  The deposed decision-makers testified they relied on prior performance evaluations, salary increases, and disciplinary infractions or reprimands.  (Defs.' App. 1967:5-19; 2027:18-24; 2245:7-2246:5; 17:24-18:6; 62:10-17*, 85:17-86:1; 137:23-138:11*; 120:6-121:5*; 806:1-4;444:14-24;453:3-15; 2488:5-10, 2120:9-20; 1970:10-20; 1263:3-5, 1268:4-10; 115:19-116:8*, 167:2-8*.)  Additionally, they considered objective criteria not explicitly referenced in the RIF forms, such as measures of productivity, the

number of stories published, and the employees' skill sets. (*Id.*) Taking the facts most favorably to Plaintiff, even if some managers did not consider employees' prior performances and two decision-makers failed to consider at least one of the four objective criteria, this does not show that the RIF process was entirely subjective or even overly subjective. Moreover, Plaintiffs' complaint that Defendants failed to require managers to consider any objective factors when they decided to completely eliminate, rather than downsize or consolidate, positions in the RIF is not a proper basis for an age discrimination claim. *Chapman*, 2008 WL 2185389 at *7 (holding an employer's decision to eliminate a job position in an economically driven RIF is a "legitimate, non-discriminatory reason for terminating an employee"). The summary judgment record does not show that TDMN's RIF policy was exclusively subjective. Plaintiff's disparate impact claim based upon undue subjectivity fails. The Court will now consider alternatively whether undue subjectivity cause a disparate impact on ADEA-protected employees.

### Whether the Summary Judgment Record Shows that Undue Subjectivity Caused a Disparate Impact on ADEA-Protected Employees

Even if Plaintiffs had proved the first element of a prima facie case of disparate impact, they would need to present "statistical evidence of a kind and degree sufficient" to show that the specific identified practice caused an adverse employment action that disparately affected workers who were forty years of age and over forty. *Collins-Pearcy*, 698 F. Supp. 2d at 741-42. Defendants contend that even assuming Plaintiffs may proceed with the purported undue subjectivity of the RIF termination selection process, they have failed to demonstrate any causation. Plaintiffs must prove that the isolated factor of undue subjectivity within the RIF selection process caused significant statistical disparities showing a disparate impact on age-protected employees to assure that Defendants are not held liable for innocent causes that lead to statistical disparities. *See Wards*

*Cove*, 490 U.S. at 657. However, as Defendants point out, Plaintiffs' expert analyzed the "statistical disparities caused by the termination process" as a whole, rather than the purported lack of objective criteria. (Pls.' Resp. at 117.)[12] Plaintiffs' Expert Report concludes that "[t]he results show that there is adverse impact in the termination decisions." (Defs.' App. 3051.) Clearly, the expert did not measure the adverse impact of undue subjectivity in the termination selection process as opposed to the myriad of other possible causes of adverse impact.

Plaintiffs have not demonstrated that the alleged policy or practice of allowing undue subjectivity in the RIF termination selection process actually caused the disparate impact their statistics purport to show. Based on Plaintiffs' own admissions and those of their expert witness, the Court can only conclude that Plaintiffs' statistical analyses have failed to "offer statistical evidence of a kind and degree sufficient to show that the practice in question – undue subjectivity in the selection process – caused employees older that forty to be included in the RIF at a disproportionate rate." *Watson*, 487 U.S. at 994. Defendants are entitled to judgment as a matter of law on Plaintiffs' disparate impact claim based on the alleged lack of objective criteria and oversight in the RIF, i.e., undue subjectivity in the RIF. The Court will now consider alternatively Defendants' "reasonable factor other than age" defense.

### Defendants' Reasonable Factor Other Than Age Defense to Plaintiffs' Disparate Impact Claims

The ADEA mandates that an employer reach employment decisions without regard to age, but it does not place an affirmative duty upon an employer to accord special treatment to members

---

[12] According to Plaintiffs' expert witness, his adverse impact analysis was based on a "holistic" view of the entire termination process. (Defs.' App. 62.) Moreover, his regression analyses only purported to show that age was a predictor of termination in the RIF, not that lack of objective criteria or lack of oversight caused a disparate impact on ADEA-protected employees. (Defs.' Resp. at 111-12.)

of the protected age group.  *Williams v. General Motors Corp.* 656 F.2d 120, 129 (5th Cir. 1981).

Accordingly, rather than demonstrating that Defendants could have achieved their goals by pursuing

an alternative course of action that would not create a disparate impact on a protected group (as in

Title VII disparate impact claims), ADEA disparate impact claims are subject to the RFOA analysis.

*See Smith*, 544 U.S. at 233, 239 (finding that it is in cases involving disparate impact that "the

RFOA provision plays its principal role by precluding liability if the adverse impact was attributable

to a nonage factor that was 'reasonable'").

Once a plaintiff has carried his heavy burden of isolating a specific policy and demonstrating

the statistical disparity, a defendant carries the burden of production and persuasion of the RFOA

defense.  *Meacham*, 554 U.S. at 101.  A plaintiff then has the opportunity to rebut the RFOA by

demonstrating that the factors offered by the defendant are unreasonable.  *See e.g., Smith*, 544 U.S.

at 243 (noting that RFOA does not permit rebuttal that other reasonable methods not resulting in a

disparate impact were available).

In this case, the Court has not found, but will assume *arguendo*, that Plaintiff has met its

initial burdens and that the burden of production and persuasion has shifted to the Defendants to

show a RFOA.  Plaintiffs respond that the RFOA defense is not available to Defendants based upon

a regulation proposed by the Equal Employment Opportunity Commission ("EEOC") on February

18, 2010.  75 FR 7212-01, 2010 WL 558711 (F.R.).  The proposed regulation provides that "when

disparate impact results from giving supervisors *unchecked* discretion to engage in *subjective*

decision making, however, the impact may, in fact, be based on age because the supervisors to

whom decision making was delegated may have acted on the bases of conscious or unconscious age-

based stereotypes."  75 Fed. Reg. at 7218 (emphasis supplied).  However, Plaintiffs' reliance on the

proposed regulation as barring the RFOA defense is misplaced because as a "notice of proposed rulemaking," it carries no legal weight or authority. *In re AppleTree Mkt., Inc.*, 19 F.3d 969, 973 (5th Cir. 1994) (stating that "proposed regulations are not entitled to judicial deference and carry no more weight than a position advanced in a brief by one of the parties). Proposed regulations are entitled to no deference until they are final. *Id. See also Teweleit v. Harford Life & Accident Co.*, 43 F.3d 1005, 1009 (5th Cir. 1995). The closing date for comments on the rule was April 19, 2010. Plaintiffs have failed to show that the rule has been adopted and is entitled to deference.

Even assuming the rule is applicable, the proposed regulation gives three criteria to be considered: "(i) the extent to which the employer gave supervisors unchecked discretion to assess employees subjectively; (ii) the extent to which supervisors were asked to evaluate employees based on factors known to be subject to age-based stereotypes; and (iii) the extent to which supervisors were given guidance or training about how to apply the factors and avoid discrimination. *Id.* As the Court previously noted, the second stage of the RIF involved the HR department's confirmation of the managers' reasons for termination and evaluation paperwork. (Defs.' App. 336:17-331:11; 1497:12-24.) At the third stage, the managers' paperwork was sent to impartial reviewers. (*Id.* 1531:11-16; 341.1:25-341.3: 23.) Some RIF forms were returned to managers to be redone in whole or in part and some proposed terminations were reversed. (*Id.* 1532.1:15-15.2:10.) Outside legal counsel conducted another review. (*Id.* 337:15-17; 1528:20-24.) An Executive Review Committee conducted the final review, judging whether the decisions were fair, supported by justifiable business reasons, and nondiscriminatory. (*Id.* 1531:21-1532:3.) The managers were not given unchecked discretion.

Plaintiffs have not pointed to any age-based stereotypes, and the managers considered objective factors, such as prior performance evaluations, salary increases, seniority, disciplinary actions, productivity, and skill sets. (Defs.' App. 1967:5-19; 2027:18-24; 2245:7-2246:5; 17:24-18:6; 62:10-17*, 85:17-86:1; 137:23-138:11*; 120:6-121:5*; 806:1-4;444:14-24;453:3-15; 2488:5-10, 2120:9-20; 1970:10-20; 1263:3-5, 1268:4-10; 115:19-116:8*, 167:2-8*.)

Finally, Defendants provided the RIF decision-makers with guidance or training about how to apply the facts and avoid discrimination. This included a question-and-answer session with the HR representative during which he stressed the importance of using objective criteria. (Kresl Dep. at Defs.' App. 801:5-12.) RIF decision-makers also received instructions to avoid discrimination against employees based on race, ethnicity, gender, and age. Defs.' App. 1539, 1516-1517.) Accordingly, the Defendants' RFOA defense is not precluded by the rule.

### The RFOA Defense Applied to TDMN's RIF

The United States Supreme Court has recognized that "[c]ourts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it." *Watson*, 487 U.S. at 999. According to the Fifth Circuit Court of Appeals, "'[t]he ADEA was not intended to be a vehicle for judicial second guessing of business decisions, nor was it intended to transform the courts into personnel managers.'" *Walther v. Lone Star Gas Co.,* 952 F.2d 119, 123 (5th Cir.1992) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 647 (5th Cir.1985)). An employer is entitled to make those decisions for itself. *Id. See Norwood v. Calpine Corp.*, 2005 WL 2171883, 6 (S.D. Tex. 2005). The reduction of a work force is a legitimate, non-discriminatory reason for termination. *E.E.O.C. v. Texas Instruments*, 100 F.3d 1173, 1181 (5th Cir. 1996). The use of project eliminations as criteria for determining which

employees to terminate is itself an objective factor. *Durante v. Qualcomm, Inc.*, 144 Fed. App. 603, 606 (9th Cir. 2005) (unpublished).

TDMN's company-wide 2004 RIF was economically motivated by a downturn in the newspaper industry. According to Department of Labor statistics, between 1999 and 2008 the total number of jobs in the American newspaper industry dropped from 448, 810 to 335,780, a twenty-five per cent decrease. TDMN was Dallas' only remaining major daily newspaper. Defendants had to implement the RIF as a direct result of declining revenues. Given economic conditions at TDMN and in the newspaper industry, their stated goal was to reduce the overall workforce salaries. They state that their RIF termination practices were clearly related to this goal and provided a fair and efficient way to reduce TDMN's workforce by approximately six percent. At TDMN 125 jobs were terminated, and across all of Belo's media companies, approximately 194 jobs were eliminated.

Plaintiffs contend the RIF was unreasonable due to undue subjectivity and lack of objective criteria. Defendants counter that the summary judgment evidence conclusively shows that managers were not only instructed to consider past performance, raises, and disciplinary issues, but managers actually considered multiple objective factors in deciding which employees to terminate during the RIF.

During the managers' training session, Skooglund repeatedly emphasized that managers were to utilize objective factors to the extent possible. (Defs.' App. 801:5-12.) Plaintiffs concede that department managers would be an important source to use in ranking employees for the RIF and that they might even be the best source. (Defs.' App. 82:24-83:4; 111:6-25.) Plaintiffs cite only their expert witness' unsupported conclusion that "[s]ome managers even admitted that they did not consider past performance appraisals to rank employees." (Pls.' App. 57.) Plaintiffs make the

unsupported assertion that managers "were allowed to change the most recent (2004) performance rating, or to make a rating for 2004 if there was not one of record" (*Id.*)  The record shows that TDMN's HR representatives analyzed demographic information to ensure that there was no disparate impact on protected groups.  (Defs.' App. 1529:3-1530:4.)  One of the HR representatives testified that she personally conducted an analysis to determine any potential adverse impact. (Defs.' App. 3267; 337-38.)  Additionally, adverse impact analysis was conducted by outside counsel. (Pls.' App. 2012-13.)

Plaintiffs' expert admitted that the RIF "was not completely subjective." (Defs.' App. 331:5-11.)  Additionally, Defendants note that Plaintiffs' expert witness admits that several objective factors correlated with termination decisions, such as "performance review scores, pay increases, and disciplinary warnings."  (Defs.' App. 3035.)  Further, Plaintiffs' expert admits it is proper for decision-makers to consider some subjective criteria such as "management judgment" when deciding who to terminate. (*Id.* 112:4-10.)  The ADEA clearly does not prohibit TDMN from using both subjective and objective criteria and considering its future business needs during its RIF.  *See Smith*, 544 U.S. at 243.

Plaintiffs' contentions that Defendants were required to establish that they had no options available other than to institute unduly subjective RIF termination practices is without merit.  Unlike Title VII disparate impact claims, where Plaintiffs can prevail by demonstrating Defendants could have achieved their goals by pursuing an alternative course of action that would not create a disparate impact on a protected group, ADEA disparate impact claims are subject to the RFOA analysis. *See Smith*, 544 U.S. at 233, 239 ("It is, accordingly, in cases involving disparate-impact claims that the RFOA provision plays its principal role by precluding liability if the adverse impact

was attributable to a nonage factor that was "reasonable."). Once Plaintiffs have carried their heavy burden of isolating a specific policy and demonstrating the statistical disparate impact resulting from the policy, the burden shifts to the Defendants to prove the actions were based on reasonable factors other than age. *See Meacham*, 554 U.S. at 102.

Although Defendants carry the burden of production and persuasion of the RFOA defense, "the more plainly reasonable the employer's 'factor other than age' is, the shorter the step for that employer from producing evidence raising the defense, to persuading the factfinder that the defense is meritorious." *Meacham*, 554 U.S. at 102. Once Defendants make such a showing, Plaintiffs can rebut Defendants' RFOA defense only by demonstrating that the factors offered by Defendants are unreasonable. *See, e.g., Smith*, 544 U.S. at 243 (noting RFOA does not permit rebuttal that other reasonable methods not resulting in a disparate impact were available). There is no requirement under the RFOA prong of the ADEA that the least discriminatory method be implemented. *Smith*, 544 U.S. at 243. For this reason, the Court has not considered Plaintiffs' expert witnesses' opinion that the Defendants' RIF practices failed to conform to his list of so-called "20 Reasonable HR Practices." (Declaration of Dr. Michael A. Campion, Ph.D., Pls.' App. 33, 83-84.) Defendants have no duty to establish the lack of better alternatives because the RFOA inquiry does not require a determination as to "whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class." *Smith*, 544 U.S. at 243; *see also Rollins v. Clear Creek Indep. School Dist.*, No. Civ. AG-06-081, 2006 WL 3302538 (S.D. Tex. Nov. 13, 2006) (holding that Defendant is not required to show that there are no other ways of remaining in compliance with the requirement, as it would under the Title VII business necessity test; it is simply required to show that "the [method] selected was not unreasonable." (citing *Smith*, 544 U.S. at 243))

(unpublished).  The fact that other RIF practices were available is not relevant to, and does not rebut, Defendants' RFOA defense.

Even assuming Plaintiffs had identified a specific policy or practice that caused an adverse statistical impact on employees over the age of forty, Defendants are entitled to judgment as a matter of law because all of the alleged policies were based on reasonable factors other than age.

TDMN asserts that to ensure that key personnel would be retained, it allowed managers with first-hand knowledge of employees' performance to consider subjective factors, such as which employees had the most skills critical to future performance, an employee's ability to work well with co-workers, and whether an employee exercised good judgment.  The summary judgment record shows that the process TDMN utilized was clearly not an "undisciplined system of subjective decisionmaking" that was insufficiently related to TDMN's RFOA.  *See Watson*, 487 U.S. at 999 (noting that many jobs require personal qualities that have never been considered amenable to standardized testing).  Defendants used reasonable, non-age related factors.  Plaintiffs' claim that the unduly subjective processes that TDMN purportedly used were unreasonable is without merit.

## Defendants' RFOA Defense to Plaintiffs' Rejuvenation Claim

Fifteen of the ADEA Plaintiffs who worked in the newsroom have explained their disparate impact claim of a "policy of rejuvenation" as: Defendants' decision to exclude *Quick* and *Al Dia*, subsidiaries of Belo, from the RIF. The Court has previously decided that assuming TDMN had the policy of rejuvenation alleged by Plaintiffs, Plaintiffs failed to show a genuine issue of material fact with respect to a disparate impact claim. However, because Defendants have articulated their defense to this claim, the Court will assume for purposes of argument that Plaintiffs have stated a claim for disparate impact based on the alleged rejuvenation policy.

Formulating a policy or plan to attract the audience most likely to raise profitability is a reasonable factor other than age. *Lit v. Infinity Broad. Corp. of Penn.*, 2005 WL 3088364 (E.D. Pa. Nov. 16, 2005) (finding that a repackaging effort to appeal to a younger audience was designed to keep the radio station successful and was a reasonable factor other than age). TDMN conducted extensive market research and surveys to determine how to reach more readers in an attempt to increase revenue. (Defs.' App. 1512:2-1512:23; 59:1-13; 1365:1-7; 1366:18-23; 1039:2-1040:4; 1018:12-1019:5.) TDMN contends that any policy intended to rejuvenate the publication was the direct result of market research and was taken for the explicit purpose of increasing readership and keeping the publication successful. (*Id.*) Plaintiffs do not rebut the reasonableness of the factors considered in implementing the alleged rejuvenation. Rather, several Plaintiffs admit that focusing on the audience that is most likely to garner the highest revenue is reasonable. (Defs.' App. 1108:20-1109:19; 1110:18-1111:15; 1762:9-12; 305:15-306:3; 622:1-4.) According to some of the Plaintiffs, an effort to reach a younger audience does not categorically correlate with or adversely affect older writers or editors. (Defs.' App. 2194:12-19; 111:6-15; 1126:23-1127:4; 1861:4-21;

1885:9-23; 622:5-13; 1232:16-1233:15.)  Plaintiffs' expert witness never performed any statistical analysis of the purported "policy of rejuvenation" and fails to mention this policy in his Report. (Defs.' App. 88:13-15.)  Plaintiffs' expert never analyzed the purported policy of selecting only particular positions, departments, or products for the RIF.  (*Id*. at 101:10-18.)  Plaintiffs offer no evidence of the purported impact of the exclusion of the *Quick* and *Al Dia* newsroom employees on the entire ADEA-protected group of TDMN's ADEA-protected employees.  (Pls.' Resp. at 66-68.) Defendants have shown that, as a matter of law, the exclusion of the two-year-old Belo subsidiaries from the RIF was based on reasonable factors other than age.  Further Defendants have shown, as a matter of law, that Plaintiffs' claims that the RIF termination process was unreasonable are without merit. Plaintiffs failed to rebut Defendants' RFOA defense.  Defendants are entitled to summary judgment on Plaintiffs' disparate impact claim arising from an alleged policy of rejuvenation and the failure to include *Quick* and *Al Dia* in the RIF.

### Disparate Treatment

When a plaintiff alleges disparate treatment, liability depends on whether the plaintiff's age, the protected trait under the ADEA, actually motivated the employer's decision.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000); *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004).  Under the ADEA, "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, *because of* such individual's age[.]" 29 U.S.C. § 623(a)(1) (2008) (emphasis added).  The plain language of § 623(a)(1) requires: "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision.  " *Gross*

*v. FBL Fin. Servs., Inc.*, ___ U.S. ____,____, 129 S. Ct. 2343, 2351, 174 L. Ed. 2d 119 (2009) (citations omitted).

The Court uses a three-step process to evaluate ADEA claims at the summary judgment stage, the modified *McDonnell Douglas* approach. *Rachid*, 376 F.3d at 312. First, the plaintiff must establish a *prima facie* case of discrimination, which creates a presumption that the employer engaged in unlawful discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "A plaintiff can demonstrate age discrimination in two ways, either through: direct evidence or by an indirect or inferential [circumstantial] method of proof." *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007) (quoting *Rachid*, 376 F.3d at 309). "Plaintiffs producing only circumstantial evidence of discriminatory animus ... must negotiate the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green." Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005) (citation omitted); *see also Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008) ("Although *McDonnell Douglas* was a Title VII case, the burden-shifting framework established therein has been adapted and applied to cases under the [ADEA]. . . .").[13]

In cases such as this one in which the plaintiffs were discharged during an RIF, a plaintiff must establish a *prima facie* case of age discrimination by showing that he or she: (1) was discharged; (2) was qualified for the remaining position; (3) belonged to a protected group of persons at least forty years old; and (4) was replaced by someone younger, or outside the protected

---

[13] Neither party has contended that the *McDonnell Douglas* framework is inapplicable to ADEA claims. The United States Supreme Court has not definitively resolved whether it is applicable. *See Gross*, ____ U.S. ____, 129 S. Ct. at 2349 n.2 (noting that "the Court has not definitively decided whether the evidentiary framework of [*McDonnell Douglas*], utilized in Title VII cases is appropriate in the ADEA context"). This Court is bound by Fifth Circuit precedent applying *McDonnell Douglas* to age discrimination cases. *See, e.g., Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 n.15 (5th Cir. 2010) and cases cited therein. Accordingly, the Court will consider Plaintiffs' claims under this analysis.

class, or otherwise discharged because of age. *Chapman*, 2008 WL 2185389 at *6 (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 992-93 (5th Cir. 1996) (abrogated on other grounds in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000)).

"Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to proffer a legitimate nondiscriminatory reason for its employment action." *Machinchick v. PB Bower, Inc.*, 398 F.3d 345, 350 (5th Cir. 2009) (citing *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003)). The Supreme Court has noted that "[t]his burden is only one of production, not persuasion"; and that it cannot involve a credibility assessment. *Reeves*, 530 U.S. at 143 (quoting *St. Mary's Honor Ctr.*, 509 U.S. 502, 509 (1993)). "If the defendant meets its burden, the presumption of discrimination created by the *prima facie* case disappears, and the plaintiff is left with the ultimate burden of proving discrimination." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 511-12).

Undisputed summary judgment evidence shows that Plaintiffs were terminated during an RIF.[14] An RIF is a presumptively legitimate, nondiscriminatory reason for an employer to terminate an employee. *EEOC v. Tex. Instruments Inc.*, 100 F. 3d 1173, 1181 (5th Cir. 1996). A plaintiff can rebut the presumption of legitimacy by showing either: (1) the purported RIF is merely a sham or a pretext for age discrimination, or (2) although the RIF is legitimate on its face, the employer implemented it in such a way that age was impermissibly used as a factor to determine which employees were terminated. *See Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004); *Thornbrough v. Columbia and Greenville R.R. Co.*, 760 F.2d 633, 645 (5th Cir. 1985), *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). When a plaintiff challenges the

---

[14] Plaintiffs do not dispute that they were terminated as part of an RIF; however, they contend the RIF was merely a pretext for age discrimination.

presumptive validity of an RIF, the defendant must articulate a specific nondiscriminatory reason why the plaintiff in particular was included in the RIF. *See Patrick*, 394 F.3d at 317; *Thornbrough*, 760 F.2d at 645 (noting that the concern in an RIF case is "why, given the employer's need to reduce his workforce, he chose to discharge the older rather than the younger employee"). Finally, the burden shifts back to the plaintiff who must show that the defendant's proffered reason is merely a pretext for age discrimination. *Rachid*, 376 F.3d at 312.

### Whether Plaintiffs Have Adduced Admissible, Direct Evidence of Age Discrimination

"Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption. *Sandstad v. CB Richard Ellis, Inc*., 309 F.3d 893, 897 (5th Cir. 2002); *see also Mooney v. Aramco Services Co*., 54 F.3d 1207, 1217 (5th Cir 1995) (noting that direct evidence of discrimination includes comments that directly suggest the existence of bias, that "cannot reasonably be interpreted as anything other than a reflection of bias") (quoting *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994) (per curiam)). Defendants contend that Plaintiffs offer no admissible direct evidence of age discrimination. Plaintiffs rely on age-based remarks and the incorporation of age bias in termination decisions.

In some ADEA cases, evidence of pretext is not needed. *Moss v. BMC Software, Inc*., 610 F.3d 917, 928-929 (5th Cir. 2010) (citing *Rachid,* 376 F.3d 305, 312 (5th Cir. 2004)). In *Rachid,* for example, the plaintiff presented evidence that the decision-maker told the plaintiff ". . . you're too old." *Id.* at 315. The court held that "such comments preclude summary judgment because a rational trier of fact could conclude that age played a role in [the employer's] decision to terminate [plaintiff]." *Id.* at 315-16. Nevertheless, the Fifth Circuit Court of Appeals has also "repeatedly held that 'stray remarks' do not demonstrate age discrimination." *Texas Instruments*, 100 F.3d at 1181.

"In order for an age-based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *Id.* (citing *Bodenheimer,* 5 F.3d at 958). "Remarks may serve as sufficient evidence of age discrimination if they are: 1) age related, 2) proximate in time to the employment decision, 3) made by an individual with authority over the employment decision at issue, and 4) related to the employment decision at issue." *Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674, 683 (5th Cir. 2001).

Plaintiffs assert that, in an early October 2004 meeting, Rodrigue announced that younger employees with more potential to grow would more likely survive the RIF than older employees. (Pls.' Br. at 180.) The only admissible evidence[15] cited in support of this allegation is Gary Stratton's ("Stratton") deposition. (Stratton Dep. at Pls.' App. 2208-09.) The Court has reviewed Plaintiffs' cited deposition pages. The cited pages do not mention any statement by Rodrigue. (*Id.*) Rodrigue explicitly denies ever making any statement that younger employees with more room to grow would be kept over older employees. (Rodrigue Dep. at Defs.' App. 1361:19-1362:10.) In his deposition, Stratton admitted he did not recall Rodrigue actually saying anything about age in connection with this purported statement. (Stratton Dep. at Defs.' App. 1606:4-1607:6.) Instead, Stratton testified that all he remembered Rodrigue saying at this meeting was that employees who had "less potential to grow" were more likely to be terminated in the RIF. (*Id.*) Assuming Rodrigue

---

[15] Plaintiffs cite a 15-page news article discussing the RIF which does not mention Rodrigue. (Pls.' App. 2213-27.) Newspaper articles containing the opinions of unrelated third parties are inadmissable hearsay. Plaintiffs also cite a conclusion by their expert witness that RIF decision-makers evaluated employees based on criteria that incorporated age bias. (Pls.' Br. at 180.) Plaintiffs cite no competent summary judgment evidence to support this conclusion. The expert witness' conclusion, even assuming it is admissible, is not direct evidence of discrimination because it would require the factfinder to make an inference or presumption. *See Sandstad*, 309 F.3d at 897 for the definition of direct evidence.

made the statement about employees with "less potential to grow," such a statement could "reasonably be interpreted as [some]thing other than a reflection of bias, and therefore does not constitute direct evidence of age discrimination. *Mooney*, 54 F.3d at 1217; *Davis*, 14 F.3d at 1085. Moreover, the summary judgment record contains no evidence Rodrigue had any authority or input into the decision to terminate Stratton or any of the other Plaintiffs. (Rodrigue Dep. at Defs.' App. 1359:4-12.)[16] Rodrigue informed the AMEs how much each department would need to cut in compensation costs, and delegated to the AMEs the responsibility of deciding which employees to include in the RIF. (Rodrigue Dep. at Defs.' App. 1360:1-19.) Rodrigue's purported comment about employees with potential to grow is not indicative of age discrimination towards Plaintiffs. *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576-78 (5th Cir. 2003) (noting that for comments to be probative of age discrimination, they must be made by an individual with authority over the termination in question).

### Other Age-Related Comments

Plaintiff contends the following age-related comments are proof of age discrimination or age bias. They contend that TDMN's Publisher Moroney stated in his January 2004 "Goals Speech" that TDMN could not achieve its goals if it was a "company full of middle-aged white guys like me" and that to that end, he explicitly "enlist[ed] every manager in this cause." (Pls.' App. 1038.) Plaintiffs have taken Moroney's comment out of context.

Moroney was not speaking about a goal for terminating employees in an RIF. Rather, he was addressing the broader goal of creating diversity and making those in leadership roles understand

---

[16] Plaintiffs make the conclusory response that Rodrigue "possessed leverage and exerted influence over the RIF decision-makers," but cite to no evidence in support of this conclusion. (Pls.' Resp. at 182.)

the communities they serve, such as "geographic communities, ethnic communities, religious communities, communities of interest." The goal was "a company whose senior leadership, middle management and non-management alike reflect the rich diversity of North Texas.' Moroney enlisted "managers who have the opportunity to hire people to make it his and her goal to have a reporting staff that reflects diversity.

The last three age-related comments that Plaintiffs rely upon follow:

1.      Bruce Tomaso, the Religion Editor who ranked the religion reporters and recommended the termination of Plaintiff Hadnot, noted in an email to Doug Bedell (a writer terminated in the RIF at the age of 53) that:

> I'm thinking that's f_____ great. In 5 to 7 years, I'll be 57 to 59 making as much as two reporters, unemployable elsewhere and of marginal value to the newspaper. I'll be, in other words, the next generation of Gary Strattons and Bob Trimbles."

(Pls.' App. 1195.) At the time of the RIF and when this email was sent, Gary Stratton was 57 years old; Bob Trimble was 65. (Pls.' App. 1143; Pls.' App. 1176.)

2.      Bedell responded to Tomaso, noting that "the prospect for normal retirement or a buy-out is gone for any boomers who stick this out. With a steady decline in readership, we [employees terminated in the October 27, 2004 RIF] will be only the first wave of 50-ish folk who are run off or dismissed."

(Pls.' App. 1195), and

3.      Sharon Grigsby, the deputy editorial page editor, noted that two Editorial Department employees – James Mitchell, then a 50-year-old editorial writer, and William McKenzie, then a 50-year-old editorial columnist – were "more than a little shell-shocked to see they are the last 'old guard' standing" following the RIF which brought the terminations of plaintiffs and editorial writers Tim O'Leary (then 47) and John Chamless (then 57), editorial cartoonist Bill DeOre (then 57), and editorial writer Jim Frisinger (then 53).

(Grigsby Dep., Pls.' App. 1500, Pls.' App. 1508 (Ex. 14); Pls.' App. 1137.)  These three reactions to the RIF are not direct and unambiguous comments that would allow a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in TDMN's decision to terminate Plaintiffs.  The remarks are age related, but there is no indication that they were made before or during the employment decision by the decision-maker.  They are stray remarks that are not made by the decision makers.

### Incorporation of Age-Based Criteria in Employment Decisions

Plaintiffs also assert as direct evidence of discrimination the proposition that the RIF decision-makers evaluated employees based on criteria incorporating age bias, such as "adaptability," "versatility," "skill sets best suited to projected work environment," "potential," or "flexibility." (Pls.' Br. at 182-83.)  Northern District of Texas Local Rule 56.5(c) requires "[a] party whose motion or response is accompanied by an appendix [to] include in its brief citations to each page of the appendix that supports each assertion that the party makes concerning the summary judgment evidence."  Plaintiffs cite no specific evidence in their voluminous appendix that supports this assertion.  Moreover, the cases that Plaintiffs rely on to support their theory all involve statements that were made about particular age-protected employees.  *See, e.g.*, *Machinchick*, 398 F.3d at 353; *Rachid*, 376 F.3d at 315; *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507 (5th Cir. 1988); *Guthrie v. J.C. Penney Co.*, 803 F.2d 202, 208 (5th Cir. 1986); *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989).

Plaintiff's assertion that decision-makers considered allegedly aged-based stereotypes during the RIF would require the factfinder to make an inference that the factor considered was an age-based stereotype.  Thus, it would not constitute direct evidence even if Plaintiffs had properly

supported their assertion. *See Sandstad*, 309 F.3d at 897. The fact that RIF decision-makers considered traits such as "versatility" and "flexibility" does not constitute direct evidence of age discrimination.

The Court now turns to whether Plaintiffs have shown that a genuine issue of material fact precludes summary judgment on their disparate treatment claims using the *McDonnell Douglas* burden-shifting framework. *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003).

### Application of the Burden-Shifting Approach

Plaintiffs contend that they are each able to establish the elements of a *prima facie* case, while Defendants argue that none of the Plaintiffs have established a *prima facie* case of age discrimination.

To establish a *prima facie* case in the context of an RIF, a plaintiff must demonstrate: (a) he or she is within the protected age group; (b) he or she has been adversely affected by the employer's decisions; (c) he or she was qualified to assume another position at the time of discharge; and (d) evidence from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue. *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (citing *Amburgey v. Corhart Refractories Corp., Inc.*, 936 F.2d 805, 812 (5th Cir. 1991)); *Chavarria v. Despachos Del Notre, Inc.*, 390 F. Supp. 2d 591, 596-597 (S.D. Tex. 2005); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 (5th Cir. 1996), and *Nichols*, 81 F.3d 38 at 41). The *prima facie* case of intentional age discrimination differs somewhat when the plaintiff was terminated in an RIF. Most notably, the fourth factor requires a plaintiff terminated in an RIF to produce evidence showing the defendant consciously chose to not treat age neutrally, or otherwise regarded age as a negative factor. *See Amburgey*, 936 F.2d at 812 (to prove the fourth factor, "the

evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) that defendant regarded age as a negative factor in such consideration.") (citation omitted); *Thornbrough*, 760 F.2d at 642 (citing *Williams v. General Motors Corp.*, 656 F.2d 120, 129-130 (5th Cir. 1981)).

Plaintiffs argue that the use of subjective criteria incorporating age bias in the RIF supports a claim of disparate treatment. (Defs.' Resp. at 184.) Plaintiffs again cite to the proposed regulation from the EEOC that has not been adopted as their sole support for this contention, and claim that the "EEOC has stated that the use of subjective criteria that incorporate age-biased criteria give rise to claims of disparate treatment." (*Id.* citing 75 Fed. Reg. 7217.) The Proposed Regulation states that the use of *unchecked* criteria can state a claim for disparate impact, not disparate treatment. (*Id.*) Plaintiffs' argument is specious and without merit. *See Richter v. Hook-SupeRx*, 142 F.3d 1024, 1032 n.4 (7th Cir. 1998) (finding that "the district court adequately considered and rejected the testimony of Dr. Michael Campion [the same Michael Campion who is Plaintiffs' expert witness], who stated that the subjective decision-making process used provided the 'perfect atmosphere' for age stereotyping, in part "[b]ecause the ADEA does not forbid subjective selection processes").

Finally, Plaintiffs argue that "Defendants' false accusations of deficient performance create an inference of discriminatory animus." (Pls.' Resp. at 185.) This argument is not supported by the record. *See Reeves*, 530 U.S. at 147 (noting, "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence . . . .").

Plaintiffs have not provided any evidence that Defendants intended to discriminate against them based on their ages, such as by consciously choosing to not treat age neutrally, or otherwise

regarding age as a negative factor in the RIF. *See Nichols*, 81 F.3d at 41 (citing *Amburgey*, 936 F.2d at 812); *Thornbrough*, 760 F.2d at 642 (citing *Williams*, 656 F.2d at 129-130). Plaintiffs have failed to satisfy the fourth prong and thus, have failed to make a *prima facie* case of disparate treatment. Nevertheless, the Court will assume, *arguendo*, that Plaintiffs have established their *prima facie* case of age discrimination and examine whether Defendants have articulated a legitimate, nondiscriminatory reason or reasons for Plaintiffs' terminations. An economically-motivated RIF constitutes a legitimate, nondiscriminatory reason for an employee's termination. *See EEOC v. Texas Instruments*, 100 F.3d at 1181; *Nichols*, 81 F.3d at 41; *Pribila v. Merson Elec. Co.*, 2002 WL 629528, at *3 (N.D. Tex. April 16, 2002) (Boyle, M.J.)). Defendants assert that, in this case, the RIF itself is a legitimate, nondiscriminatory reason for Plaintiffs' terminations. Nevertheless, Plaintiffs argue that the RIF was not economically driven. This assertion is based upon a hearsay statement by Plaintiff Hubbard, who testified that Moroney stated at the September 29, 2004 meeting at which he announced the RIF that TDMN was "very profitable." (*See* Hubbard Dep., Pls.' App. 1586-89.) This hearsay statement is not admissible. Moreover, Plaintiffs cherry-picked this statement and failed to cite the entire context of Hubbard's deposition testimony. Hubbard testified that Moroney qualified this alleged statement by noting that TDMN was 35% less profitable in 2004 than in 2000. (Hubbard Dep. at Pls.' App. 1587:1-2.) Plaintiffs' inadmissible evidence does not create a genuine issue of material fact either with respect to the legitimacy of the RIF or the fact that the RIF was economically driven by the downturn in the newspaper industry and Defendants' own financial problems.

Moreover, "an employer's decision to eliminate a job position . . . has been recognized as a legitimate, nondiscriminatory reason for terminating an employee." *Chapman*, 2008 WL 2185389

at *7.  In fact, the *Chapman* case involved the same RIF which resulted in Plaintiffs' terminations. During the 2004 RIF, if a job was eliminated, the person who performed that particular job was automatically included as part of the RIF. (Yates Dep. at Defs.' App. 2035:6-9.)  If a position was eliminated, the managers had no discretion to consider whether to transfer that particular employee to another position.  TDMN adhered to a strict no-transfer and no-bumping rule as part of the RIF. (Spitzberg Dep. at Defs.' App. 1526:15-25.)  Thus, for seven Plaintiffs, DeOre, Hubbard, Patterson, Powell, Reyes, Watson, and West, TDMN has shown a legitimate reason justifying their terminations, the elimination of their positions during the RIF.

Plaintiffs claim that Defendants changed job titles to create a class of one and thus eliminate certain Plaintiffs by eliminating their positions.  Plaintiffs claim Defendants amended the organization chart on September 15, 2004 because the charts were dated September 15, 2004. (Pls.' Resp. at 17) (citing Pls.' App. 1007-18.) (*See Org. Charts* at Pls.' App. 1007-18.)  Defendants point out that the charts do not indicate that they were revised as of that date, or at any time in the recent past. (*See id.*)  Plaintiffs have produced no evidence that Defendants amended the organization charts, or that any Plaintiff – including Hubbard, Powell, Watson, or West – had their job titles changed shortly before the RIF.  Moreover, even if Plaintiffs could demonstrate that job titles were changed near the time of the RIF, Plaintiffs' failure to argue and prove that they were more qualified for these positions, or should have been considered for these positions, demonstrates that the purported changes in job title are not pretexts for discrimination. *See Tucker v. SAS Inst., Inc.*, 462 F. Supp. 2d 715, 728 (N.D. Tex. 2006) (citing *Price v. Federal Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002)).

When a job was downsized in the 2004 RIF, the number of employees in a given position was reduced, but the position was not entirely eliminated. (Defs.' App. 1516:24-1517:4, 1546.) When a position was downsized, managers had to evaluate each employee in that position based on the employee's past and present job performance, and anticipated ability for future contributions. (Defs.' App. 1547.) Managers then had to numerically rank all employees in that position. (*Id.*) After the managers ranked the employees, they then had to recommend which employees should be included in the downsizing. (*Id.*)

When a job was consolidated in the 2004 RIF, two or more positions were combined or restructured into a fewer number of positions. (*Id.* at Defs.' App. 1553.) When a position was consolidated, managers had to evaluate each employee in their current position, and in the consolidated position, based on the employee's past and present job performance, and skill set. (*Id.* at Defs.' App. 1554.) Then managers had to numerically rank employees with respect to the consolidated position. (*Id.*) After ranking the employees, managers were then required to recommend which employees should be retained in the consolidated position. (*Id.*)

A plaintiff can rebut the presumption of an RIF's legitimacy by demonstrating either: (1) the purported RIF is merely a sham and nothing more than a pretext for age discrimination, or (2) the RIF, while legitimate on its face, is implemented in such a way that age is impermissibly used as a factor in determining which employees are terminated. *Utley v. MCI, Inc.*, No. 3:05-CV-0046-K, 2008 WL 836419, at *3 (N.D. Tex. Mar. 24, 2008) (citing *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004), and *Thornbrough*, 760 F.2d at 645). Although Plaintiffs do not contend that the RIF is a sham, they claim that the "entire RIF process . . . was tainted by age bias." They cite to the deposition testimony of Yates, the AME of the Sports Department at the time of the RIF, for the

54

proposition that Yates relied solely on his own judgment rather than performance evaluations to rank and evaluate employees for the RIF. (*Id.* 185.) Defendants respond that Plaintiffs mischaracterize Yates' testimony. Yates testified that he did not use the prior year's performance reviews to rank the five assigning editors in the Sports Department during the RIF process. (Yates Dep. at Pls.' App. 2448-2450.) Yates specifically testified that he "used annual evaluations" during the course of deliberations regarding who to cut from the Sports Department. (Yates Dep. at Defs.' App. 2027:18-24.) Further, Yates conferred with five other managers during the ranking process and they all concurred with him. The conclusory statement that the entire RIF process was "tainted with age bias" cannot be inferred from Yates' testimony. (*See* Pls.' Resp. at 185-86.) Plaintiffs state that their expert witness stated in his declaration at ¶ 29 that he "found the reasons for recommending employees for termination were simply 'post hoc' justifications for the recommendations, not objective evaluations of the employees' performance." (*Id.* at 185.) In fact, Campion makes the conclusory supposition that the checklists on the RIF forms "could have been little more than convenient post hoc justifications for why these employees were selected for termination." (Campion Dec. ¶ 29 at Pls.' App. 21-22.) The record contains no evidence that the checklists were in fact, post hoc rationalizations. Further, the record contains no evidence that the checklists did not state the real reasons for termination. The checklists contained multiple reasons. No matter when the checklist was completed, Campion's inadmissible speculations would not prove that the RIF was implemented in such a way that age was impermissibly used as a factor in determining which employees are terminated. Plaintiffs failed to rebut TDMN's legitimate, nondiscriminatory reasons. Defendants are entitled to rely on the RIF itself as a legitimate, nondiscriminatory reason for Plaintiffs' terminations.

Again, for purposes of argument, the Court will presume that Plaintiffs created a genuine issue of material fact with respect to the legitimacy of the RIF as a nondiscriminatory reason for Plaintiffs' terminations. The Court will now consider whether Defendants have articulated a specific legitimate and nondiscriminatory reason for the termination of each Plaintiff during the RIF. *See Utley*, 2008 WL at *3 (citing *Patrick*, 394 F.3d at 317, and *Thornbrough*, 760 F.2d at 645 (noting that the concern in an RIF case is "why, given the employer's need to reduce his workforce, he chose to discharge the older rather than the younger employee")).

## Michael S. Coons

## Defendants' Nondiscriminatory Reasons

Yates, the manager responsible for making RIF-related decisions for the Sports Department, selected Coons for the RIF because TDMN downsized the sports copy editor positions from nineteen to sixteen. Yates and other managers rated and ranked all nineteen sports copy editors. The other managers agreed with Yates' rankings. Coons ranked eighteenth. Yates gave the following reasons for terminating Coons. Unlike other copy editors who had not received reprimands, Coons was reprimanded frequently. Further, Coons received average overall ratings on his annual performance evaluations. Additionally, compared to his peers, he reacted poorly to changes in deadline situations. He had a temper. His temperament sometimes failed to hold up well to changes in deadlines. Coons did not think visually as he edited, and he failed to attend mandatory "breakdown" meetings. Defendants have articulated specific nondiscriminatory reasons why Coons was included in the RIF. Therefore, the burden shifts back to Plaintiffs to show that Defendants' proffered reasons are merely pretext for unlawful age discrimination. *Utley*, 2008 WL 836419 at *3 (citing *Rachid*, 376 F.3d at 112). At the pretext stage, a plaintiff must present sufficient evidence to create

a genuine issue of material fact with respect to whether age was a "but for" cause of the discharge. *Gross*, 129 S. Ct. at 2350-51. A plaintiff may do this by showing that (1) a discriminatory reason more than likely motivated the employer, or (2) the reason offered by the defendant is unworthy of credence. *Id*. Stated differently, the employee must show that the employer's proffered reason for its decision is pretextual, and that age bias is the real reason for the employer's decision. *Smith*, 351 F.3d at 196. To show pretext, the plaintiff may produce evidence creating a fact issue as to whether the plaintiff was clearly better qualified than a retained employee who assumed some of the plaintiff's duties, or the plaintiff may otherwise disprove the legitimate reasons proffered by the defendant for his or her termination. *Chapman*, 2008 WL 218539, at *8. "To establish a fact question, a plaintiff must provide sufficiently specific reasons for his opinion; mere subjective speculation will not suffice." *Nichols, v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996).

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs point to Yates' 2004 RIF evaluation which stated Coons was a "solid editor," the December 2002 review which said one of his "Strengths" is that Coons': "approach is organized and methodical . . . tackles his duty roster efficiently under deadline pressure." (Pls.' App. 0878-0879.) They claim his February 2004 review states, "can handle a heavy workload on deadline." (Pls.' App. 0885.) Plaintiffs state that Coons "meets expectations" for the relevant 2002-2004 RIF evaluation period. (Defs.' App. 2089.) They assert that nine of the retained editors also received "meets expectations" ratings for the same period, yet three were terminated. (Yates Dep., Pls.' App. 2460-2461.) Plaintiffs assert that these examples show that Defendants' stated reasons are false. This evidence shows only that Coons received mixed reviews, not that Defendants' stated reasons are false. Plaintiffs attempt to refute Yates' contention that Coons received "frequent reprimands" by

stating that Coons' RIF evaluation indicated that he had no written warnings or other disciplinary documentation during the RIF evaluation period ("the last 3 years"). (P's.' App. 0419.) However, Coons admits to three reprimands which occurred earlier. Coons blames any and all reprimands on what Coons perceives as Yates' "tendency to act on false assumptions." (Coons Dec. at ¶¶ 2, 4-6, Pls.' App. 3144, 3145-3146.) However, "an employer may take an adverse action for any reason, fair or unfair, so long as the action is not motivated by an age-based discriminatory animus." *Hidalgo v. Overseas Condado Ins. Agencies, Inc*., 120 F.3d 328, 332 (1st Cir. 1997).

Plaintiffs also assert that Yates reprimanded one other copy editor (Coons Dec. at ¶ 8, Pls.' App. 3146.) Notably, Plaintiffs fail to provide a copy of the purported e-mail reprimand. Defendants object to the portion of Coons' Declaration referencing the alleged e-mail from Yates to the other editor on grounds the Declaration is conclusory, speculative, not based on personal knowledge in violation of Rule 56(e), and hearsay. Moreover, Defendants contend that under the Best Evidence rule, Plaintiffs should be required to produce the purported e-mail. The Court agrees. However, assuming that Yates once reprimanded another copy editor, Plaintiffs cite no evidence that Yates reprimanded any copy editors other than Coons and that editor, nor do they show how this alleged reprimand of another editor demonstrates intentional discrimination against Coons based on his age. Such a reprimand would not have affected the outcome of Yates' ranking of the sports copy editors because TDMN terminated three sports copy editors in the RIF, and Coons ranked eighteenth out of nineteen. Accordingly, Plaintiffs have not offered "substantial" evidence that this reason for including him in the RIF is pretextual.

To counter Yates' assertion in the RIF evaluation: "headline writing skills not as strong as others," Plaintiffs point to Coons' February 13, 2004 review which stated that Coons had "good

news judgment" and was "vocal when an important story breaks"; "dedicated editor with a strong sense of purpose … excellence is . . . ultimate goal . . . sets a high standard and pushes himself to achieve it on a story-by-story basis." Plaintiffs assert that Yates' ranking of Coons has no meaning but simply reflects that Yates targeted Coons and contrived reasons to support the ranking.

Defendants contend that Plaintiffs do not contest that TDMN downsized Coons' sports copy editor position, that his overall ratings on annual performance evaluations were average, or that he failed to attend breakdown meetings regularly. (Defs.' Resp. at 197-99.) Rather, Plaintiffs argue that nine other sports copy editors also got average ratings and the breakdown meetings were not mandatory because they were held before Coons' four o'clock shift. Plaintiffs do not contest that these meetings were held every day and that in both Coons' 2002 and 2004 performance appraisals, Renbarger instructed Coons to attend more, or at least a few, breakdown meetings a month. (Defs.' App. 318, 243, 320, 245.) Plaintiffs have not shown that Yates' termination of Coons for his average ratings and failure to attend breakdown meetings is a pretext for age discrimination.

Plaintiffs attempt to contest the fact Coons had a temper and did not respond well to deadlines. With respect to Coons' temper, Plaintiffs merely state that "Coons is not aware of any facts to support such an assertion." (Pls.' Resp. at 198.) However, both Yates and Renbarger concluded that Coons had a problem controlling his temper (Defs.' App. 2090, 2055), and Yates explained that Coons "has a temper," and "his temperament sometimes doesn't hold up well in deadlines, to changes." (Yates Dep. at Defs.' App. 2057:9-17.) This conclusion was noted in both Coons' 2002 performance evaluation and in his RIF evaluation. (Defs.' App. 318, 243, 2090, 2055.) With respect to Coons' tendency to respond poorly to deadlines, Plaintiffs cite his 2002 evaluation – which noted, in part, he "tackles his duty roster efficiently under deadline" – and his 2004

evaluation – which stated Coons "can handle a heavy workload on deadline." (Pls.' Resp. at 198.) However, the same 2002 evaluation, performed by Renbarger, notes that Coons "still becomes overly frustrated" when problems occur near deadlines, and warned Coons to "curb these outbursts because they are disruptive to other [staff]." (Defs.' App. 317, 243.) Moreover, the fact that Coons may handle his "duty roster" or a heavy workload well under deadlines does not conflict with Yates' unequivocal testimony that Coons does not respond well to changes in deadlines. (Defs.' App. 2057:9-17.) Coons admitted that both his 2002 and 2004 performance appraisals were fair. (Coons Dep. at Defs.' App. 243:21-244:4, 245:12-246:19.) Thus, Plaintiffs have failed to offer substantial evidence discrediting the fact that Yates considered Coons' temper or his tendency to respond poorly to changes in deadlines.

Regarding the fact that Coons needed to think more visually as he edits, Plaintiffs claim this "is completely subjective and unsubstantiated." (Pls.' Resp. at 199.) The only evidence Plaintiffs cite in support of this argument is a Declaration from Plaintiff Gary West ("West"), that everyone at TDMN was told to appeal to younger readers. (*Id.*) Common sense dictates that a person of any age could appeal to younger readers and the editor's age is irrelevant to the completion of this purported directive. Even if admissible and true, a factfinder could not conclude from this remark that it had anything to do with Coons' termination or that, but for Coons' age, he would not have been terminated. This criticism regarding the need to think more visually is documented in Coons' 2002 and 2004 performance evaluations. Renbarger noted that Coons needed to think more visually as he edits, and that, in this regard, he should provide readers with more charts, graphics, and photos.

"The evidence offered to counter the employer's proffered reasons must be substantial." *See McMartin v. OfficeMax, Inc*., No. 3:08-CV-0297-K, 2009 WL 2340941, at *7 (N.D. Tex. July 27,

2009) (citations omitted). Plaintiffs have offered no substantial evidence to disprove the fact that, when recommending Coons for termination in the RIF, Yates considered Coons' lack of visual thinking in his edits.

Moreover, Coons testified to the absence of age discrimination at TDMN and much of this testimony remains undisputed, including his testimony that: no one ever made discriminatory comments about his age while he worked for TDMN; he was not aware of any facts indicating that any of his supervisors other than Yates discriminated against him on the basis of his age; his assertion that Yates discriminated against him was based solely on his own subjective belief, and not on any objective facts; and, he had not heard of anyone in management at TDMN making age disparaging remarks or stereotyping older employees. (Coons Dep. at Defs.' App. 290:14-17, 294:22-295:15, 296:21-301:4.)

## Conclusions Regarding Coons' Claim

Plaintiffs have failed to show that a genuine issue of material fact exists with respect to whether Defendants' reasons for Coons' termination are a pretext for age discrimination. Moreover, they have failed to show that a genuine issue of material fact exists with respect to proof that "but for" Coons' age, he would not have been terminated. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claim that TDMN intentionally terminated Coons in the RIF because of his age.

## Stephen Wayne Yount

### Defendants' Nondiscriminatory Reasons

Yates selected Yount for the RIF because TDMN downsized the sports assigning editor position, and because, compared to his peers, Yount was not: (1) as creative; (2) nearly as good at solving problems; and (3) as strong a line editor. Other editors had the impression Yount was not reading the stories submitted by writers before they were passed on. Further, Yount had been demoted a few years before the RIF. At no time did Yates consider Yount's age in making the decision to terminate his employment in the RIF. (Yates Aff. ¶ 7 at Defs.' App. 3283.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs claim that TDMN's assertion that Yount was selected for termination because he had "many problems with performance during his tenure" is false. Plaintiffs support their claim with: (1) the fact that in 1995, Yount was promoted to assistant editor; (2) in a 2002 performance evaluation, Yates praised Yount's performance by stating that Yount "was a thoughtful participant in our department"; had melded a strong team; offered ideas on many other beats; was thrust into his role as "pro basketball editor" at a challenging time; and was a "good advocate for his writing staff"; and "Steve's supervisory combination of zones and pro basketball is unique in our department." (Pls.' App. 0963.) Plaintiffs state that Yates also noted that Yount was in charge of numerous suburban zones and also managed the NBA/Mavericks coverage, "one of the hottest beats at our newspaper." (*Id*.) Yount received positive comments from his supervisor, Dennis Hall, in his 2003 performance review, noting Yount's varied responsibilities and his development of "potential" in writers. (Pls.' App. 0966-0967.) Plaintiffs point out that Defendants do not cite to a 2004

performance review. Plaintiffs claim that Yates' ranking Yount as fifth out of five assigning editors establishes only that Yates targeted Yount.

Defendants reply that Plaintiffs do not dispute that TDMN downsized Yount's sports assigning editor position. (Pls.' Resp. at 199-201.) With respect to Plaintiffs' attempt to discredit the reasons why Yount was one of the two assigning editors included in the RIF, Defendants assert that Defendants did not have the burden to substantiate these assertions, but to merely articulate them. (Defs' Br. at 99.) It is well settled that at the "pretext" stage, Plaintiffs have the burden to affirmatively disprove Defendants' reasons. (*Id*.) However, Plaintiffs introduce no evidence discrediting the reasons for Yount's termination. (Pls.' Resp. at 200.) For example, with respect to the criticism that editors had the impression Yount was not reading stories submitted by writers before passing them on, Plaintiffs argue that Yount was simply "following instructions to get copy quickly into the flow." (Pls.' Resp. at 200.) With respect to Plaintiffs' claim Defendants "falsely state that Yount was 'demoted' in the 2001 reduction in force," Yount conceded in his deposition that it was a demotion. (Yount Dep. at Defs.' App. 2141:18-24.) Yount admitted that he had no reason to believe Yates discriminated against him based on his age; his age discrimination claim was merely based on his belief he was discriminated against, and not on any specific facts; he never heard anyone at TDMN make discriminatory remarks; there was no specific person who he believed discriminated against him based on age; and, after he was terminated, employees of TDMN contacted him about openings at TDMN on two separate occasions, both of which were within a year of the RIF. (Yount Dep. at Defs.' App. 2159:9-13, 2161:13-2163:1, 2180:2-16, 2181:5-8, 2182:16-19.)[17]

_____

[17] TDMN has rehired a number of employees who were terminated in the 2004 RIF.

### Conclusions Regarding Yount's Claim

Plaintiffs have not provided substantial evidence to show that Defendants' articulated reason for terminating Yount's employment in the RIF was a pretext for age discrimination. Moreover, Plaintiffs have produced no evidence that age was the "but for" cause of his termination, as required under *Gross*. Accordingly, because Plaintiffs failed to discredit any of the reasons Defendants proffered for including Yount in the RIF, and failed to produce any evidence that age was the "but for" cause of his termination, as required under *Gross* (*id.* at 199-201), their claim that Yount was terminated because of his age fails as a matter of law. There is no genuine issue of material fact with respect to Yount's claim. Defendants are entitled to summary judgment on Yount's disparate treatment claim.

### Jan Michael Hubbard

### Defendants' Nondiscriminatory Reasons

Yates decided to eliminate Hubbard's position because it was a "luxury," one that was not essential to a future viable Sports Section. (Yates Dep. at Defs.' App. 2031:24-2032:10.) Yates decided that the Morning Line column was not a critical part of the Sports Section. (*Id.* at Defs.' App. 2032:21-2033:13.) At no time did Yates consider Hubbard's age when deciding to eliminate his position. (Yates Aff. ¶ 9 at Defs.' App. 3283.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs assert that, contrary to Defendants' assertion, Hubbard's actual job title was "Special Writer" and he was the "Page Two" columnist. (Pls.' App. 0296.) Plaintiffs claim that Defendants admit that a "Special Writer" "can be assigned to do a variety of things, including writing about a particular beat, writing feature stories, or writing specialty or analytical sports

columns." (Defs.' Br. at 21-22.)  Plaintiffs point to positive feedback on the column, from Hubbard's supervisor, Gary Leavell, and from Yates.  (Hubbard Dec. ¶¶ 11, 21 Pls.' App. 3162-3163, 3164, 3167.)  Plaintiffs rely on Hubbard's claims that he read columns on page two of the Sports section that were similar to the "Morning Line" after his termination.  However, Plaintiffs have no evidence that the writers of the new columns were employed by TDMN or that they were under age 40 at the time of the RIF. (Hubbard Dec. ¶¶ 6, 9, 26 and Exh. A, Pls.' App. 3162, 3163, 3164; Pls.' App. 1171.)  Hubbard's claim is based entirely on subjective beliefs.  Purported facts based only on subjective beliefs are not competent summary judgment evidence, and the Court will not consider them.  *See Grimes v. Texas Dept. of Mental Health and Mental Retardation,*102 F.3d 137, 139 -140 (5th Cir. 1996) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden."); *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994) (An employee's self-serving generalized testimony stating her subjective belief that discrimination occurred "is simply insufficient to support a jury verdict in plaintiff's favor."); *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1449 (5th Cir. 1993) ("Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue, ... if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.") (citations omitted). In response to motions for summary judgment, it is therefore incumbent upon the non-moving party to present evidence–not just conjecture and speculation–that the defendant retaliated and discriminated against plaintiff)).  *See also Little v. Liquid Air Corp.,* 37 F.3d 1069, 1079 (5th Cir. 1994) (en banc).

In his deposition, Hubbard admitted his Morning Line column was eliminated in the RIF and did not reappear in TDMN at any time after the RIF. (Hubbard Dep. at Defs.' App. 607:19-608:24.) Plaintiffs fail to show that either of the columns that purportedly appeared later was a duplicate of the Morning Line, or that the columns fulfilled the same purpose. More importantly, Plaintiffs fail to show that anyone was hired to replace Hubbard. "A company is under no obligation to eliminate all the job duties handled by an individual in a given position when the company eliminates the position." *Tucker*, 462 F. Supp. 2d at 728 n.5 (rejecting plaintiff's argument that the employer's reasons for terminating her in a reduction in force were pretextual "simply because the 'critical functions' of Tucker's former job are still being performed by employees within the company"). The allegation that others at TDMN may have occasionally written similar columns after the RIF does not prove that the reasons for eliminating Hubbard's position are pretextual. The "test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position." *Furr v. Seagate Tech.*, 82 F.3d 980, 988 (10th Cir. 1996) (rejecting employee's assertion that his position was not eliminated because his responsibilities were still performed after his layoff); *see also Webb v. Level 3 Communs., LLC*, 167 F. App'x 725, 733 (10th Cir. 2006) (citing *Furr*, 82 F.3d at 988, when concluding "the fact that [the plaintiff's] responsibilities existed after the layoff is not evidence of discrimination."). Hubbard's testimony that he has no basis for his age discrimination claim other than his belief that age factored into the decision to terminate him in the RIF is undisputed. (Hubbard Dep. at Defs.' App. 620:1-5, 623:21-624:2.)

### Conclusions Regarding Hubbard's Claim

Plaintiffs have not produced any evidence that the reasons for Hubbard's termination are unworthy of credence and that age was the "but for" cause of Hubbard's termination, as required under *Gross*. (Pls.' Resp. at 201-02.)  There are no genuine issues of material fact with respect to Hubbard's claim.  Accordingly, Defendants are entitled to summary judgment on Hubbard's disparate treatment claim.

### Gary Van West

### Defendants' Nondiscriminatory Reasons

Yates decided to terminate West's employment.  He eliminated West's position as "Horse Racing Writer" because the demand for horse racing coverage had been declining for several years.  Further, horse racing coverage was not essential to the future Sports Section.  (Yates Aff. ¶ 10 at Defs.' App. 3283.)  At no time did Yates consider West's age when deciding to eliminate his position. (*Id.* ¶ 11 at Defs.' App. 3283.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs contend that Yate's assertion is false because West had never heard of the position "Horse Racing Writer."  He claims his position was "Special Writer," the same job title as many other writers with varied duties and beats.  West contends that he was assigned to cover the "beat" of horse racing, received good performance reviews throughout his employment, and in 2004 was rated as "Exceeds Expectations." (West Dec. at ¶¶ 15, 16 Pls.' App. 3224.)  West avers that he wrote about nearly all sports while at TDMN on topics as varied as the Mavericks, Cowboys, Golden Gloves, soccer, senior track and field, and high school football.  He claims he also wrote features (including about sports of the 1990s and the history of the Yale-Harvard football game), several

book reviews, and twice wrote previews of the Academy Awards. West contends he covered these varied topics along with the horse racing beat. West claims his additional writings demonstrate that TDMN did not regard him as just a "Horse Racing Writer." (West Dec. at ¶ 10, Pls.' App. 3223.) The Court has previously noted that the evidence does not support Plaintiffs' claim that Defendants created new job titles for purposes of eliminating employees during the RIF.

Plaintiffs argue that Defendants' attempts to narrowly portray West's role as "Horse Racing Writer" show that TDMN's reasons for terminating him are false. Plaintiffs contend that the excuse of "reduced demand" for coverage of horse racing did not occur until after 2004; that West was assigned to cover the beat during its rise in popularity; and that this shows the strength of his skills. Also, TDMN's plan for West, as articulated by Sports Editor Dwayne Bray, was to have him continue to cover the horse racing beat until the 2004 Breeders' Cup World Thoroughbred Championships, and then to make him a Sports columnist. (West Dec. at ¶¶ 3, 4, Pls.' App. 3220.) Instead, Yates terminated West three days before the Breeders' Cup. After his termination, West covered the event for the *Fort Worth Star Telegram* and observed that TDMN sent Richard Durrett, Kevin Blackstone, and Eddie Sefko to cover the event. West contends he had significantly more experience and knowledge and was better prepared to cover the event than Durrett, Blackstone and Sefko. West declares that after a long history of insisting that horse racing was an important sports topic to cover, TDMN suddenly, three days before the Breeders' Cup, determined that horse racing was not important as an area of coverage. (West Dec. at ¶¶ 2, 3, Pls.' App. 3220.)

TDMN also asserts that it had "substantially reduced the space allotted to horse racing coverage" before the RIF. (Defs.' Br. at 23.) The newspaper, and the sports section in particular, were shrinking, and TDMN had reduced the space allotted to almost everything except, perhaps,

coverage of the Dallas Cowboys. West also observed through reading the paper that after the RIF, TDMN continued to cover the sport of horse racing in a weekly horse racing column, at least during the Lone Star season. West has observed TDMN reporters frequently at Lone Star park since 2004 to cover major races. TDMN also has continued to employ Rick Lee to provide the newspaper with picks for Lone Star's races and a morning line. West contends he was well qualified to do all of these jobs. (West Dec. at ¶¶ 3, 5, Pls.' App. 3220-3221.)

Plaintiffs point out that sports writers at TDMN frequently changed assignments and beats. Tim Cowlishaw, for example, changed from football to the hockey beat. Kevin Blackstone was not in the Sports Department before becoming a sports columnist. West asserts that TDMN did not emphasize a person's familiarity with a particular sport when making assignments. For example, in 2000, West was asked to cover the fifth game of the Stanley Cup Finals, although at that time he had no experience covering hockey. Dave Smith, the Sports Editor who preceded Yates, stated in West's annual evaluations that TDMN did not intend to confine his beat to horse racing. Smith told West that, if he was a columnist, "you'd be one of our best columnists . . . and if you were a features writer, you'd be one of our best features writers." In April or May 2004, Bray met with West and confirmed that TDMN plan was for West to become a general sports columnist after the Breeders' Cup. That was West's goal and his expectation at the time he was terminated. Instead, TDMN terminated both West and Hubbard and permitted two younger writers, Todd Davis and Steve Davis, to write columns after the RIF. Bray, in fact, met with West after the RIF and informed him he had not agreed with the decision to terminate him. (West. Dec. at ¶¶ 6-9, 12, 29, Pls.' App. 3221-3223, 3227.) Plaintiffs contend that these facts contradict Defendants' assertion that West's position as "Horse Racing Writer" was eliminated and that West was not "qualified to assume a remaining

position." However, in his deposition, West admitted his position was eliminated in the RIF, and that "TDMN did not hire anyone specifically to cover horse racing" at any time following the RIF. (West Dep. at Defs.' App. 1851:13-22.) West's Declaration now disputes the fact that TDMN eliminated West's position in the RIF. (Pls.' Resp. at 202.) West's Declaration, to the extent that it conflicts with his deposition testimony, is a sham affidavit and is not admissible. *See S.W.S. Erectors,* 72 F.3d at 496. Plaintiffs clearly failed to introduce evidence sufficient to rebut Defendants' assertions. Plaintiffs' arguments about West's title are irrelevant because West admits he spent the vast majority of his time writing about horse racing, a beat no one else covered. (West Dep. at Defs.' App. 1839:25, 1851:4-8.) Plaintiffs likewise concede that being a "horse-racing journalist" was West's "primary responsibility as an employee." (Pls.' Resp. at 26.) Clearly, there is no dispute that West was the only employee whose job duties principally consisted of writing about horse racing, and his termination in the RIF resulted from the elimination of his position because of a reduction in horse racing coverage. Plaintiffs do not contend that the demand for horse racing coverage did not begin to decline before the RIF, just that most of the slippage in demand was later. (Pls.' Resp. at 202) (citing West Dec. ¶¶ 3-4 at Pls.' App. 3220.) Yates affirmed that the demand for horse racing coverage had dramatically declined in the years leading up to the RIF. (Yates Aff. ¶ 10 at Defs.' App. 3283.) Irrespective of whether the decline was "dramatic," or had only just begun – as West contends – the parties are in agreement that demand began to decline before the RIF, and has continued to decline.

Plaintiffs next argue that TDMN sent three writers to cover the Breeders' Cup. (Pls.' Resp. at 203) (citing West Dec. ¶¶ 2-3 at Pls.' App. 3220.) However, Yates noted that TDMN ran occasional horse racing stories following the RIF. (Yates Aff. ¶ 10 at Defs.' App. 3283.) TDMN's

sending some reporters (whose primary responsibility was not horse racing) to cover the Breeders' Cup after it eliminated West's position in the RIF, does not show that the reasons for terminating West were pretextual. Moreover, Plaintiffs do not assert these reporters were under forty, or even younger than West. (*See* Pls.' Resp. at 203.) Plaintiffs admit there were cutbacks in the amount of space allotted to horse racing before the RIF, but contend the entire newspaper, especially the Sports Section, was experiencing cutbacks. (*Id.*) (citing West Dec. ¶¶ 3, 5 at Pls.' App. 3220-21.) This directly conflicts with West's deposition testimony, in which he testified that cutbacks in coverage in 2004 were "mainly a reduction in space allotted to horse racing." (West Dep. at Defs.' App. 1847:2- 6.) West provides no testimony in his deposition that the entire newspaper, or the Sports Section in particular, had downsized prior to the RIF, or that any other parts of the paper were downsizing. Furthermore, Plaintiffs do not claim other parts of TDMN suffered cutbacks of the same magnitude as horse racing, but merely allege they also suffered cutbacks at "some" level. (*See* Pls.' Resp. at 203.) Plaintiffs contend that following the RIF, TDMN continued to cover horse racing. (*Id.*) In support, they rely on West's Declaration, in which he claims to have observed reporters from TDMN at Lone Star Park "since 2004 to cover major races." (*Id.*) (citing West Dec. ¶¶ 3, 5 at Pls.' App. 3220-21.) Defendants do not dispute that TDMN continues to run an occasional horse racing story, including "major races." (Yates Aff. ¶ 10 at Defs.' App. 3283.) This fact does not contradict the fact that TDMN eliminated West's position of a full-time Horse Racing Writer, and has not replaced him since the RIF – both of which West admits. Plaintiffs also contend that TDMN "has continued to employ Rick Lee to provide the newspaper with picks for Lone Star's races and a morning line." (Pls.' Resp. at 203.) West admitted that Rick Lee is only a part-time employee. (West Dep. at Defs.' App. 1876:6- 10.) Additionally, Rick Lee was employed as a part-

time handicapper before the RIF. (Yates Dep. at Defs.' App. 2037-38.)  Given West's testimony that TDMN has not replaced him since the RIF (*see* West Dep. at Defs.' App.1851:19-22), the allegation that TDMN still has a part- time employee predicting the winners of local horse races does not discredit Defendants' reasons for terminating West in the RIF.  Even if Plaintiffs could demonstrate that other employees of TDMN  absorbed some of West's duties following the RIF, this would not constitute evidence of pretext. "[A] company is under no obligation to eliminate all the job duties handled by an individual in a given position when the company eliminates the position." *Tucker*, 462 F. Supp. 2d at 728 n.5.  Accordingly, given the undisputed fact that TDMN eliminated West's position in the RIF and has not replaced him, the allegations that various other employees perform some of the same duties as West are completely irrelevant to the issue of whether the elimination of his position was a pretext for age discrimination.   In sum, Plaintiffs have not introduced "substantial" evidence discrediting the reasons Defendants proffered for including West in the RIF.  Nor have Plaintiffs produced any evidence that age was the "but for" cause of his termination, as required under *Gross*. (*See* Pls.' Resp. at 202-04.)  Additionally, West testified at his deposition that Yates never did anything to make West think that Yates' personal animosity towards him was based on his age; no one ever made discriminatory comments towards him; he is not aware of anything in writing demonstrating age discrimination; and he does not believe anyone other than Yates discriminated against him based on age. (West Dep. at Defs.' App. 1877:16-1878:1, 1884:4-6, 1884:13-20.)

## Conclusions Regarding West's Claim

West fails to raise a genuine issue of material fact concerning TDMN's reasons for terminating him.  West presents no competent summary judgment evidence that shows age was the

"but for" reason that TDMN terminated him.  There is no genuine issue of material fact with respect to West's claim.   Accordingly, Defendants are entitled to summary judgment on West's disparate treatment claim in Count Four.

## Gary Stratton

### Defendants' Nondiscriminatory Reasons

Jarrett Rush ("Rush") recommended Stratton for termination in the RIF because TDMN downsized his position of copy editor on the Suburban News Desk.  On performance reviews, Stratton ranked last behind the other layout editors in multiple performance-related categories which included productivity, adaptability, and versatility.  Additionally, Rush had to make more revisions to Stratton's work than to the other two layout editors with whom Rush compared him.  (Rush Dep. at Defs.' App. 1405:17-1406:8.)  Rush never took Stratton's age into account when deciding to terminate him in the RIF. (*Id*. at Defs.' App. 1406:15-18; Rush Aff. ¶ 4 at Defs.' App. 2880.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs contend that Rush became Stratton's supervisor "sometime" in 2004 and supervised him for only a short time before the RIF. (Defs.' Br. at 23; Rush Dep., Pls.' App. 1956.) They also note that Rush acknowledged that all three employees had received the same performance rating, "meets expectations." (Rush Dep., Pls.' App. 1956-1957.)

Plaintiffs assert that Defendants' claim that Stratton's productivity was "much less" than the other layout editors because he completed only one "section" a day, compared to one-and-one-half to two sections by the two comparators is false.  (Defs.' Br. at 24.)  Plaintiffs claim that Defendants fail to specify the sections, covers, or specific days to which they refer. (Stratton Dep., Pls.' App.

2205.)  Nevertheless, they contend Stratton testified that he averaged building one to one-and-one-half "covers" (front pages) a day, depending on the section.  (Stratton Dep., Pls.' App. 2205-2206.)

Plaintiffs also label as false Defendants' assertion that Stratton was not "versatile" because he was unable to switch back and forth between "multiple" sections on a given day.  (Rush. Dep., Pls.' App. 1955; Rush Dep., Pls.' App. 1974.)  Plaintiffs assert that Stratton switched between "two" sections to complete one-and-one-half covers, and that he assisted others in finishing their sections.  (Stratton Dec. at ¶ 1, Pls.' App. 3209.)  Plaintiffs allege that Defendants provide no documentation to support their conclusory assertions that Stratton was less productive than the other two editors and point out that Stratton rarely missed deadlines and was consistently on time with all his sections even when others on the desk missed theirs.  Stratton claims he assisted others (including Jennifer Robles) in making deadline and points out that other designers often had problems with Robles' sections.  (Stratton Dec. at ¶ 1, Pls.' App. 3209.)

Plaintiffs assert as false Defendants' claim that Stratton ranked third in "adaptability" because he "struggled learning CCI," a pagination system which allows the editor to lay out pages on a computer.  (Stratton Dep., Pls.' App. 2203; Rush Dep., Pls.' App. 1973.)  They claim Stratton flatly denied that he "continued to struggle with certain aspects of CCI" until he was terminated.  (Defs.' App. 1599; Stratton Dep., Pls.' App. 2204.)  They point out Stratton's contention that: (1) like his colleagues, he learned the CCI system when TDMN began using it; (2) almost everyone on the zone desk had occasional trouble with building charts on the CCI system; and (3) he took a course in building charts and had no further problem before Rush became his supervisor. (Stratton Dec. at ¶ 2, Pls.' App. 3209.)

Plaintiffs also label as false Defendants' assertion that Rush had to make more revisions to Stratton's work than to the other two layout editors but Rush "tweaked things" for all the editors. (Defs.' App. 1406, Rush Dep., Pls.' App. 1974-1975.) Rush testified in his Affidavit that "ultimately, [he] decided to terminate Gary Stratton." (Defs.' App. 2880, Rush Aff. at ¶ 3.) Plaintiffs contend that these facts establish that Rush targeted Stratton based on false allegations.

Defendants note that Plaintiffs do not dispute that TDMN downsized Stratton's position, or that Stratton was by far the weakest of the three layout editors. (Pls.' Resp. at 212-14.) With respect to Plaintiffs challenge to Defendants contention that Stratton's productivity was lower than the other layout editors, Defendants point out that Stratton admitted he did not know how many covers the other layout editors averaged per day. (Stratton Dep. at Defs.' App. 1600:14-1601:7.) Therefore, he cannot make a comparison. Rush's undisputed testimony is that "there were days where one layout editor would build two sections," whereas Stratton "could [only] do one section a day." (Rush Dep. at Pls.' App. 1955, 1974.)

Defendants contend that Plaintiffs misconstrue Defendants' argument and evidence with respect to versatility. Defendants state they never claimed that the other layout editors worked on "more than two sections" each day, but only argued that they worked on "multiple" sections per day. Plaintiffs' assertion that Defendants failed to prove any editor worked on more than two sections is baseless, as well as irrelevant. Plaintiffs rely on Stratton's Declaration. However, Stratton's Declaration conflicts with his deposition testimony which indicates that Stratton lacked personal knowledge with respect to the other layout editors' work or productivity. Accordingly, his testimony is not admissible under the sham affidavit doctrine.

Defendants contend that Plaintiffs do not dispute that Stratton had more difficulties with CCI than the other layout editors, or assert the other layout editors experienced difficulties with CCI. (Pls.' Resp. at 213-14.) Rather, Plaintiffs simply deny that Stratton continued to struggle with "building charts" in CCI at the time of his termination, even though he testified that, up until the time he was let go, "[s]ome aspects [of CCI] were a little bit more difficult than others." (Stratton Dep. at Defs'. App. 1598:11-1599:6.) Rush unequivocally testified that Stratton had more troubles with CCI than the other two layout editors. (Rush Dep. at Defs.' App. 1403:19-1404:20.) Irrespective of the precise level or type of difficulties Stratton faced with respect to CCI at the time of the RIF, Rush, the decision-maker, perceived that he had more problems with CCI than his colleagues. The record does not show that Rush's perception regarding CCI problems was a pretext for discrimination.

Finally, Defendants assert that Plaintiffs have failed to disprove that, of the three layout editors, Rush had to "tweak" – or revise – Stratton's work far more often. (Rush Dep. at Defs.' App. 1406:1-8.) Plaintiffs' allegations that Rush sometimes revised the work of the other layout editors does not negate the fact that Rush had to make revisions to Stratton's work much more frequently than he did to the others' work. Thus, Plaintiffs have failed to discredit the assertion that Rush had to more frequently revise Stratton's work as compared to the other layout editors.

Stratton testified he did not know of any actions taken by Rush that were indicative of age discrimination; he was not aware of a specific person at TDMN ever discriminating against him on the basis of his age; and, he was not aware of any written documents demonstrating age discrimination against him by Defendants. (Stratton Dep. at Defs.' App. 1590:24-1591:1, 1618:21-1619:10.)

### Conclusions Regarding Stratton's Claim

Plaintiffs have not offered "substantial" evidence proving that any of the reasons offered by Defendants for Stratton's inclusion in the RIF are unworthy of credence. Nor have Plaintiffs produced any evidence that age was the "but for" cause of his termination, as required under *Gross*. To the contrary, most of Stratton's testimony regarding the absence of age discrimination at TDMN remains undisputed. There are no genuine issues of material fact with respect to Stratton's claim. Accordingly, Defendants are entitled to summary judgment on Stratton's disparate treatment claim in Count Four.

### Ewina H. Schumacher

### Defendants' Nondiscriminatory Reasons

James Yaws selected Schumacher for termination in the RIF because TDMN downsized her position of Lead Data Control Analyst, and because the only other Lead Data Control Analyst – Lafreda King ("King") – received higher overall ratings than Schumacher in each of the three years prior to the RIF. Yaws concluded that it would have been very difficult for him to justify terminating King in favor of Schumacher in light of King's consistently higher ratings on these evaluations. (Yaws Dep. at Defs.' App. 2120:9-20.) Yaws did not consider Schumacher's age when deciding to recommend her for termination in the RIF. (*Id.* at Defs.' App. 2121:14-20.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs contend that Yaws showed age bias in Schumacher's reviews. They cite as an example, Yaws' statement that Schumacher "sometimes allows history to cloud her present interactions with others." (2003 Schumacher Performance Evaluation at Defs.' App. 1477.) Plaintiffs contend that Schumacher was employed by TDMN for 16 years before Yaws was hired,

and she received solid reviews and promotions. Plaintiffs further argue that Schumacher had more experience than King in computer mainframe, the scheduling and running of jobs, and writing programs, together with many years of CA7 background, as well as computer programming background. Schumacher alleges that Brian Bush, another manager in the IT Department where Schumacher worked, told her to "double check" King's work to ensure that her schedules and jobs were set up correctly. Schumacher claims that she did so on a regular basis, and that she would not have been asked to review King's work unless she was better qualified. Plaintiffs argue that Defendants ignore the positive aspects of Schumacher's extensive history but cite an incident that occurred in 2001 as a reason for her termination. Plaintiffs contend that these facts, and Defendants' assertion that Yaws gave higher performance ratings to an employee Schumacher was asked to oversee, establish pretext.

Defendants contend that Plaintiffs fail to dispute that Yaws selected Schumacher for termination in the RIF because: (1) TDMN downsized her position of Lead Data Control Analyst; (2) the only other person in this position – King – received higher overall ratings than Schumacher in each of the three years preceding the RIF; and (3) Schumacher received a written warning during the three years preceding the RIF, whereas King did not. (Defs.' Br. at 27-28, 116.) Defendants point out that, instead, Plaintiffs argue – without substantiation – (1) that James Yaws "showed age bias in Schumacher's reviews," (2) that Schumacher had more experience than King, and (3) that another manager in the IT Department purportedly told Schumacher to double check King's work. Defendants urge that Plaintiffs cite no evidence in support of any of these contentions. With respect to the unsubstantiated claim that Yaws showed age bias in Schumacher's reviews, Plaintiffs ignore the fact that in 2004 – the year of the RIF – Bush, who was responsible for rating both King and

Schumacher, gave King a higher overall evaluation than Schumacher. (Defs.' Br. at 153.) According to Defendants, even if Yaws had shown age bias in performing the annual performance reviews of Schumacher, the evidence demonstrates that Bush – about whom Schumacher had nothing negative to say – similarly rated Schumacher lower than King.

Defendants point out that the only example Plaintiffs provide of Yaws' purported age bias is a statement he made in Schumacher's 2003 Performance Appraisal, that Schumacher "sometimes allows history to cloud her present interactions with others." (Pls.' Resp. at 225; 2003 Schumacher Performance Evaluation at Defs.' App. 1477.) For an age-related comment to be probative of age discrimination, Plaintiffs must show that the comments were: (1) age-related; (2) proximate in time to the termination; (3) made by an individual with authority over the termination, or someone in a position to influence the termination decision; and (4) related to the challenged employment decision. *See Palasota*, 342 F.3d at 576-78. Plaintiffs wholly fail to explain how this statement by Yaws is age-related. (Pls.' Resp. at 225.) Furthermore, because Yaws wrote this in Schumacher's February 14, 2003 Performance Appraisal – over a year-and-a-half before the RIF – any connection to Schumacher's termination is remote. (2003 Schumacher Performance Evaluation at Defs.' App. 1477.) Defendants point out that Plaintiffs also fail to explain how this statement is related to Yaws' decision to terminate Schumacher, particularly given that Yaws made no mention of this criticism in his RIF evaluation of Schumacher. (Schumacher RIF Form at Defs.' App. at 2131-33.) Defendants conclude that Yaws' purportedly age-related comment about Schumacher does not demonstrate age bias.

Defendants contend that Plaintiffs fail to clarify how Schumacher's supposedly greater CA7 experience disproves the fact that Schumacher received lower overall ratings than King in each of

the three years prior to the RIF, Yaws' primary consideration in ranking Schumacher lower than King. Defendants assert that Schumacher admitted that before the RIF, TDMN planned to phase out the CA7 computer program. (Schumacher Dep. at Defs.' App. 1441:24-1442:16.) Defendants further contend that Schumacher's allegedly greater knowledge of an antiquated computer system that would soon be obsolete does not show that Schumacher had more relevant experience than King.

Defendants point out that Plaintiffs cite no evidence to support the contention that Bush asked Schumacher to "double check" King's work and that this unsubstantiated allegation conflicts with the undisputed fact that Bush rated King as "Exceeds Expectations" in 2004, whereas he rated Schumacher as "Meets Expectations." Taking as true the fact that Bush requested Schumacher review King's work, this fact was not Yaws' primary consideration in selecting Schumacher for termination. Yaws relied on the fact that Schumacher received lower overall evaluations than King in each of the three years leading up to the RIF. (Yaws Dep. at Defs.' App. 2110:1-7.)

Defendants conclude that: (1) Plaintiffs have not offered "substantial" evidence discrediting any of the reasons offered by Defendants for Schumacher's inclusion in the RIF; (2) Plaintiffs have not produced any evidence that age was the 'but for' cause of her termination, as required under *Gross*. Defendants urge that Schumacher's disparate treatment claim in Count Four must fail as a matter of law.

### Conclusions Regarding Schumacher's Claim

Plaintiffs have not shown that Schumacher was more qualified than King or that Defendants' reasons for her termination are false. Plaintiffs have not offered "substantial" evidence proving that any of the reasons offered by Defendants for Schumacher's inclusion in the RIF are unworthy of

credence. Plaintiffs have not produced any evidence that age was the "but for" cause of Schumacher's termination, as required under *Gross*. To the contrary, most of Schumacher's testimony regarding the absence of age discrimination at TDMN remains undisputed. There are no genuine issues of material fact with respect to Schumacher's claim. Accordingly, Defendants are entitled to summary judgment on Schumacher's disparate treatment claim in Count Four.

## Paulette Ladach

### Defendants' Nondiscriminatory Reasons

Curtis Jones terminated Ladach in the RIF because: (1) TDMN consolidated her position with another position in the Circulation Department; (2) she had the narrowest scope of work among the employees Jones supervised, the lowest overall performance, and the least versatility; (3) she agitated and alienated her coworkers; (4) she failed to follow established procedures; (5) she jeopardized relationships with clients; (6) she failed to complete projects in a timely manner; (7) she lacked effective communication skills; and (8) the year of the RIF, she received a lower overall rating on her performance evaluation than her comparator. At no point did Jones consider Ladach's age when recommending her for termination in the RIF. (Jones Dep. at Defs.' App. 689:18-23.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs contend that: (1) Ladach's title was Acquisition/Retention Coordinator, not Direct Mail Coordinator; (2) she received only one review, her 2003 Review, which was "exceeds expectations," but which routinely included goals for improvement; (3) her performance was not "inconsistent"; and (4) contrary to Defendants' assertions, her primary job duty, managing direct mail and insert programs, did not change. Plaintiffs argue that Defendants fail to state how Utz was better qualified than Ladach, but even if Defendants' assertions are true, the two positions were not

comparable. Plaintiffs contend that Utz was an hourly employee performing clerical duties, whereas Ladach was a salaried employee overseeing programs. (Ladach Dec. at ¶ 5, Pls.' App. 3176-3177.) Plaintiffs claim that Jones never conducted a formal evaluation of Ladach in 2004, although she requested one. Plaintiffs assert that Jones told Ladach that he had sent her review to the HR Department, but HR said it had not received the review. Plaintiffs contend that Jones' refusal to review Ladach in 2004 despite her requests, and his post hoc "laundry list" of purported deficiencies, establish that Jones' stated reasons for terminating Ladach are false.

Plaintiffs argue that Defendants' assertion that they evaluated Ladach for "flexibility" establishes that they actually based the evaluation on an age-biased criterion. (Defs.' Br. at 116.) However, this Court has found that the fact that RIF decision-makers considered traits such as "versatility" and "flexibility" does not constitute direct evidence of age discrimination. Plaintiffs have given the Court no reasonable basis to infer that Ladach's lack of flexibility establishes that they based the evaluation on an age-biased criterion.

Defendants contend that Plaintiffs do not dispute that TDMN consolidated Ladach's position; she had the narrowest scope of work or the least versatility; she had problems getting along with coworkers; she failed to follow procedures; she jeopardized client relationships; she failed to complete projects in a timely manner; or she lacked effective communication skills. Instead, Plaintiffs merely dispute that Ladach's performance was inferior to her comparator, Utz, and that she received a lower overall rating on her performance appraisal the year of the RIF. (Pls.' Resp. at 224.) Defendants state that Plaintiffs claim "Defendants make several misstatements of fact," asserting that "Ladach's title was Acquisition/Retention Coordinator, not Direct Mail Coordinator," and that Ladach "received only one review," in 2003. (*Id.*) (incorrectly citing Ladach Dec. ¶ 5 at

Pls.' App. 3176-77.)  According to Defendants, in her Declaration, Ladach merely averred she "believed [her] title was Acquisition/Retention Coordinator." (Ladach Dec. ¶ 1 at Pls.' App. 3176.) An affirmation in a declaration that one "believes" a certain statement to be true is not competent summary judgment evidence. *de la O v. Hous. Auth.*, 417 F.3d 495, 502 (5th Cir. 2005) ("statements made on information and belief do not constitute proper summary judgment evidence") *See Bolen v. Dengel*, 340 F.3d 300, 313 (5th Cir. 2003).  Moreover, Ladach did not definitively state she only received a performance appraisal in 2003, but merely declared she had "no recollection of receiving a performance review for the year 2002." (*Id*. ¶ 3 at Pls.' App. 3176) This statement does not satisfy the requirement of Rule56(e).  Ladach further admitted that Jones told her that he had sent her 2004 performance review to the HR Department, even though he did not formally review it with her pursuant to the normal procedure.  (*Id*. ¶ 4 at Pls.' App. 3176.) Although Jones may not have gone over Ladach's 2004 evaluation with her, the undisputed evidence demonstrates that he did perform such an evaluation.  (Ladach RIF Form at Defs.' App. 698-99.)  Accordingly, as Defendants have shown, they did not misstate either of these facts.  Defendants assert that Ladach's title at the time of the RIF is irrelevant, given the fact that when Jones compared Ladach's performance to Utz, Utz was superior.  Jones found Ladach's overall performance to be lacking when he considered such factors as her inability to get along with coworkers, her tendency to jeopardize client relationships, her time management problems, and her ineffective communication skills.

Defendants show that they did not mistakenly "claim that [Ladach's] supervisor, Davi Gray, noted she needed to improve certain skills" in her 2003 performance review.  Even though Ladach received an overall rating of "Exceeds Expectations," Ladach's 2003 review clearly states that she

needed to improve her people skills and time management. (2003 Ladach Performance Evaluation at Defs.' App. 901-902.) Jones noted in Ladach's RIF evaluation the fact that at the time of her 2003 review, she had a different supervisor, a different job title, and different responsibilities. Accordingly, although she received an overall rating of "Exceeds Expectations" in 2003, many changes had taken place since that time. These changes explain the decline in Ladach's overall rating to a "Needs Improvement" in 2004.

Plaintiffs also argue that "Defendants fail to state how Utz was better qualified than Ladach." (Pls.' Resp. at 224.) This is not Defendants' burden. Plaintiffs have the burden of proving pretext, which can be accomplished by showing that a plaintiff was "clearly better qualified" than a retained younger employee. *See Running v. Guar. Fed. Bank FSB*, No. 3:07-CV-01711-K, 2009 WL 2835763 (N.D. Tex. Sept. 2, 2009). Nevertheless, even though they did not have the burden, Defendants contend they provided multiple reasons why Utz was better qualified for the consolidated position than Ladach. (Defs.' Br. at 156-57.) Defendants note that Plaintiffs fail to dispute the fact that Utz had eleven years more seniority than Ladach and do not dispute that it was proper for Jones to consider seniority in deciding who to retain. (Pls.' Resp. at 224.)

Ladach has testified, conceding the absence of age discrimination at TDMN. (Ladach Dep. at Defs.' App. 824:4-17, 824:20-23, 831:13-19, 832:15-16, 832:20-22, 836:10-837:15.) The reasons for her termination remain undisputed. Ladach testified that: she has been laid off from "most" of the jobs she has held in her life; her relationship with Jones was good; Jones was a fair supervisor; she had no problems with Jones; and, other than her termination, she could point to no specific facts demonstrating that Jones discriminated against her on the basis of her age. (*Id.*)

## Conclusions Regarding Ladach's Claim

Plaintiffs have not shown that Ladach was clearly better qualified than Utz or that Defendants' reasons for her termination are false. Plaintiffs have not offered "substantial" evidence proving that any of the reasons offered by Defendants for Ladach's inclusion in the RIF are unworthy of credence. Plaintiffs have not produced any evidence that age was the "but for" cause of Ladach's termination, as required under *Gross*. To the contrary, most of Ladach's testimony regarding the absence of age discrimination at TDMN remains undisputed. There is no genuine issue of material fact with respect to Ladach's claim. Accordingly, Defendants are entitled to summary judgment on Ladach's disparate treatment claim in Count Four.

## Raul Prezas Reyes

### Defendants' Nondiscriminatory Reasons

Mark Edgar ("Edgar") terminated Reyes because: (1) TDMN eliminated his National Editor position; (2) other employees on the National Desk were higher performers with respect to critical duties that would be needed in that section following the RIF; (3) Reyes received lower ratings and more criticisms in his prior performance evaluations than others on the National Desk; and (4) Reyes ranked behind the other National Desk employees in productivity, adaptability, and versatility. (Defs.' Br. at 31-33, 117.) Edgar never considered Reyes' age when recommending him for termination in the RIF. (Edgar Aff. ¶ 4 at Defs.' App. 2865.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs contend that Defendants' reason which stated that Reyes' position as National Desk Editor was eliminated is false because one of Reyes' direct reports, Nancy Visser, held the title of

"National Desk Editor" after the RIF. (Reyes Dec. ¶ 5, Pls.' App. 3202-3203.)  Plaintiffs contend

that Defendants' statement that Edgar terminated Reyes because Visser and Rusak had higher ratings

with respect to the "critical duties" that would be needed on the National Desk after the RIF is

unsubstantiated.  Plaintiffs also claim that Defendants' statement that Reyes ranked behind Visser

and Rusak in productivity, adaptability, and versatility is unsubstantiated.  Plaintiffs argue that even

if the reasons are true, Defendants' arguments establish that Edgar evaluated Reyes based on criteria

that incorporate age bias and that he failed to follow the RIF Guidelines, which did not provide for

evaluations or comparisons of employees whose positions were eliminated or of employees holding

different job titles.  Plaintiffs note that Defendants assert that Edgar "was responsible for supervising

the employees assigned to the National Desk"; however, although Reyes reported to Edgar, Reyes

supervised and evaluated Visser and Rusak. Plaintiffs argue that if those evaluations are a reason

for retaining those employees, the Court can infer that Defendants had confidence in Reyes'

judgment as a manager.  They further argue that Reyes provided story lines to Visser from the

Washington Bureau that he had either already assigned or discussed with TDMN Deputy Bureau

Chief in Washington D.C., Kathy Lewis, and that Reyes, not Visser and Rusak, almost always edited

the major Sunday packages received from Washington.  These required far greater editing skills than

editing wire stories.  Plaintiffs contend that Reyes handled the more complicated editing and

assigned the wire stories to Visser and Rusak for editing, and that any comparison between Reyes

and Visser and Rusak is not valid.

Reyes was an assistant managing editor in San Antonio, and a metro and state editor in Fort

Worth.  Plaintiffs assert that it is patently false that Rusak, an employee with only ten years'

journalism experience and no management experience, was better qualified than Reyes, who had

both extensive journalism and management background. (Reyes Dec. at ¶¶ 2, 3, 11, Pls.' App. 3201-3202, 3204-3205.) Plaintiffs contend that Defendants also falsely state that Reyes "had not prepared the daily story budget, scheduled shifts or handled bulldog copy." (Defs.' Br. at 32.) Reyes performed all the duties listed and, in fact, he frequently and regularly handled (assigned, edited, and moved to copy desk) staff Sunday stories that were in the early edition of the Sunday paper, the bulldog edition. Plaintiffs also label as false Defendants' statement that Rusak "also had the primary responsibility of handling staff reporters from TDMN' Washington bureau" because Reyes made the assignments. (Reyes Dec. at ¶ 5, Pls.' App. 3202-3203.) Plaintiffs urge that Defendants' false and inconsistent statements establish that their stated reasons for terminating Reyes are pretexts for discrimination.

Defendants note that Plaintiffs do not contest that Reyes received less favorable evaluations, or that he ranked behind other employees in productivity, adaptability, and versatility. (Pls.' Resp. at 214-16.) Defendants correctly state that Plaintiffs rely upon the argument TDMN did not actually eliminate Reyes' National Editor position in the RIF based upon the facts that (1) Edgar compared Reyes' performance to other employees from different positions, and (2) Visser allegedly held the title of "National Desk Editor" at some undetermined time following the RIF. (Reyes Dec. ¶ 5 at Pls.' App. 3202-03.) Defendants argue that the only reason Edgar characterized the inclusion of Reyes in the RIF as a position elimination was because the National Desk had a unique structure consisting of four employees, each in a different position. (Org. Chart at Defs.' App. 2983.) Three of the employees, including Reyes, were editors; the fourth was an "Editorial Assistant." (*Id.*) Because the RIF guidelines provided that downsizings were only for positions containing more than one employee (Spitzberg Dep. Exh. 5 at Defs.' App. 1540, 1546-47), Edgar had to eliminate one of

the editor positions to meet his salary reduction target, even though he planned to evaluate and rank the three editors to determine who to include in the RIF. Defendants explain that although Edgar characterized Reyes' inclusion in the RIF as a position elimination, it was actually the result of a one-person downsizing of the four-person National Desk. Defendants note that nothing in the RIF instructions for a position elimination prevents a manager from comparing employees to one another. (Spitzberg Dep. Exh. 5 at Defs.' App. 1543.) Defendants point out that Plaintiffs do not cite any evidence in support of the assertion that the RIF Guidelines "did not provide for evaluations or comparisons of employees whose positions were eliminated." (Pls.' Resp. at 215.) Even if Edgar should have characterized Reyes' termination as a downsizing, rather than an elimination, Edgar compared Reyes to the other employees – Visser and Rusak – and legitimately determined that Reyes ranked behind Visser and Rusak in a number of important job categories and skills. No evidence supports Plaintiffs' allegations of pretext. With respect to the fact that Visser and Rusak were better performers of critical duties, Plaintiffs merely argue that Defendants falsely state Reyes had not prepared the daily story budget, scheduled shifts, or handled "bulldog" copy. (Pls.' Resp. at 215.) According to Plaintiffs, Reyes handled all listed duties, and frequently handled "bulldog" copy. (*Id*. at 215-16, citing Reyes Dec. ¶ 5, Pls.' App. 3202-03.) However, this assertion conflicts with Reyes' deposition testimony that, at the time of the RIF, Visser handled scheduling shifts of employees, and prepared the daily story budget report. (*See Brief* p. 163.) Under the "sham affidavit" rule, the Court will not consider this part of Reyes' Declaration. Plaintiffs do not claim Reyes "frequently and regularly" prepared the daily story budget or scheduled shifts. (Pls.' Resp. at 215-16.) Moreover, Plaintiffs do not dispute that Visser and Rusak were able to edit more stories

than Reyes, or that Rusak moved more copy than Reyes – two additional duties that Edgar deemed to be "critical" following the RIF. (*Id*.)

Plaintiffs next argue that Reyes – not Rusak – had the primary responsibility of handling staff reporters from TDMN's Washington bureau. (Pls.' Resp. at 216.) Plaintiffs' sole support for this contention is Reyes' Declaration that he was responsible for making "assignments." (Reyes Dec. ¶ 5, Pls.' App. 3202-03.) Plaintiffs fail to explain how the allegation that Reyes was responsible for making assignments demonstrates that he also had primary responsibility for handling TDMN's staff reporters in Washington. (Pls.' Resp. at 216.) Edgar explained that Rusak had this responsibility because he worked the "late night shifts," and Edgar affirmed that Reyes, the National Editor, did not have this responsibility. (Edgar Dep., Defs.' App. 459:22-460:8.) Finally, there is no admissible evidence that Visser ever held the title of National Desk Editor following the RIF. In their *Objections to Plaintiffs' Declarations*, Defendants object to the portion of Reyes' Declaration stating that Visser held the title of National Desk Editor after the RIF, because it is hearsay. (*See id*. at 46.) The Court agrees that the statement is inadmissible hearsay and will not consider it. Additionally, Edgar unequivocally testified that TDMN never filled Reyes' former position of National Desk Editor following the RIF, and that the National Desk no longer exists. (Edgar Dep. at Defs.' App. 460:17-25.)

Reyes' testimony conceding the absence of age discrimination at TDMN remains undisputed. Reyes testified that he had a good relationship with Edgar; considered Edgar to be a fair supervisor; and did not believe Edgar discriminated against him. Additionally, he testified that no one from TDMN's management ever made ageist remarks to him; he was not aware of anything in writing demonstrating that TDMN discriminated on the basis of age; there was no specific person at TDMN

who he thought discriminated against him because of his age; and he did not believe that TDMN had any policy to eliminate older workers during the time he worked there. (Reyes Dep. at Defs.' App. 1295:10-17, 1323:20-1324:4, 1325:14-16, 1325:23-1326:14, 1332:10-13.)

## Conclusions Regarding Reyes' Claim

Plaintiffs have not shown that Reyes was better qualified than his comparators or that Defendants' reasons for his termination are false. Plaintiffs have not offered "substantial" evidence proving that any of the reasons offered by Defendants for Reyes' inclusion in the RIF are unworthy of credence. Plaintiffs have not produced any evidence that age was the "but for" cause of Reyes' termination, as required under *Gross*. To the contrary, most of Reyes' testimony regarding the absence of age discrimination at TDMN remains undisputed. There is no genuine issue of material fact with respect to Reyes' claim. Accordingly, Defendants are entitled to summary judgment on Reyes' disparate treatment claim in Count Four.

## Deborah Sue Voorhees

## Defendants' Nondiscriminatory Reasons

Deborah Voorhees ("Voorhees") was selected for termination in the RIF because: (1) TDMN downsized her copy editor position in the Lifestyles Department; (2) she was difficult to get along with; (3) she was unresponsive to questions that were asked of her; (4) she was a below average writer; (5) she frequently was the subject of complaints from both coworkers and clients; (6) she had a belligerent attitude; (7) she lacked sound judgment, as demonstrated by a well-known sexual affair Voorhees had with a married coworker at TDMN; and (8) she often engaged in confrontations with her colleagues and superiors. (Defs.' Br. at 117.) At no time was Voorhees' age

considered in connection with the decision to recommend her for termination in the RIF. (Kresl Aff. ¶ 10 at Defs.' App. 2870; Reed Aff. ¶ 4 at Defs.' App. 2876.)

### **Plaintiffs' Claims of Pretext and Defendants' Rebuttal**

Plaintiffs assert that although Voorhees worked in the Arts and Entertainment Department, Defendants compared her to copy editors who worked for the Lifestyles Department, performing different editing functions. Plaintiffs claim that Defendants' assertion that Voorhees had a long history of below average work and questionable decision-making is false. Plaintiffs contend Voorhees never received a "below average" performance review, and in August 2003, she received a merit raise of ten percent. (Voorhees Dec. at ¶ 1(I), Pls.' App. 3211.) Plaintiffs state that typical merit raises were between two and three percent. They argue Voorhees had a record of solid performance reviews dating to 1993. They contend her July 2004 performance review stated, "Integrity is never an issue with Deborah. She goes about her work quietly and efficiently and seldom asks for, or needs, guidance. Her work ethic is solid." (Voorhees Dec. at ¶ 1(II), Pls.' App. 3211-3212.) "Deborah's a quiet veteran on the team; she includes everybody and reaches out to all sorts of readers." (Pls.' App. 0934.) After the RIF, her supervisor, Rick Holter ("Holter"), wrote, "Just wanted you to know how much I appreciate your contributions to TDMN over the last 11 years. You really made a difference here. " (Voorhees Dec. at ¶ 1(II), Pls.' App. 3211-3212.) Her 2002 review stated, "Deborah has had another strong year in Guide." (Pls.' App. 939.01-939.03.) Her January 2001 review stated, Deborah is "a pillar of the Guide staff." (Pls.' App. 0931.) Plaintiffs contend that despite these accolades, Defendants make allegations about Voorhees' skills that have nothing to do with her job responsibilities. Plaintiffs claim Voorhees' duties were layout and design, collecting photographs, planning, gathering information, proofreading, and paginating

for the Guide section. (Defs.' Br. at 68-70.) Plaintiffs contend that rather than address Voorhees'

actual job duties, Defendants attack her writing, an affair, and an evaluation form she failed to

complete due to work priorities. With respect to Defendants' criticisms of Voorhees' writing skills,

Plaintiffs claim that her workload for Guide precluded her from having much writing time. They

point out that her supervisor, Tracy Brown, noted this as far back as her 2001 review. (Voorhees

Dec. at ¶ 4, Pls.' App. 3212-3213.) Plaintiffs argue that Voorhees also had a long history of

accuracy and state, for example, that Holter asked her to compile an Arts and Entertainment Style

Guide for the entire department so that the critics and writers could use the same style that she used.

(Voorhees Dec. at ¶¶ 4, 5, Pls.' App. 3212-3214.) Plaintiffs note that Defendants also make vague

assertions that Voorhees did not respond quickly enough to emails and had "conflicts, " but point

out that she never received a reprimand for any such purported behavior. According to Plaintiffs,

Defendants fail to name a single person with whom Voorhees purportedly had conflicts and point

out that Kresl also testified that Voorhees did not violate any rules. Plaintiffs claim that

Defendants' accusation that Voorhees failed to respond to two coworkers, Amy Burt ("Burt") and

Kim Oglethorpe ("Oglethorpe"), is false. Plaintiffs respond that neither coworker complained to

Voorhees of a lack of communication, and note that she spoke with them on a daily basis. With

respect to Lois Reed, who testified that Voorhees had difficulty completing her work, Plaintiffs

contend that Reed never worked with Voorhees and Reed relies on hearsay statements. Voorhees

asserts that: (1) never once in her 11 years at TDMN did anyone mention to Voorhees that she could

not get her work completed; and (2) often, she helped others complete their work. Holter, who

supervised Voorhees and was familiar with her work, told her at her termination that she had done

nothing wrong. Plaintiffs assert that Defendants contrived the reasons for terminating Voorhees, an older employee.

Defendants contend that Plaintiffs have failed to dispute the facts that Voorhees often received complaints from coworkers, had trouble with clients, or had a belligerent attitude. Defendants note that instead, Plaintiffs first argue that Defendants improperly compared Voorhees to copy editors working in the Lifestyles Department, even though she purportedly "worked in the Arts and Entertainment Department." Defendants contend that Plaintiffs misrepresent the facts. According to Defendants, there was no stand-alone Arts and Entertainment Department. Rather, there was an Arts and Entertainment Section, which was part of the Lifestyles Department. (*See News/Lifestyles Org. Chart* at Defs.' App. at 2977.) The Guide, in turn, was part of the Arts and Entertainment Section. (*See id.*; *Voorhees RIF Form* at Defs.' App. 581.) Holter, Voorhees' supervisor at the time of the RIF, was the Editor of the Arts and Entertainment Section of the Lifestyles Department. (*News/Lifestyles Org. Chart* at Defs.' App. at 2977; Holter Dep. at 59:6-13, 125:17-126:15.) The other copy editors to whom TDMN compared Voorhees were all assigned to the Lifestyles Department. (*Lifestyles Department Staffing Plan* at Defs.' App. 2889-91.) Although copy editors assigned to the Guide had slightly different – and less demanding – editing duties than other copy editors in Lifestyles, all copy editing in Lifestyles requires the same basic skill set. Thus, the RIF decision-makers for the Lifestyles Department evaluated and compared all the copy editors in Lifestyles to each other, rather than conducting a section-by-section analysis. (*Id.*)

Defendants next discuss an alleged ten percent raise Voorhees received in August 2003. (Voorhees Dec. ¶ 1.I at Pls.' App. 3211.) In their *Objections to Plaintiffs' Declarations*, Defendants object to the portion of Voorhees' Declaration stating that merit raises are not given to below

average performers, and that typical raises are two to three percent, on the grounds it is speculative, vague, lacks a proper foundation, and is not based on personal knowledge. They argue that the Court should decline to consider this "evidence." When Holter completed Voorhees' RIF Form, he noted that she received an above-average raise in 2003. (*Voorhees RIF Form* at Defs.' App. 581.) Accordingly, the Court will consider that the raise was "above average," but the Court will disregard the assertions about typical raises in Plaintiff's declaration, sustaining Defendants' objections.

Holter also noted that Voorhees "can be prickly to work with," has a limited upside, "her writing is just ok, and she's difficult in certain situations: recalcitrant with editors working on her stories and occasionally short and surly with readers or outside sources." (Defs.' App. 582-83.) According to Defendants, these personality issues – rather than Voorhees' raise the year before the RIF – were the primary focus of the four RIF decision-makers in Lifestyles when they evaluated Voorhees. (Defs.' Br. at 36-37.) Defendants also point out that Plaintiffs fail to explain why Voorhees received the supposed "merit raise," given that her overall performance that year was only rated as "Meets Expectations." (*Voorhees RIF Form* at Defs.' App. 581.) Defendants assert, and the Court agrees, that the fact that Voorhees received an above-average salary increase more than a year before the RIF does not disprove Defendants' many reasons for terminating her in the RIF.

Defendants next address Plaintiffs' claim that "Defendants make allegations about Voorhees' skills that have "nothing to do with her job responsibilities, which were layout and design, collecting photographs, planning, gathering information, proofreading and paginating for the Guide section." (Pls.' Resp. at 220.) According to Defendants, Plaintiffs take an extremely narrow view of Voorhees' job responsibilities. Defendants contend that although Voorhees shortcomings may not have been strictly related to her ability to edit copy, they made her an extremely difficult person with

whom to work. Defendants assert that it is undisputed that Voorhees was difficult to get along with, unresponsive to questions that were asked of her – even critical ones, a below-average writer, frequently the subject of complaints, had a belligerent attitude, lacked sound judgment, and often engaged in confrontations with her coworkers. Defendants note that these factors were the primary considerations when the RIF decision-makers for Lifestyles ranked Voorhees twenty-second out of the twenty-four copy editors. (Defs.' Br. at 36-37.) Defendants point out that Plaintiffs make no attempt to explain how consideration of Voorhees interpersonal skills is somehow inappropriate or more importantly, is indicative of age discrimination. (Pls.' Resp. at 219-21.) Defendants assert that the fact that TDMN focused its criticism of Voorhees on her interpersonal shortcomings, rather than her ability to perform rudimentary copy editing, does not discredit Defendants' stated reasons for her inclusion in the RIF.

Defendants contend that their assertions that Voorhees did not respond quickly enough to emails and had conflicts are not vague, as Plaintiffs assert. (Pls.' Resp. at 220.) Defendants state that Voorhees' inability to timely respond to e-mails was raised numerous times in the years leading up to the RIF, including in her 2002 performance evaluation, which stated that Voorhees "should also try to keep up with email more," as this is "crucial to the editing process, and it can take hours to get a response" from her. They note that other copy editors, including Burt and Oglethorpe, voiced similar concerns with Voorhees' refusal to answer questions and e-mails in a timely manner. (Defs.' Br. at 36.) Defendants show that in her own Declaration, Voorhees conceded that at the time Rob Clark ("Clark") became Editor of the Guide in 2002, she only checked her e-mail twice a day. (Voorhees Dec. ¶ 6 at Pls.' App. 3214.) According to Voorhees' Declaration, after Clark noted in her 2002 evaluation that he was dissatisfied with how often she checked her e-mails, Voorhees

"increased it to once each hour." (*Id*.) Defendants claim they provided numerous examples of her confrontations with coworkers. In 2000, Voorhees' supervisor criticized her for raising questions in a confrontational manner with her coworkers. (Defs.' Br. at 35.) Further, Voorhees' 2002 Performance Appraisal stated she needed to continue working on controlling her temper, and referenced a loud argument Voorhees had in the newsroom. (*Id*.) Burt and Oglethorpe criticized Voorhees' belligerent attitude. (*Id*. at 36.) Indeed, Voorhees conceded she was often accused of being confrontational or rude to her coworkers. The evidence that Voorhees had a long history of engaging in confrontations with her colleagues is undisputed. Much of Voorhees' testimony regarding the absence of age discrimination at TDMN, or the reasons for her termination in the RIF, remains undisputed, including: (1) her testimony that Holter not only wrote a letter of recommendation for Voorhees after the RIF, but also sent her an e-mail alerting her to a part-time position that had opened up at TDMN, which Voorhees declined to pursue; (2) TDMN retained people older than Voorhees after the RIF, including copy editors; (3) she received repeated complaints about her interactions with others; (4) she had a well-known affair with a married coworker; and (5) she was often accused by others as having a belligerent or confrontational attitude. (Voorhees Dep. at Defs.' App. 1725:8-21, 1728:8-1729:20, 1735:19-1736:3, 1745:10-1746:20, 1753:4-15, 1754:21- 1755:3.)

### Conclusions Regarding Voorhees' Claim

Plaintiffs have not shown that Voorhees was better qualified than her comparators or that Defendants' reasons for her termination are false. Plaintiffs have not offered "substantial" evidence proving that any of the reasons offered by Defendants for Voorhees' inclusion in the RIF are unworthy of credence. Plaintiffs have not produced any evidence that age was the "but for" cause

of Voorhees' termination, as required under *Gross*.  There is no genuine issue of material fact with respect to Voorhees' claim   Accordingly, Defendants are entitled to summary judgment on Voorhees' disparate treatment claim in Count Four.

## Paula F. Watson and Larry Randall Powell

## Defendants' Nondiscriminatory Reasons

Lisa Kresl was responsible for RIF decision-making in the Lifestyles Department where Watson and Powell worked. (Kresl Dep. at Defs.' App. 799:21-800:5, 803:1-7.) Kresl decided to eliminate the Leisure, Pets, and Recreation beat that Watson edited, and for which Powell wrote, because the department could not support narrow levels of specialization after the RIF. (Kresl Dep. at Defs.' App. 811:13-23.) Neither Watson's nor Powell's age was considered by Kresl, Reed, Huang, or Holter at the group meetings where they discussed how to reconfigure the Lifestyles Department, and Kresl did not consider Watson's or Powell's age when deciding to eliminate the Leisure, Pets, and Recreation beat. (Kresl Aff. ¶¶ 6-7 at Defs.' App. 2870.) Rather, the sole consideration was this beat's very narrow area of focus. (Kresl Aff. ¶ 5 at Defs.' App. 2869-2870.) With a reduced staff following the RIF, the department needed to restrict its efforts to those subject matters that had the broadest appeal to readers. (*Id.*)

## Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs contend that Defendants' failure to cite to marketing studies, focus group results, internal evaluations, or other evidence shows pretext because the studies would have revealed that the "Pets and Leisure" section had broad reader appeal. In support, Plaintiffs note that Powell's column about pets routinely received a large volume of reader mail. (Powell Dec. at ¶ 3, Pls.' App. 3198.) Plaintiffs also infer pretext from Defendants' decision that the employees assigned to this "beat" could not cover other subject matters. Plaintiffs point out that Watson and Powell had worked in various sections of TDMN throughout their lengthy tenure with the newspaper. Powell demonstrated a facility for all positions, periodically winning awards and receiving honors. He held

many positions: national editor (overseeing both the national and international desks), copy editor, copy desk chief, layout editor, assistant night news editor, metro feature editor, and columnist. (Powell Dec. at ¶¶ 3, 4, Pls.' App. 3198.)  According to Plaintiffs, he was quite clearly qualified to accept any assignment in the newsroom.  (*Id.*)

Plaintiffs assert that Defendants' conclusory allegations are not competent summary judgment evidence, and their stated reasons for terminating Powell and Watson are false.  They note that TDMN continued to cover leisure, pets, and recreation after the RIF, and that Defendants do not assert otherwise.  They contend the only difference is that the stories are being written by different people.  Plaintiffs assert that:  reporter Katie Menzer would email Powell for help with animal stories; Menzer's editor, Selwyn Crawford, asked for Powell's help with this topic; David Tarrant and other reporters also have asked for Powell's help since the RIF; and the  current Oak Cliff reporter, Roy Appleton, has asked Powell for help.  Plaintiffs assert that TDMN also continues to run "general interest" columns in the Metro section.  Plaintiffs conclude that although Powell's columns vanished, the column subject matter remained relevant to the readership. They argue that younger people were doing the stories and pursuing Powell for his assistance.  Plaintiffs urge that even today, the paper's website offers animal stories and information similar to that provided by Powell under the column headline "Dog About Town."

Plaintiffs contend that the evidence establishes that Kresl targeted this popular section because Watson and the writers she supervised were all over age 50.  They claim Lifestyles employees at departmental meetings in 2004 were subjected to the constant drumbeat of the "be younger" and "attract younger readers" messages from Kresl and her "young" assistant, Thomas

Huang.[18]  (Defs.' Br. at 171 n.87; Pls.' App. 1149.)  Plaintiffs claim that Huang routinely reviewed the New York Times and large papers looking for youth-oriented stories to emulate.

Plaintiffs state that in 2003, TDMN launched a new product, the then-daily *Quick*, to pursue young readers. At one planning meeting for *Quick*, Kresl asked staffer Steve Kenny to find a pet columnist.  When he responded that the paper already had one, Kresl stated, "No, a pet columnist for young people," according to Kenny. (Powell Dec. at ¶ 5, Pls.' App. 3198-3199.)  Plaintiffs argue that Defendants also ignored Powell's second column which ran in the Metro section, which had broad appeal and was not limited in focus.  The "general" portion of the column was the lead and always involved people who had a reason to be in the newspaper. The history portion was the second part and had a faithful readership which had developed over the years. Powell wrote about the topics his supervisors encouraged him to write, including animal stories. He did what he was told. (Powell Dec. at ¶ 6, Pls.' App. 3199.)

Plaintiffs conclude that Defendants' inconsistent and false assertions establish that the elimination of the Pets and Leisure section was not the true reason that Kresl terminated Watson and Powell.

Defendants assert that Plaintiffs' contention that Kresl "targeted this popular section because Watson and the writers she supervised were all over age 50" is not substantiated.  (Pls.' Resp. at 222; no cite in support.)  With respect to Plaintiffs' initially faulting Defendants for citing no "marketing studies, focus group results, internal evaluations or other evidence" supporting the decision to eliminate the Leisure, Pets, and Recreation beat, Plaintiffs provide no authority imposing a requirement on an employer like TDMN to conduct such analyses before deciding to eliminate a

---

[18]  As a matter of fact, Huang was only two months shy of his fortieth birthday–the date he would become age-protected--at the time of the RIF.

portion of its business in an RIF. Contrary to Plaintiffs' assertion, Defendants cite to "other evidence" supporting the elimination of this beat, including the deposition testimony of Lisa Kresl, an affidavit from Kresl, Watson's 2004 performance evaluation, and Watson's deposition testimony – all of which confirm that TDMN had been reducing coverage devoted to this beat for at least several years prior to the RIF, that this beat had a narrower appeal than other beats in Lifestyles, and that following the RIF, TDMN would not have the manpower to produce a beat with such a narrow area of specialization. (Defs.' Br. at 117-18, 178.) Defendants point out that Plaintiffs next argue that Defendants "infer that the employees assigned to this 'beat' could not cover other subject matters." (Pls.' Resp. at 221.) Defendants contend that they did not make any such "inference," and that they do not argue that Watson was not qualified to cover other subject matters. Rather, given the "no-bump" and "no-transfer" rule in the RIF which applied when a position was eliminated, Kresl could not have transferred Watson to another position in TDMN. (Spitzberg Dep. at Defs.' App. 1526:15-25; Daume Aff. ¶ 13 at Defs.' App. 2305.) Additionally, Defendants state that Plaintiffs make the unsubstantiated claim that TDMN "continued to cover leisure, pets and recreation after the RIF." (Pls.' Resp. at 222.) They contend that although Plaintiffs allege the same stories are being written by different people, Plaintiffs provide absolutely no evidence to support this assertion. (*Id.*) Watson conceded that Huang, her immediate supervisor, had a philosophy of reducing the coverage of pets long before the RIF. (Defs.' App. 1793:7-14.) Moreover, taking the facts most favorably to Plaintiffs, their allegations merely show that TDMN occasionally publishes stories on some of the same subject matters as were covered in the Leisure, Pets, and Recreation beat; Plaintiffs do not dispute that Defendants eliminated the entire beat in the RIF and that they no longer publish the beat. (Watson Dep. at Defs.' App. 1795:3-7.)

To prove pretext in the context of a position elimination, "the test . . . is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position." *Furr*, 82 F.3d at 988; *Westbrook v. City Univ. of New York*, 591 F. Supp. 2d 207, 229-231 (E.D.N.Y. 2008). Clearly, Plaintiffs have introduced no evidence that Watson's responsibilities constituted a single, distinct position at TDMN following the RIF. Even if Plaintiffs could demonstrate that other employees of TDMN absorbed some of Watson's duties following the RIF, this would not constitute evidence of pretext. As the Court previously noted, "a company is under no obligation to eliminate all the job duties handled by an individual in a given position when the company eliminates the position." *Tucker*, 462 F. Supp. 2d at 728 n.5. Accordingly, given the undisputed fact that TDMN eliminated Watson's position in the RIF and have not replaced her, the allegations that various other employees perform some of the same duties as Watson are completely irrelevant to the issue of whether the elimination of her position was a pretext for age discrimination.

Defendants contend that in support of Plaintiffs' contention that Kresl targeted Watson's beat because Watson and her writers were all over age 50, Plaintiffs merely note that TDMN began to target younger readers, and cite two alleged comments. (Pls.' Resp. at 222.) Specifically, Plaintiffs allege that Huang "routinely reviewed the New York Times and large papers looking for youth-oriented stories to emulate," and that TDMN launched *Quick* in 2003 to "pursue young readers." (*Id*.) Neither of these allegations relate to Watson's termination. At most, they show that TDMN targeted younger readers, which is not indicative of age discrimination. (Defs.' Br. at 129-30.) Plaintiffs also claim that managers constantly told employees of the Lifestyles Department to "be younger" and "attract younger readers." (Powell Dec. ¶ 5 at Pls.' App. 3198-99.) However, as previously noted, any instruction to "attract younger readers" does not demonstrate age bias.

Moreover, Powell's allegation that he and other Lifestyles employees were told to "be younger" – to the extent Plaintiffs contend this is an age-discriminatory comment – directly contradicts his deposition testimony, wherein he testified that none of his managers ever made age-discriminatory comments. (*See* Powell Dep. at Defs.' App. 1231:13-18.) The Court has sustained Defendants' objections to the Declaration pursuant to the sham affidavit doctrine.

Watson testified that she could not recall any of her managers ever making discriminatory remarks. (Watson Dep. at Defs.' App. 1806:25-1807:8.) Moreover, taking the facts most favorably to Plaintiffs, the most reasonable interpretation of an admonition to "be younger" is that it was a request for employees to think and write like the younger audience that TDMN began targeting prior to the RIF. There is no evidence this purported admonition affected the decision to eliminate the Leisure, Pets, and Recreation beat in the RIF. The other purported age-related comment was made by Kresl, who supposedly stated at a planning meeting that she wanted a "pet columnist for young people." (*See* Pls.' Resp. at 222) (citing Powell Dec. ¶ 5 at Pls.' App. 3198-99.) This comment is inadmissible hearsay. In his Declaration, Powell does not contend that he heard Kresl make this statement. (*See* Powell Dec. ¶ 5 at Pls.' App. 3198-99.) Rather, Powell merely states, "This was told to me by [Steve] Kenny in the presence of two other people." (*See id*. at Pls.' App. 3199.) Hearsay, however, is inadmissible summary judgment evidence and cannot support a finding in favor of the non-moving party. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Furthermore, Powell's Declaration, once again, directly contradicts his deposition, where he testified that none of his managers ever made age-discriminatory comments, and he was not aware of anyone at TDMN ever making discriminatory comments about him. (*See* Powell Dep. at Defs.' App. 1231:13-18, 1235:14-20.) Consideration of this purported statement is barred by the sham affidavit doctrine.

Accordingly, Plaintiffs' reliance on this purported statement is misplaced. Plaintiffs have offered no evidence supporting their contention that Kresl targeted Watson's beat because of age bias. In sum, Plaintiffs have not offered "substantial" evidence discrediting any of the reasons offered by Defendants for Watson's inclusion in the RIF. Plaintiffs have not produced any evidence that age was the "but for" cause of her termination, as required under *Gross*. To the contrary, much of Watson's testimony conceding the absence of age discrimination at TDMN remains unchallenged, including her testimony that: she was unaware of any facts supporting her discrimination claim; she got along "great" with Huang, her immediate supervisor; she thought both Huang and Kresl were fair supervisors; she could not recall any problems she had with either Kresl or Huang while working for them; no one at TDMN ever made discriminatory comments towards her; she did not recall anyone in management ever making discriminatory remarks; and, she was not aware of anything in writing demonstrating that employees were treated adversely because of their age. (Watson Dep. at Defs.' App. 1785:22-1787:16, 1806:25-1807:8, 1807:18-24, 1808:6-17.) Defendants contend that for these reasons, Watson's disparate treatment claim in Count Four must fail as a matter of law.

## Conclusions Regarding Watson's Claim

Watson was the Assistant Editor for the Leisure, Pets, and Recreation beat in the Lifestyles Department. Accordingly, when TDMN decided to eliminate this entire beat in the RIF, including Watson's Assistant Editor position, it legitimately included Watson in the RIF given the rule prohibiting transfers. Plaintiffs have not offered "substantial" evidence proving that any of the reasons offered by Defendants for Watson's inclusion in the RIF are unworthy of credence. Plaintiffs have not produced any evidence that age was the "but for" cause of Watson's termination, as

required under *Gross*. There are no genuine issues of material fact with respect to Watson's claim. Defendants are entitled to summary judgment on Watson's claim of disparate treatment in Count Four.

### Defendants' Additional Nondiscriminatory Reasons with respect to Powell

As noted above, Kresl eliminated the Leisure, Pets, and Recreation beat, in which Powell worked, because the Lifestyles Department could not support that narrow a level of specialization with a reduced workforce following the RIF. (Defs.' Br. at 117-18.) Instead, Kresl wanted to focus its efforts on those subject matters that had the broadest appeal to readers. (*See id*. p. 118.) Plaintiffs, however, argue – without substantiation – that Kresl "targeted this popular section because Watson and the writers she supervised were all over age 50." (Pls.' Resp. at 222) (no cite in support). The Court notes that initially, Plaintiffs combined their "pretext" arguments regarding Powell and Watson into one section of their Response. (Pls.' Resp. at 221-23.) Thus, the Court considered all the arguments made by Defendants regarding Watson to be applicable to Powell. However, to the extent Plaintiffs make additional arguments relevant to Powell, the Court will address them.

### Plaintiffs' Additional Claims of Pretext With Respect to Powell and Defendants' Rebuttal

Plaintiffs first cite Powell's Declaration in support of the contention that he was "quite clearly qualified to accept any assignment in the newsroom." (Pls.' Resp. at 221) (citing Powell Dec. ¶¶ 3, 4 at Pls.' App. 3198.) Defendants do not contest that Powell was qualified to perform tasks other than writing about pets. According to Powell, Rodrigue appeared at Powell's termination meeting and, with tears in his eyes, encouraged him to apply for future openings at TDMN. (Powell Dep. at Defs.' App. 1219:10-1220:13.) However, given the "no-bump" and "no-transfer" rule in the RIF, Kresl was prohibited from transferring Powell to another position in TDMN. (*See* Spitzberg

Dep. at Defs.' App. 1526:15-25; Daume Aff. ¶ 13 at Defs.' App. 2305.) Thus, the fact that Powell was qualified to perform some jobs other than writing about pets in no way discredits Defendants' reasons for including him in the RIF.  Furthermore, Plaintiffs argue, again without support, that stories about pets continued to be published in TDMN following the RIF. (Pls.' Resp. at 222.) Although TDMN may have run an occasional story about pets after Powell's departure, Powell admitted that since the RIF, no one at TDMN has regularly written about pets. (Powell Dep. at Defs.' App. 1230:1-19.)  Specifically, Powell testified that following the RIF, no one replaced him as the Pets Columnist, and other than the fact there may be sporadic stories regarding pets, he is not aware of anyone that writes about pets on a regular basis. (*Id*.) These admissions corroborate Defendants' assertion that TDMN eliminated Powell's Leisure, Pets, and Recreation beat because there would not be sufficient manpower to focus on such a narrow subject matter following the RIF. Finally, Plaintiffs claim Defendants "ignore Powell's second column which ran in the Metro section," and which focused on both general interest issues and history.  (Pls.' Resp. at 222-23.) Defendants contend that Plaintiffs are mistaken.  Defendants claim they did not ignore Powell's non-pet contributions to TDMN. Indeed, Defendants noted that "Powell's general issues/history column, which only took a small portion of his time, appeared in the Metro section of TDMN paper." (Defs.' Br. at 180 n.89; *see also id*. at 38-39.)  Defendants explain that because Powell's column and blog about pets consumed 80-85% of his time,  it was properly the focus of any RIF decision.  (Powell Dep. at Defs.' App. 1207:3-10.)  Put another way, since the vast majority of his time was spent writing about pets, he was primarily considered a "Pets Columnist" for purposes of the RIF.   (Pets Columnist Position Elimination Form at Defs.' App. 2893.)  This decision is supported by Powell's admission that he reported directly to Watson, the Assistant Editor for the Leisure, Pets, and

Recreation beat in the Lifestyles Department. (Powell Dep. at Defs.' App. 1204:12-16; Watson Dep. at Defs.' App. 1782:14-18.) Thus, when TDMN decided to eliminate this entire beat, including Powell's primary position of Pets Columnist, it legitimately included him in the RIF given the rule prohibiting transfers. Additionally, Powell conceded that following the RIF, no one at TDMN continued to write his second column about general issues and history, or regularly wrote about the same subject matters. (Powell Dep. at Defs.' App. 1230:12- 19.) As noted previously, in the context of a position elimination, "the test…is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position." *Furr*, 82 F.3d at 988; *see also Tucker*, 462 F. Supp. at 728 n.5 ("[A] company is under no obligation to eliminate all the job duties handled by an individual in a given position when the company eliminates the position" in a reduction in force); *Westbrook*, 591 F. Supp. 2d at 229-231. Because Plaintiffs do not even attempt to prove that one full-time employee of TDMN continues to perform all of Powell's previous responsibilities, they cannot demonstrate the decision to eliminate his position in the RIF was pretextual. Accordingly, Plaintiffs have not shown that Defendants' proffered reasons for including Powell in the RIF are pretextual. In sum, Plaintiffs have not offered "substantial" evidence discrediting any of the reasons offered by Defendants for Powell's inclusion in the RIF. Additionally, Plaintiffs have not produced any evidence that age was the "but for" cause of his termination, as required under *Gross*. To the contrary, most of Powell's testimony conceding the absence of age discrimination at TDMN remains undisputed, including testimony that: he is not aware of any evidence supporting his claim that his termination from TDMN was a result of his age; he had no reason to think Kresl had any sort of bias against him; none of his managers ever made age discriminatory comments; he was not aware of anyone at TDMN ever making discriminatory

comments about him or other Plaintiffs; he did not know of any written documentation showing that Defendants discriminated against him; and, he did not believe any specific person discriminated against him. (Powell Dep. at Defs.' App. 1209:4-1210:1, 1224:3-9, 1231:13-18, 1235:14-20, 1236:17-25.) Accordingly, Defendants contend that Powell's disparate treatment claim in Count Four must fail as a matter of law.

### Conclusions Regarding Powell's Claim

Powell fails to prove that the reasons for his termination are unworthy of credence, or that his age was the "but for" cause of his discharge. Because the majority of Powell's time was spent writing about pets, he was primarily considered a "Pets Columnist" for purposes of the RIF. Powell admitted that he reported directly to Watson, the Assistant Editor for the Leisure, Pets, and Recreation beat in the Lifestyles Department. Accordingly, when TDMN decided to eliminate this entire beat, including Powell's primary position of Pets Columnist, it legitimately included him in the RIF given the rule prohibiting transfers. Additionally, Powell conceded that following the RIF, no one at TDMN continued to write his second column about general issues and history, or regularly wrote about the same subject matters. There are no genuine issues of material fact with respect to Powell's claim. Defendants are entitled to summary judgment on Powell's claim of disparate treatment in Count Four.

## Timothy Arthur O'Leary

### Defendants' Nondiscriminatory Reasons

Keven Willey ("Willey") who was responsible for RIF-related decisions in the Editorial Department, recommended Timothy O'Leary ("O'Leary") for inclusion in the RIF because: (1) TDMN downsized O'Leary's Editorial Writer position; (2) O'Leary had significant problems with time management; (3) O'Leary had been placed on a Performance Improvement Program "PIP" in 2004; and (4) O'Leary often made factual errors in his stories. (Defs.' Br. at 43, 118.)

Defendants contend that O'Leary had repeatedly missed deadlines and arrived late for work and meetings during the last few years of his employment with TDMN. He also had used an improper tone in his stories. The PIP instructed him to improve the substance of his editorials, meet deadlines, and attend meetings on time. Because of these issues, Willey recommended that O'Leary be terminated in the RIF. At no time did Willey consider O'Leary's age when deciding to terminate him in the RIF. (Willey Aff. ¶ 10 at Defs.' App. 3280.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs contend that O'Leary was one of TDMN's best performers during his more than 11 years at the paper and that he won more awards for editorial writing than perhaps any other writer in Texas. In O'Leary's February 13, 2004 annual performance review (for the period beginning on May 3, 2003), Willey indicated that his writing ability was one of his strong points, stating, "Tim helps the department produce Pulitzer-quality work" and "Tim is an elegant writer." (Pls.' App. 0907; O'Leary Decl. ¶¶ 4, 18, Pls.' App. 3182, 3186.) Plaintiffs claim that the statements that Willey "terminated O'Leary because of his recurrent time management problems and errors" (Defs.' Br.

at 118) and the statement that O'Leary had a "long" history of performance issues are demonstrably false.

Plaintiffs argue that Defendants, in fact, acknowledge that O'Leary received ratings of "meets expectations" in the two years before the RIF. (Defs.' Br. at 43.) They contend Defendants' fabrications are further evidenced by their false statement that Willey's predecessor, Rena Pederson ("Pederson"), criticized O'Leary for using an improper tone, not meeting deadlines, and making factual errors. (Defs.' Br. at 42 (citing Defs.' App. 1065-66; O'Leary Dep., Pls.' App. 1811-1812.) He did not so testify. (O'Leary Dep., Pls.' App. 1811.)

Plaintiffs claim that Willey's targeting of older employees is further evidenced by her manipulation of the job title of "Editorial Writer." Defendants identify six "Editorial Writers" with whom O'Leary was purportedly compared: Jim Mitchell, Victoria Loe Hicks, Rodger Jones, John Chamless, and Jim Frisinger. (Defs.' Br. at 43 (citing Defs.' App. 2883, 2885).) Plaintiffs point out that Chamless' true function was copy editor, and Frisinger's was letters editor. Plaintiffs base this upon the fact that neither Chamless nor Frisinger held the job title "Editorial Writer" until 2003. The two rarely wrote editorials because they were rarely asked to. They contend William McKenzie, Ruben Navarrette (age 37), Rod Dreher ("Dreher") (age 37), and Michael Landauer (age 29) had the primary task of writing editorials. (Pls.' App. 1137.) Nevertheless, McKenzie and Navarrette were classified as "Editorial Columnists" and Dreher and Landauer were classified as "Assistant Editorial Page Editors." Plaintiffs assert that under Willey, "Editorial Columnist" and "Assistant Editorial Page Editor" became protected titles held by the under-40 writers.

Plaintiffs assert that in 2003, O'Leary's output was compared against "Editorial Writers" Dreher, Jones, and Landauer, whereas in 2004, it was compared against "Editorial Writers" Jones,

Loe Hicks, Mitchell, Chamless, and Frisinger. (O'Leary Decl. at ¶ 3, Pls.' App. 3181.) In dozens of columns that O'Leary wrote for TDMN between 1993 and 2004, the newspaper described him as "an Editorial Writer and Columnist." (O'Leary Dep., Pls.' App. 1810.) Except for Chamless and Frisinger, all of the Editorial Department "writers" did essentially the same work–write editorials, columns, and blog entries. (O'Leary Decl. ¶ 3, Pls.' App. 3181.) Plaintiffs allege that Defendants' claim that O'Leary's "production was the lowest in the department" is false and unsubstantiated.

Plaintiffs contend that on September 9, 2004, Deputy Editorial Page Editor Sharon Grigsby (hired by Willey from TDMN newsroom) told O'Leary he was averaging only 2.2 editorials per week. O'Leary checked the department's official tally. He was the third most productive, having written 119 editorials between January and August 2004, or more than 3.41 per week. Two of his "comparators," Loe Hicks and Jones, had written fewer than 50 each. Dreher, one of the protected younger "Editorial Columnists," had written only 105. When O'Leary showed Willey the numbers, she stated that she was referring to the time period "since June." O'Leary, however, had been on leave and then on foreign assignment during five weeks of that period. (O'Leary Decl. at ¶ 5, Pls.' App. 3182.) Plaintiffs contend that Defendants' statement that O'Leary was the least productive of the Editorial Writers is false and without supporting documentation. Although Defendants also accuse O'Leary of "using an improper tone in editorials" without any factual basis, O'Leary contends that he cannot determine the nature of this accusation because Grigsby and Willey never stated what they meant and judgments of tone are, by their nature, highly subjective. Plaintiffs point out that in O'Leary's long career as a journalist, no other supervisor told him that he used an improper tone. (O'Leary Decl. at ¶ 6, Pls.' App. 3182.)

Plaintiffs address the claim that Defendants also targeted O'Leary for criticism purportedly because he requested extensions of deadlines and was late to meetings. Plaintiffs state that although all employees were, at times, late for meetings, missed deadlines, or made mistakes, Grigsby and Willey criticized only certain employees. O'Leary defends his performance by claiming that if he missed a deadline or was late for a meeting, the typical cause was the crushing work load and complicated editorial subjects Willey had assigned to him. O'Leary discussed his work load with Willey at his February 13, 2004 evaluation. She agreed that he could request and receive deadline extensions whenever the complexity of an editorial required more time or when staff meetings were too long. O'Leary believed from this discussion that he had Willey's agreement that his schedule was flexible. O'Leary claims that he did not realize that Willey was keeping score until he received an email from Grigsby in August 2004, in which she criticized him for supposedly requesting "more deadline extensions" than other staff members. One of his colleagues, renowned columnist Ruben Navarrette ("Navarrette"), remarked to O'Leary that Willey and Grigsby were targeting Willey. (O'Leary Decl. at ¶¶ 8, 35, 41, Pls.' App. 3183, 3189.)   As further evidence that he was being targeted, Willey required him to write "corrections" for non-existent mistakes. As one example, Willey, on October 13, 2004, criticized O'Leary for purportedly reporting incorrectly the boundaries of a state legislator's district. The boundaries were correct but included uninhabited areas. Willey criticized O'Leary for failing to obtain information from a "primary source" in reporting the boundaries, although he had obtained the information–which was correct–from the legislator's executive office. Even Grigsby acknowledged that the legislator's office should have known the correct boundaries. (O'Leary Decl. at ¶ 11, Pls.' App. 3183, 3184.)  On other occasions, Grigsby criticized O'Leary's stance in an AIDS editorial, but never asked his source, a world-renowned

expert. She criticized his use of the word "holocaust" in a story about a nuclear event although Willey claims the usage was appropriate.

Plaintiffs contend that Defendants cite no company policy or journalistic standard that O'Leary violated. (O'Leary Decl. at ¶¶ 23, 27, Pls.' App. 3187-3188.) With respect to Defendants' assertion that O'Leary was not showing enough "leadership," O'Leary claims he had advocated for clean air, expanded public transit, a sound foreign policy toward Latin America and the Caribbean, and a host of other desirable ends. (O'Leary Decl. at ¶ 36, Pls.' App. 3189.)

Plaintiffs state that on September 9, 2004, Willey and Grigsby warned O'Leary that they would put him on probation unless he "improved his performance" by October 1, 2004. However, O'Leary claims that Willey and Grigsby did not wait until October 1, 2004, a date which would have been two days after Moroney's announcement of the RIF. Rather, he contends they put him on probation on September 21, 2004 – ten days before they had said they might and eight days before Moroney's announcement. (O'Leary Dep., Pls.' App. 1816.) Willey knew of the upcoming RIF at that time. Plaintiffs contend that all of Defendants' stated "reasons" for terminating O'Leary are false. Plaintiffs argue that the Court can infer that Grigsby and Willey invented reasons to criticize O'Leary and other older employees in the Editorial Department to target them for termination.

Defendants urge that O'Leary fails to prove that the reasons for his termination are unworthy of credence, or that his age was the "but for" cause of his discharge. Plaintiffs concede that TDMN downsized O'Leary's Editorial Writer position, and that O'Leary was placed on a PIP in 2004. (Pls.' Resp. at 205-09.) However, Plaintiffs contest the other two reasons, which they claim "are demonstrably false," by first claiming that O'Leary received ratings of "Meets Expectations" in the two years preceding the RIF. (Pls.' Resp. at 205.) Defendants assert that Plaintiffs' argument

would mean that, if an employee receives an overall rating of "Meets Expectations," no single component of their performance can possibly be deficient. Defendants note that in these same two annual performance evaluations, O'Leary was strongly criticized for his problems in complying with deadlines and timely attending meetings, which the 2003 appraisal referred to as his "Achilles heel." (Defs.' Br. at 42.) In O'Leary's 2004 evaluation, Willey noted that he had missed deadlines or been late to meetings at least thirty-one times since his last evaluation, and no other staff member had missed deadlines even half as many times. (*Id*. at 42-43.) O'Leary agreed with these shortcomings, noting in his 2003 self evaluation that he could improve on his time management skills. (O'Leary Dep. at Defs.' App. 1079:8-11.) Plaintiffs do not dispute that O'Leary missed deadlines or was late for meetings much more frequently than other Editorial Department employees. (Pls.' Resp. at 207.) Defendants contend that Plaintiffs' attempt to excuse O'Leary's perennial lateness based on "the crushing work load and complicated editorial subjects Willey had assigned him" is baseless because in his Declaration, O'Leary does not state that Willey assigned these editorial subjects to him, but simply states, "the subjects about which I wrote were more complicated than those of the other writers." Defendants assert that this is a concession that he, rather than Willey, was the one responsible for his "crushing work load." (O'Leary Decl. ¶ 8 at Pls.' App. 3183.) With respect to Plaintiffs' contention that Willey told him that he could request deadline extensions in 2004, even if true, this does not alter the fact that O'Leary had time management problems during the two years prior to this supposed agreement, as noted in his 2003 and 2004 performance appraisals. Defendants also assert that this permission to extend deadlines, when necessary, does not preclude Defendants' criticism that he requested more deadline extensions than other staff members. (*Id*.)

Defendants point out that Plaintiffs' claim that the "Editorial Columnist" and "Assistant Editorial Page Editor" positions "became protected titles held by the under-40 writers" under Willey's management is unsubstantiated and completely irrelevant to Defendants' reasons for terminating O'Leary. (Pls.' Resp. at 206.) Plaintiffs cite ¶ 3 of O'Leary's Declaration in support of this claim. O'Leary states, "[u]nder Editorial Page Editor Keven Willey, 'editorial columnist' and 'assistant editorial page editor' became protected categories." (O'Leary Decl. ¶ 3, Pls.' App. 3181.) O'Leary does not state or imply that the decision to protect these positions/categories was made on the basis of age. Defendants further contend that: even if the Plaintiffs could somehow demonstrate that TDMN placed certain people in protected positions near the time of the RIF, Plaintiffs have failed to argue that Plaintiffs were more qualified for these positions, or should have been considered for these positions.

Defendants do not refute the criticism that O'Leary was frequently late to staff meetings. Plaintiffs next argue that O'Leary was being held to a different standard than other employees, but in support, merely cite O'Leary's Declaration, where he quotes an email another employee allegedly sent him. (Pls.' Resp. at 207.) Plaintiffs provide no copy of the alleged email, and it is not in evidence. (*Id.*; O'Leary Decl. ¶ 41 at Pls.' App. 3190-91.) Plaintiffs cite a hearsay remark purportedly made by Navarrette that Willey was "targeting" O'Leary. Even if the hearsay remark were admissible, nothing in this incident would lead a factfinder to infer that Willey was targeting O'Leary because of his age. Defendants assert that Plaintiffs have failed to explain how holding O'Leary accountable for missing deadlines and being late to meetings more than twice as often as any other employee is holding him to "a different standard." (Pls.' Resp. at 207.) Defendants point out O'Leary's admission that he was frequently late for work. Defendants argue that O'Leary's time

management problems were legitimate reasons for Willey to terminate O'Leary during the RIF. With respect to his tendency to make factual errors, Defendants claim that O'Leary admitted that both Willey and his former supervisor, Pederson, criticized him for, among other things, "factual mistake[s]" in his stories. (Defs.' Br. at 42.) Plaintiffs do not dispute any such criticism leveled against O'Leary by Pederson, nor do they even attempt to explain away any of the three examples of such factual mistakes provided by Defendants. (*Id.*; Pls.' Resp. at 208.) Plaintiffs contend that because O'Leary violated "no company policy or journalistic standard," Defendants' consideration of these factual mistakes – which he admittedly made – is somehow discriminatory. (Pls.' Resp. at 208.) Defendants assert that Plaintiffs have failed to discredit this legitimate, nondiscriminatory reason for O'Leary's termination. The record supports Defendants' assertion.

### Conclusions Regarding O'Leary's Claim

Plaintiffs have failed to provide "substantial" evidence that casts doubt on any of the reasons offered by Defendants for O'Leary's inclusion in the RIF. Plaintiffs have not produced any evidence that age was the "but for" cause of his termination, as required under *Gross*. O'Leary does not challenge that: he was terminated in connection with an RIF; at the time of the RIF, there were layoffs and economic problems at newspapers throughout the country and at TDMN; he was frequently late for work; and, he was placed on a PIP in 2004. (O'Leary Dep. at Defs.' App. 1069:1-3, 1074:5-1075:15, 1084:11-13, 1087:20-23, 1088:5-1089:12.) There is an absence of genuine issues of material fact with respect to O'Leary's claim. Accordingly, Defendants are entitled to summary judgment on O'Leary's disparate treatment claim in Count Four.

### John Paul Chamless

### Defendants' Nondiscriminatory Reasons

Willey ranked Chamless fifth out of the six Editorial Writers because Chamless: (1) was one of only two Editorial Writers who was on a PIP at the time of the RIF; (2) was the only Editorial Writer to receive an overall performance rating lower than "Meets Expectations" during 2004; (3) was a weaker writer compared to most of the other Editorial Writers; (4) lacked good judgment; (5) was unable to respectfully debate an issue with someone who had a differing opinion; (6) needed to improve his headline writing; repeatedly failed to catch errors in stories; and (7) had less experience as an Editorial Writer than his comparators. Willey did not consider Chamless' age in ranking him for the RIF. (Willey Aff. ¶ 12 at Defs.' App. 3280.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs claim there is an inconsistency in what Defendants asserted to the EEOC and what Defendants assert here. They claim that TDMN reported to the EEOC that they evaluated Chamless based on his "flexibility," whereas Defendants now assert that Willey terminated Chamless because he was one of the weaker writers, frequently missed errors, and was on a PIP at the time of the RIF. (Pls.' App. 0261; Defs.' Br. at 119.) Plaintiffs claim that when Willey evaluated Chamless' "flexibility," Willey contrived reasons to place him on a PIP and then to terminate him. Plaintiffs point out Willey's criticism of Chamless' web log ("blog") tone and his asserting personal opinions on the blog. Chamless contends that the point of TDMN's editorial blog was to permit the writers to express personal opinions. Plaintiffs also claim Willey criticized Chamless' use of the word "Palestine" as too controversial. Plaintiffs contend that Willey did not similarly criticize Dreher, the young "Editorial Columnist," who was known to have combative exchanges with "bloggers" and

117

other Editorial Board members who did not agree with his opinions. (Chamless Decl. at ¶¶ 8, 9, 10, Pls.' App. 3142.)

Plaintiffs claim that Willey's targeting of Chamless is further evidenced by Defendants' assertion that he was one of the weaker writers. They point out that Willey gave him the title of "Editorial Writer" in 2003, but required him to continue in his primary role as copy editor. (Willey Dep. ¶¶ 51:2-52:12, Pls.' App. 2373-2374; O'Leary Decl. ¶ 3, Pls.' App. 3181.) Plaintiffs contend that Willey knew Chamless' background and writing skills when she gave him the title and would not have assigned him additional duties if he lacked the required skills. Plaintiffs assert that Defendants' claims that Chamless "frequently missed errors" and was not a strong headline writer are conclusory assertions, not facts. Plaintiffs also assert that Chamless was a solid linear headline writer, and because of his unique skills, was able to handle large volumes of copy while editing writers' work. Plaintiffs fault Defendants for failing to state how many errors Chamless purportedly missed and how often; how much copy he edited; what industry or company standards, if any, Willey relied upon to evaluate him; or how his headline skills were deficient. (Chamless Decl. at ¶ 5, Pls.' App. 3142.) According to Plaintiffs, when Willey placed Chamless on a PIP, she set an impossible goal of only one missed error per day. (Chamless Dep., Pls.' App. 1355, 1356-61, Ex. 10.) Plaintiffs blame Willey for "targeting Chamless to ensure failure." (Chamless Decl. at ¶¶ 4, 5, Pls.' App. 3141.) Chamless met with Mong and requested a transfer to the newsroom because he felt Willey was abusing him. However, he did not receive a transfer. (Chamless Decl. at ¶ 11, Pls.' App. 3142-43.) Willey consolidated Chamless' position and replaced him with a younger employee, Tyra Damm. Grigsby, in an email to Willey, noted that the remaining older writers, McKenzie and Mitchell, seemed shocked that they were the remaining members of the "old guard"

after the RIF. Grigsby noted that they seemed to feel it was unfair that Chamless was not given the opportunity to apply for the copy editor position Willey created for Damm.

Plaintiffs contend that Defendants mischaracterize Chamless' testimony when they infer that he was not confident about his writing. (Defs.' Br. at 44, citing Defs.' App. 131:13-15; 132:5-11; Chamless Dep., Pls.' App. 1353-54.) They explain that Chamless simply stated in his 2003 self review that he was less confident about his writing than his editing and assert this was not unusual for a copy editor recently assigned additional editorial writing assignments. Chamless explained that he looked through the news for topics worth commenting on that would not fall into other writers' beats. (Chamless Dep., Pls.' App. 1353.)

Plaintiffs assert that Defendants also falsely infer that Chamless needed to become more proficient with the use of computers, even though this was not a purported reason for his termination. (Defs.' Br. at 44.) Plaintiffs note Chamless' testimony that his level of computer proficiency was "certainly well more than adequate for the jobs" he was doing, but he simply wanted to learn more. (Chamless Dep., Pls.' App. 1354.) Plaintiffs assert that they have shown that Defendants' stated reasons for terminating Chamless are false, and that Defendants have stated conflicting reasons for the termination.

Defendants contest Plaintiffs' argument they made "conclusory assertions" that Chamless needed to improve his headline writing and often failed to catch errors in stories. (Pls.' Resp. at 209.) According to Defendants, in Chamless' deposition, he agreed with a criticism from his 2004 performance review that he needed to improve his headline writing. (Chamless Dep. at Defs.' App. 150:18-151:3.) This review also noted that Chamless failed to catch far too many errors, and he admitted it was common for him to miss multiple typos on a single page. (Defs.' Br. at 45; Chamless

Dep. at Defs.' App. 154:7-11.)  Defendants contend that Plaintiffs present no evidence to dispute either of these two concessions by Chamless.  (Pls.' Resp. at 209-10.)

Defendants disagree that they mischaracterized Chamless' testimony that he was not confident about his writing. (*Id*.)  They point out that Chamless specifically testified he was less confident about his writing than his editing. (Chamless Dep. at Defs.' App. 131:13-15, 132:5-11.) Defendants contend that even if Chamless was completely confident in his writing, his confidence fails to disprove that he was a weaker writer than his comparators in the RIF.

Defendants rebut Plaintiffs' claims regarding Chamless' use of the word "Palestine" during a debate with a reader by showing Chamless' choice of words directly disobeyed an instruction from Willey, a fact Plaintiffs do not contest. (Defs.' Br. at 45; Pls.' Resp. at 209.)  Defendants also rebut Chamless' claims regarding two other specific incidents of Chamless' unwillingness to respectfully debate issues.  First, Chamless sent an email response to numerous coworkers regarding an editorial he disagreed with, stating "this is a terrible edit." (Defs.' Br. at 45.)  In addition, Chamless wrote on one of his blogs that a newspaper looks bad when it endorses someone in a general election whom it did not endorse in the primary, even though the Editorial Department had already discussed this issue and agreed it was a reasonable practice. (*Id*.)  Defendants point out that rather than dispute these incidents, Plaintiffs simply allege that Willey "did not similarly criticize [Rod] Dreher, the young 'Editorial Columnist,' who was known to have combative exchanges with 'bloggers' and other Editorial Board members who did not agree with his opinions." ( Pls.' Resp. at  209) (citing Chamless Decl. ¶¶ 8-10 at Pls.' App. 3142.) Defendants correctly note that Chamless does not state – or even imply – that Willey failed to criticize Dreher. (Chamless Decl. ¶¶ 8-10 at Pls.' App. 3142.) Chamless merely alleges that Dreher would sometimes block email from readers who "hammered"

him, and would deliberately insult readers who disagreed with him. (*Id*. ¶¶ 8-9 at Pls.' App. 3142.) Chamless does not contend that Dreher had combative exchanges with Editorial Board members who disagreed with his opinions. (*Id*. ¶¶ 8-10 at Pls.' App. 3142.) Defendants have shown that Plaintiffs failed to present any evidence that Willey failed to criticize Dreher, or that she targeted Chamless for criticism because of his age.

Finally, Defendants challenge Plaintiffs' implication that Defendants' reasons for terminating Chamless' employment in the RIF have changed over time. (Pls.' Resp. at 209.) Defendants contend Plaintiffs patently misrepresent the reasons for Chamless' termination that Defendants provided to the EEOC. Defendants claim that in the very letter to the EEOC that Plaintiffs cite, Defendants' attorney, Robert Sheeder, notes with respect to Chamless' termination, "it was important to retain the employees with the most flexibility and highest quality production." (Pls.' App. 261.) Mr. Sheeder notes that TDMN determined Chamless' "performance was weaker than the three employees retained." (*Id*.) Furthermore, Mr. Sheeder points out that Chamless was placed on a PIP in July 2004, often missed errors when editing, had problems with headline writing, was disrespectful when debating issues on his blogs, and suffered from poor judgment – as evidenced by his appearance at an interview with former Secretary of State Madeleine Albright in shorts and tennis shoes.

Chamless' testimony concerning the absence of age discrimination at TDMN remains undisputed, for the most part. Chamless testified that: other than his subjective belief that Willey discriminated against him because of his age, he "cannot point to a single thing somewhere and say that it was discrimination based on age"; he is not aware of any written document demonstrating age

discrimination against him; and, he is not aware of any specific person who discriminated against him due to his age.  (Chamless Dep. at Defs.' App. 181:4-182:3, 183:3-6, 183:13-184:1.)

### Conclusions Regarding Chamless' Claim

Plaintiffs' argument that Defendants gave false and inconsistent reasons for Chamless' termination fails.  Plaintiffs have failed to offer "substantial" evidence casting doubt on any of the legitimate reasons offered by Defendants for Chamless' inclusion in the RIF.  Plaintiffs produced no evidence that age was the "but for" cause of his termination, as required under *Gross*.  There is an absence of genuine issues of material fact with respect to Chamless' claim.  Accordingly, Defendants are entitled to summary judgment on Chamless' disparate treatment claim in Count Four.

### Lawrence William DeOre

### Defendants' Nondiscriminatory Reasons

Willey eliminated DeOre's Editorial Cartoonist position because editorial cartoons were a luxury that were not essential to the future successful operation of the Editorial Department, and because, to the extent TDMN needed editorial cartoons in the future, it could hire freelance cartoonists or buy syndicated cartoons. Thus, Willey concluded that the Editorial Department did not need a full-time cartoonist on staff.  When deciding to eliminate this position, Willey did not consider DeOre's age. (Willey Aff. ¶ 6 at Defs.' App. 3280.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs claim that DeOre was a highly regarded editorial cartoonist, a position which requires a unique blend of insight, wit, and art skills, and extensive knowledge of current events. (DeOre Decl. at ¶ 1, Pls.' App. 3148.) Plaintiffs assert that Willey had targeted DeOre for criticism before the RIF.  In a July 2, 2004 email to Mong, Willey referred to DeOre's age and tenure and

offered him a buyout. (Willey Dep., Pls.' App. 2412 [Ex. 22]; Pls.' App. 2423-2424.) In the spring of 2004, Willey had placed DeOre on a PIP. Plaintiffs contend that to this day, DeOre does not know why Willey placed him on a PIP because he always met deadlines and produced high quality work. He claims that she selected the ideas for cartoons among several he proposed each day. DeOre contends that Willey began making demands that were impossible to meet. In addition to DeOre's regular full-time duties, Willey required him to produce ten cartoons over a biweekly period, five that "worked" and five that did not. He was then to meet with her to discuss what "worked" and what did not. DeOre explained he did not know how to create a political cartoon that would not "work," but he attempted to comply with her directive. She also instructed him to enhance his syndication numbers. DeOre contends this was completely unreasonable because he could not control how, when, or why Universal Press Syndicate sold his features to prospective clients. Similarly, DeOre contends he could not require other newspapers to publish his cartoons, many of which reflected topics of local interest. She required him to "blog," although he was not a writer, and he could not type. He learned to do both soon and had an impressive following on TDMN's website. Willey told DeOre that if he complied with her directives, she would take him off the PIP in 60 days; then, without explanation, she refused to do so. (DeOre Decl. at ¶ 4, Pls.' App. 3149-3150.)

Plaintiffs contest Defendants' statement that they terminated DeOre simply because they no longer needed a cartoonist and could use freelance or contract cartoonists, contending that DeOre also drew illustrations for the Viewpoints page and the Sports pages. They claim he had experience as an artist both in the Advertising Department and newsroom and could work in multiple media. Plaintiffs argue that Defendants did not offer DeOre the opportunity to work on a freelance or

contract basis. Plaintiffs claim that since the RIF, TDMN has regularly published cartoons in the Metro and Editorial pages by a younger and basically unknown cartoonist, "Bubba Flint" ("Flint"). Plaintiffs claim TDMN also continues to publish illustrations and other art in all of their sections, all of which DeOre was well-qualified and competent to produce. (DeOre Decl. at ¶ 5, Pls.' App. 3150.) Plaintiffs contend that these facts establish that Defendants' true reason for terminating DeOre was his age and that Willey eliminated his position to accomplish that goal.

Defendants contend that DeOre fails to prove that the reasons for his termination are unworthy of credence, or that his age was the "but for" cause of his discharge. As stated, they claim Willey eliminated DeOre's Editorial Cartoonist position because it was a luxury that was not essential to the future successful operation of the Editorial Department. (Defs.' Br. at 46, 119.) It is undisputed that, to the extent TDMN needed an occasional editorial cartoon following the RIF, it could purchase cartoons from other sources like syndicates or freelance cartoonists – at a cost much less than paying an Editorial Cartoonist's annual salary. (Defs.' Br. at 46-47.)

In his deposition, DeOre admitted his position was eliminated in the RIF, and that no one replaced him as Editorial Cartoonist for TDMN at any time following the RIF. (DeOre Dep. at Defs.' App. 396:20-397:2.) With respect to Plaintiffs' argument that TDMN continues to regularly publish cartoons "in the Metro and Editorial pages by a younger and basically unknown cartoonist, 'Bubba Flint,'" Defendants note that Plaintiffs do not dispute that TDMN eliminated DeOre's position in the RIF, or that he was never replaced following the RIF. (*Id.*)

Defendants label as "false" Plaintiffs' statement Willey targeted DeOre before the RIF by placing DeOre on a PIP in the spring of 2004, for reasons allegedly "unknown" to DeOre. (Pls.' Resp. at 211) (citing to DeOre Decl. ¶ 4 at Pls.' App. 3149-50.) In his deposition, DeOre testified

there were several reasons Willey placed him on a PIP, all of which came from his refusal to comply with instructions Willey gave him in his 2003 performance appraisal.  (DeOre Dep. at Defs.' App. 102:1-20, 108:12-109:8, 126:10-24, 129:8:13, 139:13-24, 142:14-18) (testifying he had not complied with Willey's instructions to: (1) stay until 3 p.m. rather than going home at 1 p.m.; (2) become familiar with the internet; (3) create and maintain a blog; and (4) prepare quarterly reports on his progress regarding the instructions from his 2003 review).  The Court has sustained Defendants' objection to DeOre's Declaration on the grounds that an affidavit that contradicts prior testimony or admissions for the purposes of creating a fact issue is not competent summary judgment evidence and cannot be considered.  (Obj. to Pls.' Decl. at 14, Exh. A.)  The Court affords DeOre's Declaration no credence to the extent it directly conflicts with his deposition testimony.

Defendants contend that because Willey did not consider the PIP or DeOre's performance when deciding to eliminate his position, neither of these factors are relevant to whether Willey's decision to eliminate DeOre's position was motivated by his age.   Defendants urge that the only evidence Plaintiffs recite in support of their claim Willey somehow targeted DeOre because of his age is a single email  in which Willey discusses potential outcomes of DeOre's PIP.  (Willey Dep. Exh. 22 at Pls.' App. 2423-24.) "One option is to offer DeOre a buyout, rather than simply terminating him without any sort of severance package." (*Id.*)  When Willey discussed the details of a potential buyout in the fifth paragraph of the email to Mong, in which TDMN would pay DeOre one week's salary for each year of service, Willey notes that DeOre " has been employed with TDMN since 8/31/70, so he is just shy of 34 years of service."  (*Id.* at Pls.' App. 2423.) Furthermore, Willey states, "[h]e will be 57 years old in August and he earns a yearly salary of $81,667," which "is the equivalent of $1,574 on a weekly basis." (*Id.*) Defendants note that Willey

says nothing negative about DeOre's age, and does not even imply that she considers his age to be a problem. Instead, this comment occurred in a discussion of DeOre's years of service and salary, which Willey then used to provide estimates of how much a buyout – prompted by DeOre's repeated failures to follow instructions – would cost TDMN. It is well accepted that in order for an age-related comment to be probative of age discrimination, Plaintiffs must show that the comments were: (1) age-related; (2) proximate in time to the termination; (3) made by an individual with authority over the termination, or someone in a position to influence the termination decision; and (4) related to the employment decision at issue. *Palasota*, 342 F.3d at 576-78. Defendants state that at a minimum, Plaintiffs cannot satisfy the second and fourth factors. Further, they contend that Willey sent this email nearly four months before the October 27th RIF, and a month before she first learned that the RIF would impact the Editorial Department. (Willey Dep. at Defs.' App. 1960:20-1961:2.)

There is no evidence that this single neutral reference to DeOre's age was in any way related to Willey's decision to eliminate his position in the RIF. Accordingly, the Court finds that Willey's remark about DeOre's age is a "stray remark" which is not evidence of discrimination. The remark does not discredit Willey's reasons for eliminating the Editorial Cartoonist position.

Finally, Plaintiffs appear to question whether TDMN actually eliminated the Editorial Cartoonist position, alleging that following the RIF, TDMN "has regularly published cartoons in the Metro and Editorial pages by a younger and basically unknown cartoonist, 'Bubba Flint.'" (Pls.' Resp. at 212) (citing DeOre Decl. ¶ 5 at Pls.' App. 3150.) Plaintiffs have not disputed that Flint is not an employee of TDMN, but is occasionally asked to provide cartoons on a freelance basis. (Defs.' Br. at 110 n.59) Further, Plaintiffs do not dispute that Flint is not a full-time employee, or that he never replaced DeOre. (Pls.' Resp. at 212.) Defendants contend that given that DeOre was

strictly an Editorial Cartoonist, the allegation that Flint's cartoons run in the Metro Section is irrelevant to whether TDMN eliminated DeOre's position in the RIF. Willey testified that Flint's cartoons "occasionally" appear on the [suburban] editorial pages, and appear "very rarely on the editorial page." (Willey Dep. at Defs.' App. 1975:12-19.) Finally, Defendants point out that Plaintiffs have failed to provide any evidence that Flint was younger than DeOre. (Pls.' Resp. at 212.)

Defendants claim that the admissible evidence conclusively demonstrates that TDMN entirely eliminated DeOre's Editorial Cartoonist position in the RIF and has not replaced him since that time. Moreover, as noted above, to prove pretext in the context of a position elimination, "the test . . . is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position." *Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 988 (10th Cir. 1996); *Westbrook v. City Univ. of New York*, 591 F. Supp. 2d 207, 229-231 (E.D.N.Y. 2008). Defendants argue that Plaintiffs have introduced no evidence that DeOre's responsibilities constituted a single, distinct position at TDMN following the RIF. Even if Plaintiffs could demonstrate that other employees of TDMN absorbed some of DeOre's duties following the RIF, this would not constitute evidence of pretext. "[A] company is under no obligation to eliminate all the job duties handled by an individual in a given position when the company eliminates the position." *Tucker*, 462 F. Supp. 2d at 728 n.5. Accordingly, given the undisputed fact that TDMN eliminated DeOre's position in the RIF and has not replaced him, the allegations that various other employees perform some of the same duties as DeOre are completely irrelevant to the issue of whether the elimination of his position was a pretext for age discrimination. Thus, even if TDMN continues to occasionally run editorial cartoons purchased from freelance artists, this does not rebut

the legitimate reasons Defendants offered for eliminating DeOre's position.  Defendants urge that Plaintiffs' failure to prove that a full-time employee of TDMN continues to perform the same responsibilities as DeOre demonstrates that they cannot show that the decision to eliminate his position in the RIF was pretextual.

Defendants contend that much of DeOre's deposition testimony regarding the absence of age discrimination at TDMN, and the reasons for his inclusion in the RIF, remains undisputed.  DeOre testified that: no one at TDMN ever said anything he considered to be ageist; his position was eliminated in the RIF; no one replaced him as Editorial Cartoonist following the RIF; and, many other large newspapers have eliminated their in-house editorial cartoonists.  (DeOre Dep. at Defs.' App. 396:20-397:2, 411:6-8, 417:5-19.)

### Conclusions Regarding DeOre's Claim

The Court finds that Plaintiffs have not offered "substantial" evidence casting doubt on any of the reasons offered by Defendants for DeOre's inclusion in the RIF.  Plaintiffs failed to produce any evidence that age was the "but for" cause of DeOre's termination, as required under *Gross*. There is an absence of genuine issues of material fact with respect to DeOre's claim.  Accordingly, Defendants are entitled to summary judgment on DeOre's disparate treatment claim in Count Four.

### Ira Hadnot Alexander

### Defendants' Nondiscriminatory Reasons

Hadnot's supervisor, Bruce Tomaso, included Hadnot in the RIF because TDMN downsized her Religion Reporter position, and Tomaso ranked Hadnot last among the employees in this position. Tomaso had given Hadnot multiple written warnings about her performance over the prior year.  Hadnot often made "careless factual errors," and she erred far more frequently than the other

Reporters. She was by far the least productive Reporter and her stories required the most editing time from Tomaso. At no point did Tomaso consider Hadnot's age when recommending Hadnot for termination in the RIF. (Tomaso Dep. at Defs.' App. 1655:18-1656:4.)

### Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs claim that Defendants' statements that Hadnot was the least likely to be "flexible, versatile and adaptable" establish that Tomaso based his decision on age stereotypes. (Defs.' Br. at 47.) Plaintiffs also contend that Tomaso, contrary to company policy, had not performed a yearly performance review of Hadnot or informed her of deficient performance. Hadnot asserts that, contrary to Tomaso's assertions, she had never received a written reprimand. (Hadnot Decl. at ¶¶ 11, 13, Pls.' App. 3153.) Hadnot contends the only feedback Tomaso provided was in two oral communications with Hadnot. The first meeting involved Tomaso's edit on a story about a new law preventing hospital visits by the clergy. Hadnot allegedly asked for guidance because the topic was complex. The second meeting occurred over lunch in the West End. Hadnot claims she told Tomaso that she wanted to have a better working relationship with him. She avers that on these occasions, Tomaso did not paint the kind of damaging portrait he now asserts. Rather, Tomaso praised her work in his comments on more than one story. On a story about Bishop T.D. Jakes producing a film to help heal victims of sexual abuse, he wrote: "This is very good . . . overall, I think it works nicely." (Hadnot Decl. at ¶¶ 14-16, Pls.' App. 3153.) Tomaso made minor changes to the story which contained no errors. (*Id.*) When the Religion section won a national award based on stories written by all four staff members, including Hadnot, Tomaso provided a personal note attached to an ad announcing the honor. (*Id.*) The note stated: "Ira, you've been a welcome addition to our religion family . . . . " (*Id.*)

According to Hadnot, she has extensive editing experience. She states that editing is a very subjective process, and no two editors will approach a story the same way. She claims that many stories, columns, book and music reviews, and graphics she wrote for the Religion desk were used without major editing changes and were free of errors. Hadnot claims that Defendants' "overly magnified example" of the transposed name of Lieberman is not indicative of Hadnot's body of work on the Religion desk or of a 12-year career at TDMN. (Hadnot Decl. at ¶¶ 18, 26, Pls.' App. 3154.) Hadnot contends she was aware of only one error she made that was printed while she was on the Religion desk, a misspelling in a graphic. (*Id*.) The page was proofed by Tomaso, Trya Damm, Susan Hogan-Albach, and Berta Delgado-Young. (*Id*.) On previous performance evaluations, her supervisors Steve Yount and Lois Reed rated Hadnot's accuracy as "outstanding" and "exceeds expectations." (*Id*.) Hadnot blames Tomaso, urging that she has worked with many editors inside and outside TDMN, before and since the RIF, and none of them edits like Tomaso. (*Id*.) In defense of her productivity, Hadnot claims that she was assigned to special projects during the relevant three-year RIF evaluation period, two of which lasted for several months. (*Id*.) She contends that she was selected often to participate in special assignments because she had shown leadership, versatility, and adaptability. (*Id*.) Hadnot points out that Defendants make no mention of the page one stories she wrote or to which she contributed while on the Religion desk. (*Id*.) According to Plaintiffs, Defendants assert false, inconsistent, and unsubstantiated statements as to their purported reasons for terminating a highly-regarded and talented veteran writer.

Defendants assert that Hadnot fails to prove that the reasons for her termination are unworthy of credence, or that her age was the "but for" cause of her discharge. Defendants note that Plaintiffs do not dispute that TDMN downsized Hadnot's position, that she ranked last among the Religion

Reporters in Tomaso's RIF evaluation, or that her stories required the most editing. (Pls.' Resp. at 216-17.) According to Defendants, Plaintiffs do not contest the substance behind some of the warnings Tomaso gave Hadnot, including that she had time management problems, or that she had the highest number of errors among the Religion Reporters by a wide margin. (*Id*.) Instead, Plaintiffs argue that Tomaso based his ranking of Hadnot on "age stereotypes," and note that, "contrary to company policy, [Tomaso] had not performed a yearly performance review of Hadnot or informed her of deficient performance." (Hadnot Decl. ¶¶ 11, 13 at Pls.' App. 3153.) Defendants contend that in her Declaration, Hadnot merely denies getting "written reprimands" from Tomaso. (*Id*.) She admits, however, that they had face-to-face meetings in which Tomaso criticized her performance. (*Id*.) Tomaso unequivocally testified that he gave Hadnot multiple warnings on a variety of topics during the year prior to the RIF, and that Hadnot was not yet due for her annual evaluation at the time of the RIF. (Tomaso Dep. at Defs.' App. 1641:1-1644:22; Hadnot Dep. at Defs.' App. 487:4-11;Tomaso Dep. at Defs.' App. 1641:11-17.) This was because she had transferred to the Religion Section in late 2003, less than a year before the RIF. (*Id*.) Plaintiffs contend, without citation, that Hadnot was "assigned to special projects during the relevant three-year RIF evaluation period." (Pls.' Resp. at 217.) Defendants respond that this does not refute Tomaso's testimony that he calculated the number of stories published by each Religion Writer during the year preceding the RIF, and found that Hadnot ranked a "distant fourth" place in production. (Tomaso Dep. at Defs.' App. 1652:25-1653:23.) Tomaso considered irrelevant to his calculation any "special projects" to which Hadnot was assigned before she joined the Religion Section. (*Id*.) Furthermore, Plaintiffs do not dispute that Hadnot was much less productive than her colleagues. (Pls.' Resp. at 217.) Plaintiffs also fail to explain Hadnot's admission that she could

have improved her productivity during the last two years she worked at TDMN. (Hadnot Dep. at Defs.' App. 477.1:5-11.)

With respect to Hadnot's frequent errors, Plaintiffs claim Hadnot was "only aware" of one error she made in print, other than the "Stanley Lieberman" incident. (Pls.' Resp. at 217.) Tomaso, however, testified that she "had far more errors than any of the other three" Religion Reporters. (Tomaso Dep. at Defs.' App. 1653:24-1654:12.)

Further, much of Hadnot's testimony regarding the absence of age discrimination at TDMN remains undisputed. Hadnot could not recall a single instance where Tomaso discriminated against her on the basis of age. (Hadnot Dep. at Defs.' App. 475:8-17, 476:4-7, 490:5-8, 533:25-534:21, 534:25-535:6, 535:11-14, 539:23-540:1.) She considered Tomaso to be a fair supervisor, except for the way in which he edited her work. (*Id*.) She did not recall anyone at TDMN ever making ageist remarks to her. (*Id*.) She was not aware of anything in writing demonstrating age discrimination against her, and she did not believe a specific person at TDMN discriminated against her on the basis of her age. (*Id*.)

### Conclusions Regarding Hadnot's Claim

Plaintiffs have not offered "substantial" evidence discrediting any of the reasons offered by Defendants for Hadnot's inclusion in the RIF. Plaintiffs have not produced any evidence that age was the "but for" cause of her termination, as required under *Gross*. There is an absence of genuine issues of material fact with respect to Hadnot's claim. Accordingly, Defendants are entitled to summary judgment on Hadnot's disparate treatment claim in Count Four.

**Linda Jones**

**Defendants' Nondiscriminatory Reasons**

Leona Allen, Walt Stallings, and three other supervisors in the Metro Section selected Linda Jones for the RIF because TDMN downsized her Metro Reporter position. She ranked second to last among the employees in this position because: (1) she received lower overall ratings on her annual performance appraisals than her comparators; (2) her performance declined following her transfer from Features to Metro News;[19] (3) she was frequently reprimanded by her supervisors; (4) she had difficulty getting along with coworkers; (5) her stories were merely average in content and execution; (6) she had been asked to broaden the sourcing of her stories and inject more context and depth, but failed to do so; (7) she ranked near the bottom of Metro Reporters in her ability to produce above-average stories; (8) she struggled with the pace required for Metro Reporters; (9) she often failed to meet story quotas; (10) her stories routinely had misspellings and other errors; and (11) she was placed on a PIP due to the slowness and poor quality of her writing, among other things.

Ultimately, Allen and Stallings made the decision of which Metro Reporters to terminate in the RIF after meeting by themselves to confirm that the ranking of all Reporters was accurate. (Allen Dep. at Defs.' App. 19:12-20:1) Allen and Stalls did not consider Linda Jones' age when deciding to recommend her for termination in the RIF. (Allen Aff. ¶ 5 at Defs.' App. 2208; Stalls Aff. ¶ 3 at Defs.' App. 3269.)

---

[19] Linda Jones transferred to Metro Reporters because she had taken a voluntary one-year leave of absence, and when it was time to return, her position in Features had been filled.

## Plaintiffs' Claims of Pretext and Defendants' Rebuttal

Plaintiffs argue that Defendants curiously assert that Linda Jones' performance declined after she was assigned to the Grand Prairie Bureau "as the result of her taking a voluntary one-year leave of absence." Plaintiffs contend that Defendants' assertion implies that Linda Jones' request for leave (a Belo benefit) was somehow inappropriate and that Defendants assigned her to a lesser position as a result. (Defs.' Br. at 120.) Plaintiffs have presented no reason for the Court to read such an implication into what is clearly a straightforward explanation of why Defendant was reassigned. There is no implication of wrongdoing on Linda Jones' part or any hint of demotion.

Plaintiffs fault Defendants for making several allegations about incidents that occurred before 2002. Plaintiffs contend that the assertions establish that Defendants failed to follow RIF Guidelines by limiting their evaluation to incidents that occurred within the three-year evaluation period. However, nothing in the RIF forms or instructions prevented managers from looking beyond the three-year period preceding the RIF when evaluating employees. (Spitzberg Dep. Ech. 5 at Defs.' App. 1539-64.) Defendants' failure to limit the evaluation to the three-year period does not show discriminatory animus based on age.

Plaintiffs assert that Defendants falsely state that Linda Jones was placed on a PIP. Plaintiffs declare that Linda Jones was not placed on a PIP and point out that Defendants cite only to a September 3, 2002 typed summary of a meeting of Leona Allen, Linda Jones, and her supervisor Kerry Gunnels. Plaintiffs contend the meeting was held due to a misunderstanding about how many stories Linda Jones was required to produce after she was transferred to the Bureau. Plaintiffs state that Gunnels wrote in her August 2002 review, "As a senior reporter, Linda has much to offer younger and less experienced colleagues." (Pls.' App. 0991.)

Plaintiffs argue that Defendants also inexplicably assert that Linda Jones did not meet with Gunnels as instructed despite Linda Jones' testimony that they communicated weekly. (Defs.' Br. at 51.) Defendants also assert that Linda Jones "frequently had difficulty getting along with co-workers." (Defs.' Br. at 51, citing Defs.' App. 723:7-724:3; 725:14-726:8.) Gunnels, however, noted that Linda Jones was not unfriendly or hostile to fellow workers. (Pls.' App. 0991.) Gunnels also noted that Linda Jones was a smart, perceptive observer and had located stories others had not noticed. (Pls.' App. 0992.) Gunnels, in Linda Jones' 2003 performance evaluation, gave her an overall rating of "meets expectations." He noted that she had met her productivity goal. (Pls.' App. 0997.) He also noted improvement in other areas and that she had adjusted to the "faster pace." (Pls.' App. 0998.) Gunnels commended her professional behavior. (Linda Jones Decl. at ¶¶ 1-4, Pls.' App. 3173-3174.)

Defendants assert that Allen, Stalls, and other supervisors in the "Metro Section" selected Linda Jones for the RIF because TDMN downsized her Metro Reporter position. (Defs.' Br. at 120.) Plaintiffs contend that Defendants failed to present evidence that Linda Jones ever received an overall rating lower than "meets expectations" and failed to substantiate their assertion that her overall rating was lower than other Metro Reporters or that her writing skills became deficient. (Linda Jones Decl. at ¶ 3, Pls.' App. 3173.) Before her transfer to the Grand Prairie Bureau, Defendants had entered her work in writing competitions and recommended her for key writing positions. (*Id.*) She had won the coveted first place award for feature writing from the American Association for Women Journalists. (*Id.*) Plaintiffs assert that Defendants' false and inconsistent allegations establish pretext.

Defendants assert that Linda Jones fails to prove that the reasons for her termination are unworthy of credence, or that her age was the "but for" cause of her discharge. Defendants note that Plaintiffs do not dispute that: (1) TDMN downsized Linda Jones' position; (2) she ranked second to last among the Metro Reporters; (3) her performance declined following her transfer to Metro News; (4) she received frequent reprimands; (5) her stories were merely average in content and execution; (6) she failed to broaden the sourcing of her stories as requested; (7) she ranked near the bottom of Metro Reporters in her ability to produce high-quality stories; (8) she struggled with the pace required in the Metro Section and frequently failed to meet story quotas, and (9) her stories often had misspellings and other errors. (Pls.' Resp. at 217-19.) Defendants claim that instead, Plaintiffs merely dispute the facts that: (1) Allen placed Linda Jones on a PIP; (2) she had difficulties getting along with coworkers; and (3) she received lower overall evaluations than her comparators. (*Id*.) With respect to Plaintiffs' claim that Linda Jones was not actually placed on a PIP, and that "Defendants cite only to a September 3, 2002 typed summary of a meeting held among Leona Allen, Linda Jones and her supervisor Kerry Gunnels." Defendants contend the typed document itself makes clear it is a PIP. In this "typed summary," Allen informs Linda Jones that she needs to take three specific steps as a result of her poor performance: (1) improve the speed and quality of her writing; (2) meet with Kerry Gunnels weekly to discuss her performance; and (3) correct her frequent typos and misspellings. (Linda Jones Dep. at Defs.' App. 732:25-735:14.) Defendants state that whatever label Plaintiffs attach to this document, it is clear Allen was dissatisfied with Linda Jones' performance, provided her with written instructions on what to improve, and set the steps she needed to undertake to achieve these improvements. Plaintiffs do not claim that Linda Jones subsequently improved the speed and quality of her writing, or even attempted to correct her

typos and misspellings. (*Id.*; Pls.' Resp. at 218.) Although Plaintiffs imply that she satisfied the requirement to "meet" with Gunnels weekly given her purported testimony that "they communicated weekly," Defendants point out that Plaintiffs fail to note the distinction between meeting with someone in person, and merely communicating with them. Allen did not instruct Linda Jones to "communicate" with Gunnels weekly. (Linda Jones Dep. at Defs.' App. 733:10-21.) Linda Jones was well aware of this distinction, as she testified, "we did communicate weekly. Official meetings, each time, sit down, I don't remember." (*Id.* at Defs.' App. 733:18-25.) Defendants assert that it is disingenuous for Plaintiffs even to suggest – without citation – that Linda Jones met with Gunnels as instructed. In addition, Defendants refute Plaintiffs' claim that Defendants cite only to this "typed summary" in support of the assertion that Allen placed Linda Jones on a PIP. (Pls.' Resp. at 218.) Defendants point out that they also cite to Linda Jones' own deposition testimony and to an affidavit from Allen as proof that Linda Jones was placed on a PIP. (Defs.' Br. at 52-53.) Next, Defendants show that Plaintiffs cherry picked evidence to show that Linda Jones had no difficulty getting along with coworkers based on a statement Gunnels made in her 2002 performance evaluation. Defendants demonstrate that the remainder of this section of the 2002 evaluation expressly notes problems Linda Jones was having getting along with her colleagues. (Linda Jones' 2002 Perf. Eval. at Pls.' App. 991.) Plaintiffs failed to mention Gunnels notation that "she has not made a strong effort to form working relationships in the bureau," and that "she keeps to herself and only rarely interacts with colleagues." (*Id.*) Defendants point out that Plaintiffs' argument that Defendants failed to present evidence that Linda Jones ever received an overall rating on a performance evaluation lower than "Meets Expectations" misses the point. (Pls.' Resp. at 219.) Defendants are

correct that the fact that Linda Jones did not receive an overall rating lower than "Meets Expectations" on her evaluations does not disprove that she had lower ratings than her colleagues.

Defendants demonstrate that a review of the Metro Department Staffing Plan demonstrates that during the three years prior to the RIF, Linda Jones was one of the lowest-rated Metro Reporters and did in fact receive an overall rating lower than "Meets Expectations." (*See Metro Reporters Department Staffing Plan* at Defs.' App. 2898-2902.) Specifically, in Linda Jones' 2002 performance appraisal, she received an overall rating of "Below Average." (*Id*. at 2902.) Accordingly, Plaintiffs have not discredited Defendants' contention that she received lower overall evaluations than her comparators.

Much of Linda Jones' testimony regarding the absence of age discrimination at TDMN remains undisputed. She testified that: no one ever told her she was being discriminated against based on her age; no one at TDMN ever made disparaging remarks about her age; no one in management at TDMN ever made ageist remarks about anyone; she is not aware of any documents demonstrating age discrimination against her; and, she could not point to any facts supporting her allegation that Leona Allen or Walt Stalls, who recommended her for termination in the RIF, discriminated against her on the basis of her age. (Linda Jones Dep. at Defs.' App. 749:22-750:3, 751:3-10, 752:14-20, 772:11-14, 773:9-13, 774:8-20.)

### Conclusions Regarding Linda Jones' Claim

Plaintiffs have not offered "substantial" evidence disproving any of the reasons offered by Defendants for Linda Jones' inclusion in the RIF. Plaintiffs have not produced any evidence that age was the "but for" cause of her termination, as required under *Gross*. There is an absence of

genuine issues of material fact concerning Linda Jones' Claim. Accordingly, Defendants are entitled to summary judgment on Linda Jones' disparate treatment claim in Count Four.

### **Linston Robert Lofley**

### **Defendants' Nondiscriminatory Reasons**

Chris Wienandt ("Wienandt") included Lin Lofley ("Lofley") in the RIF because: (1) TDMN downsized Lofley's Business News Copy Editor position; (2) Lofley ranked last out of eleven Copy Editors when evaluated for purposes of the RIF; (3) Lofley made frequent errors, some of which were serious; (4) Lofley erred far more often than other Copy Editors in Business News; and (5) Lofley needed to improve on his headline and caption writing. (Defs.' Br. at 54-56, 121.) Wienandt never took into account Lofley's age when ranking him in connection with the RIF. (Wienandt Dep. at Defs.' App. 1928:12-15.) Notably, Lofley testified that he did not believe Wienandt selected him for termination because of his age. (Lofley Dep. at Defs.' App. 962:5-14.)

### **Plaintiffs' Claims of Pretext and Defendants' Rebuttal**

Plaintiffs challenge Defendants assertion that Lofley had more errors than the other Business News Copy Editors, and point out that he received performance evaluations of "meets expectations." Plaintiffs contend that Defendants fail to explain why Wienandt terminated him in 2004 for an incident that occurred more than two years before Wienandt became his supervisor. (Lofley Decl. at ¶ 2, Pls.' App. 3178.) Plaintiffs urge that employees with longer tenure are more likely to have a mistake in their record. Plaintiffs claim that Defendants acknowledge that the disciplinary action they cite occurred in January 2001, outside the three-year relevant RIF period. Plaintiffs contend that because Defendants' purported reasons for terminating Lofley do not comply with the RIF Guidelines, they have established pretext.

Defendants contend that Lofley fails to prove that the reasons for his termination are unworthy of credence, or that his age was the "but for" cause of his discharge. They state that Plaintiffs do not dispute that TDMN downsized Lofley's position, that Lofley ranked at the bottom of Business News Copy Editors, or that Lofley needed to improve his headline and caption writing. (Pls.' Resp. at 223.) Defendants contend that instead, Plaintiffs attempt – without substantiation – to refute Lofley's well-documented accuracy deficiencies. (*Id*.) Defendants point out that Plaintiffs' reliance on the fact that because Lofley received overall performance ratings of "Meets Expectations" in the two years preceding the RIF, he could not have erred far more often than other Copy Editors is misplaced. (*Id*.) The Court agrees that Defendants have shown that the fact that Lofley received overall ratings of "Meets Expectations" does not disprove the complaint that he committed errors much more frequently than his colleagues. Defendants point out that a review of Lofley's performance appraisals and self-evaluations from the three years preceding the RIF reveals persistent accuracy issues. In each of Lofley's performance appraisals from 2002 to 2004, his supervisors expressed concerns with his accuracy. In 2002, Lofley's supervisor, Patricia Marroquin ("Marroquin"), noted there was widespread concern with his accuracy, and others were therefore reluctant to use him. (Lofley Dep. at Defs.' App. 926:5-927:5.) In 2003, Marroquin again noted multiple problems with Lofley's accuracy. (*Id*. at Defs.' App. 931:2-7, 931:16-23, 932:5-10.) In his 2004 appraisal, Wienandt noted that Lofley needed to pay more attention to details, such as errors in spelling and capitalization. (*Id*. at Defs.' App. 935:3-8, 935:18-936:6.) Lofley himself shared his supervisors' concern with his accuracy. In his 2002 self evaluation, Lofley admitted he regularly failed to catch errors. (Lofley Dep. at Defs.' App. 923:23-924:12, 924:20-22.) In 2003, Lofley wrote that he continued to have problems with accuracy. (*Id*. at Defs.' App. 928:20-22.)

Thus, even though Lofley received overall ratings of "Meets Expectations," the undisputed record shows that there were continuing concerns with his accuracy.

Plaintiffs attempt to characterize Wienandt's decision to select Lofley for the RIF as being based solely on a 2001 incident involving Lofley's erroneous statement that American Airlines had lost money during the previous year, which "occurred more than two years before Wienandt became his supervisor" is not well taken. (Pls.' Resp. at 223.) The undisputed record shows that Wienandt also relied on other factors, including employees' reluctance to use stories edited by Lofley for fear of his inaccuracy, the fact that Lofley erred far more frequently than other Copy Editors in Business News, the fact that much of Lofley's work contained errors he "overlooked or introduced," and Lofley's inability to achieve a desired consistent level of accuracy. (Defs.' Br. at 56.) Moreover, nothing in the RIF forms or instructions prevented managers from looking beyond the three-year period preceding the RIF when evaluating employees. (Spitzberg Dep., Ech. 5 at Defs.' App. 1539-64.) Clearly, when Wienandt evaluated Lofley for the RIF, he did not rely solely on the 2001 incident involving American Airlines – one of many instances where Lofley committed a serious error – and even if he had, nothing in the RIF process prevented him from doing so. More importantly, although the American Airlines incident occurred more than three years prior to the RIF, Wienandt's consideration of this error does not establish pretext. As noted above, both Lofley and his supervisors expressed repeated concerns with his accuracy following the American Airlines incident. Accordingly, Wienandt's consideration of this incident does not discredit Defendants' assertion that the primary reason he selected Lofley for the RIF was because of Lofley's tendency to frequently err.

Lofley's testimony conceding the absence of age discrimination at TDMN remains undisputed. This includes testimony that no one at TDMN told him that he was being discriminated against based on his age and no one at TDMN ever made any comments towards him that were indicative of age discrimination. (Lofley Dep. at Defs.' App. 963:1-16.)

### Conclusions Regarding Lofley's Claim

Plaintiffs have not offered "substantial" evidence discrediting any of the reasons offered by Defendants for Lofley's inclusion in the RIF. Plaintiffs have not produced any evidence that age was the "but for" cause of his termination, as required under *Gross*. Accordingly, Defendants are entitled to summary judgment on Lofley's disparate treatment claim in Count Four.

### Conclusion Regarding ADEA Plaintiffs' Claims

The ADEA Plaintiffs have failed to raise a genuine issue of material fact regarding their terminations during the 2004 RIF with respect to any disparate impact or disparate treatment by TDMN based upon age-protected status. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' ADEA claims.

### Plaintiffs' ERISA Claim

According to Plaintiffs, they have elected not to pursue their claims under ERISA which do not arise under Section 502 (29 U.S.C. § 1132). (Pls.' Resp. at 232.) Accordingly, Plaintiffs' only remaining claim under Count Two is for Defendants' alleged failure to timely respond to requests for plan documents under Section 502 of ERISA.

Plan participants have the right to request – and receive within 30 days of that request – summary plan descriptions pursuant to Section 502. *See* 29 U.S.C. §1132(c)(1)(B). To provide incentive to administrators to comply with requests for information, Section 502 requires that

administrators furnish requested summary plan descriptions within 30 days of the request or face personal liability for penalties. *Id.*

Plaintiffs contend that they failed to timely receive two sets of documents upon request, May 2004 Summary Plan Descriptions ("SPDs") for both Plans, and June 1, 2005 SPDs for both Plans. (*Id.* at 228.) Defendants respond that Plaintiffs' argument is premised on the assumption that they actually requested SPDs for the Pension Plan and Savings Plan. However, according to Defendants, Plaintiffs made only a single request for an SPD on January 27, 2005, when their attorney, Karen Shropshire ("Shropshire"), requested "summaries of plans under whose terms [Hubbard] was or is entitled to benefits . . . ." (Defs.' Br. at 67-68.) Shropshire stated that she was making a request "on behalf of Plaintiff Hubbard," thus expressly limiting the request to plans under which Hubbard was entitled to benefits. (*Id.* at 67, 85.) Fourteen days later, on February 10, 2005, Belo's outside counsel responded to Shropshire's request by sending her the "latest" SPDs, as required by ERISA Section 104(b)(4), attaching both the "October 1, 2003 Belo Savings Plan SPD," and "the 2004 G.B. Dealey Retirement Pension Plan SPD." (*Id.* at 89-90.) Shropshire admits she received the October 2003 SPD, but claims Defendants failed to provide a "summary plan description containing the August 2004 plan amendment or other amendments made since October 2003." (Shropshire Decl. ¶ 2 at Pls.' App. 3119.)

The August 2004 amendments to the Pension and Savings Plan involved changes affecting only members of *The Providence Journal* Guild (a union) at a Belo subsidiary in Rhode Island. The amendments did not affect Hubbard or any employees at TDMN. (Defs.' Br. at 75-76.) Plaintiffs also referred to a purported amendment to the Savings Plan that included severance payments as covered compensation. (*Id.* at 72; Pls.' Resp. at 228.) However, Defendants conclusively

demonstrated that no such amendment existed. (Defs.' Br. at 72-74.) Moreover, Plaintiffs have abandoned their claims under ERISA Sections 102 and 104, in which they asserted the purported amendment existed, rendering this claim moot. (Pls.' Resp. at 232.)

The Court finds that the evidence shows that the August 2004 plan amendments had nothing to do with Hubbard or the other Plaintiffs, and there were no "other amendments made since October 2003." The Court further finds that the May 2004 SPDs, which Plaintiffs claim they did not receive in a timely manner, were written for and distributed to members of *The Providence Journal* Guild, with the intent of notifying these members about the August 1, 2004 amendments to the Plans, which affected only those members. (May 1, 2004 Belo Savings Plan Summary Plan Description for Journal-Guild Employees at Defs.' App. 2222-23; Carey Aff. ¶¶ 6-10 at Defs.' App. 2213.) The May 2004 SPDs only reflected changes affecting members of a Belo subsidiary in a different location, and were specifically written for employees in that location.

## Conclusion Regarding ERISA Claim

The Court finds that: (1) Plaintiffs were not entitled to copies of the May 2004 SPDs upon request (29 C.F.R. § 2520.102-4); and (2) Defendants complied with their duty under ERISA Section 104 to timely disclose the "latest" SPDs upon request by providing Shropshire and Hubbard with both the "October 1, 2003 Belo Savings Plan SPD," and "The 2004 G.B. Dealey Retirement Pension Plan SPD." Defendants are entitled to summary judgment on Plaintiffs' Claim under § 502 of ERISA.

## CONCLUSION

Defendants' Motion for Summary Judgment (doc. 241) is **GRANTED**. Plaintiffs' Motion for Leave to File Consolidated Supplemental Appendix in Support of Plaintiffs' Response to

Defendants' Objections to Plaintiffs' Declarations, filed December 10, 2010 (doc. 287) is **DENIED**.

Plaintiffs' Motion for Leave to File Consolidated Supplemental Appendix in Support of Plaintiffs' Response to Defendants' Objections to Mischaracterization of Summary Judgment Evidence, filed December 10, 2010 (doc. 285) is **DENIED**. Defendants' Motion to Strike Appendix in Support of Declaration of Michael A. Campion [doc.280], filed December 1, 2010 (doc. 283) is **GRANTED**.

**SO ORDERED**, March 28, 2011.


PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE